Matthew L. Schwartz
Eric J. Brenner
Katherine Zhang
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, New York 10001
(212) 446-2300

Marc Ayala
Andrew P. Steinmetz
Alexander J. Law
BOIES SCHILLER FLEXNER LLP
333 Main Street
Armonk, New York 10504
Tel.: (914) 749-8200

*Counsel for Plaintiffs*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>REVLON, INC., *et al.,*<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 22-10760 (DSJ)<br><br>(Jointly Administered) |
| AIMCO CLO 10 LTD, AIMCO CLO, SERIES 2017-A, AIMCO CLO, SERIES 2018-B, AIMCO CLO, SERIES 2015-A, AIMCO CLO, SERIES 2018-A, ALLSTATE INSURANCE COMPANY, ANTARA CAPITAL MASTER FUND LP, HALCYON LOAN ADVISORS FUNDING 2013-1 LTD, HALCYON LOAN ADVISORS FUNDING 2013-2 LTD, HALCYON LOAN ADVISORS FUNDING 2014-1 LTD, HALCYON LOAN ADVISORS FUNDING 2014-2 LTD, HALCYON LOAN ADVISORS FUNDING 2014-3 LTD, HALCYON LOAN ADVISORS FUNDING 2015-1 LTD, HALCYON LOAN ADVISORS FUNDING 2015-2 LTD, HALCYON LOAN ADVISORS FUNDING 2015-3 LTD, HALCYON LOAN ADVISORS FUNDING 2017-1 LTD, HALCYON LOAN ADVISORS FUNDING 2017-2 LTD, BENEFIT STREET PARTNERS CLO II LTD, BENEFIT STREET PARTNERS CLO III LTD, BENEFIT STREET PARTNERS CLO IV LTD, BENEFIT STREET | **ADVERSARY COMPLAINT** |

---

[1]     The last four digits of Debtor Revlon, Inc.'s tax identification number are 2955. Due to the large number of debtor entities in these Chapter 11 Cases, for which the Debtors have requested joint administration, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.ra.kroll.com/Revlon. The location of the Debtors' service address for purposes of these Chapter 11 Cases is: One New York Plaza, New York, NY 10004.

PARTNERS CLO IX LTD, BENEFIT STREET
PARTNERS CLO V LTD, BENEFIT STREET
PARTNERS CLO VI-B, LTD, BENEFIT STREET
PARTNERS CLO VII LTD, BENEFIT STREET
PARTNERS CLO VIII LTD, BENEFIT STREET
PARTNERS CLO X LTD, BENEFIT STREET
PARTNERS CLO XII LTD, ACIS CLO 2014-5 LTD,
BATTALION CLO IX LTD, BATTALION CLO VII
LTD, BATTALION CLO VIII LTD, BATTALION CLO
X LTD, BATTALION CLO XI LTD, BATTALION CLO
XII LTD, BATTALION CLO XIV LTD, BIG RIVER
GROUP FUND SPC LLC, BLUE FALCON LIMITED,
BRIGADE COLLECTIVE INVESTMENT TRUST -
BRIGADE DIVERSIFIED CREDIT CIT, BRIGADE
CREDIT FUND II LTD., BRIGADE DEBT FUNDING I,
LTD., BRIGADE DEBT FUNDING II, LTD., BRIGADE
DISTRESSED VALUE MASTER FUND LTD.,
BRIGADE OPPORTUNISTIC CREDIT LBG FUND
LTD., CITY OF PHOENIX EMPLOYEES'
RETIREMENT PLAN, DELTA MASTER TRUST, FCA
CANADA INC. ELECTED MASTER TRUST, FCA US
LLC MASTER RETIREMENT TRUST, FEDEX
CORPORATION EMPLOYEES' PENSION TRUST,
FUTURE DIRECTIONS CREDIT OPPORTUNITIES
FUND, ILLINOIS STATE BOARD OF INVESTMENT,
JPMORGAN CHASE RETIREMENT PLAN BRIGADE
BANK LOAN, JPMORGAN CHASE RETIREMENT
PLAN BRIGADE HY BOND, LOS ANGELES
COUNTY EMPLOYEES RETIREMENT
ASSOCIATION, MEDIOLANUM BEST BRANDS –
GLOBAL HIGH YIELD, SUBCHAPTER 2,
NORTHROP GRUMMAN PENSION MASTER TRUST
(ACCOUNT A - HY), PANTHER BCM, LLC - CLASS
A, SC CREDIT OPPORTUNITIES MANDATE, LLC,
SEI GLOBAL MASTER FUND PLC THE SEI HIGH
YIELD FIXED INCOME FUND, SEI INSTITUTIONAL
INVESTMENTS TRUST - HIGH YIELD BOND FUND,
SEI INSTITUTIONAL MANAGED TRUST - HIGH
YIELD BOND FUND, SEI INSTITUTIONAL
MANAGED TRUST - MULTI-STRATEGY
ALTERNATIVE FUND, THE COCA-COLA
COMPANY MASTER RETIREMENT TRUST, U.S.
HIGH YIELD BOND FUND, CASTLEKNIGHT
MASTER FUND LP, CORRE OPPORTUNITIES
QUALIFIED MASTER FUND LP, CORRE HORIZON
FUND, LP, CORRE HORIZON II FUND, LP,

ELLINGTON CLO II LTD, ELLINGTON CLO I LTD ,
ELLINGTON CLO III LTD, GREYWOLF CLO II LTD,
GREYWOLF CLO IV LTD (RE-ISSUE), GREYWOLF
CLO V LTD, ARCH INVESTMENT HOLDINGS IV
LTD, CARDINAL FUND LP, GIM CREDIT MASTER
LUX SARL (FKA) HPS GIM CREDIT MASTER LUX
SARL (FKA) HIGHBRIDGE GIM CREDIT MASTER
LUX SARL, HPS LOAN MANAGEMENT 10 2016
LTD, HPS LOAN MANAGEMENT 11 2017 LTD (FKA)
JORDY WAREHOUSE 2016 LTD, HPS LOAN
MANAGEMENT 2013 2 LTD (FKA) HIGHBRIDGE
LOAN MANAGEMENT 2013 2 LTD (FKA
LOMBARDI 2013 2 LLC), HPS LOAN
MANAGEMENT 3 2014 LTD (FKA) HIGHBRIDGE
LOAN MANAGEMENT 3 2014 LTD, HPS LOAN
MANAGEMENT 4 2014 LTD (FKA) HIGHBRIDGE
LOAN MANAGMENT 4 2014 LTD, HPS LOAN
MANAGEMENT 5 2015 LTD (FKA) HIGHBRIDGE
LOAN MANAGEMENT 5 2015 LTD, HPS LOAN
MANAGEMENT 6 2015 LTD (FKA) HIGHBRIDGE
LOAN MANAGEMENT 6 2015 LTD, HPS LOAN
MANAGEMENT 7 2015 LTD (FKA) HIGHBRIDGE
LOAN MANAGEMENT 7 2015 LTD, HPS LOAN
MANAGEMENT 8 2016 LTD (FKA) HIGHBRIDGE
LOAN MANAGEMENT 8 2016 LTD, HPS LOAN
MANAGEMENT 9 2016 LTD, INSTITUTIONAL
CREDIT FUND SUBSIDIARY LP (FKA) HPS
INSTITUTIONAL CREDIT FUND SUBSIDIARY LP,
LIQUID LOAN OPPORTUNITIES MASTER FUND LP
(FKA) HIGHBRIDGE LIQUID LOAN
OPPORTUNITIES MASTER FUND LP (HIGHBRIDGE
CAPITAL MANAGEMENT LLC), WATFORD ASSET
TRUST I, ZURICH AMERICAN LIFE INSURANCE
COMPANY - ZALICO VL SERIES ACCOUNT - 2,
ZURICH AMERICAN INSURANCE COMPANY,
LIVELLO CAPITAL SPECIAL OPPORTUNITIES
MASTER FUND LP, JMP CREDIT ADVISORS CLO III
R LTD (FKA) JMP CREDIT ADVISORS CLO III LTD,
JMP CREDIT ADVISORS CLO IV LTD, JMP CREDIT
ADVISORS CLO V LTD, VENTURE 28A CLO
LIMITED, VENTURE 31 CLO LIMITED, VENTURE
32 CLO LIMITED, VENTURE 33 CLO LIMITED,
VENTURE XII CLO LIMITED, VENTURE XIII CLO
LIMITED, VENTURE XIV CLO LMITED, VENTURE
XIX CLO LIMITED, VENTURE XV CLO LIMITED,
VENTURE XVI CLO LIMITED, VENTURE XVII CLO

LIMITED, VENTURE XVIII CLO LIMITED, VENTURE XX CLO LIMITED, VENTURE XXI CLO LIMITED, VENTURE XXII CLO LIMITED, VENTURE XXIII CLO LIMITED, VENTURE XXIX CLO LIMITED, VENTURE XXV CLO LIMITED, VENTURE XXX CLO LIMITED, NEW GENERATION LOAN FUND LIMITED PARTNERSHIP, NUVEEN ASSET MANAGEMENT, LLC ON BEHALF OF ALL ENTITIES UNDER ITS MANAGEMENT, NUVEEN ALTERNATIVE INVESTMENT FUNDS SICAV-SIF - NUVEEN US SENIOR LOAN FUND (FKA BAYCITY ALTERNATIVE INVESTMENT FUNDS SICAV-SIF - BAYCITY US SENIOR LOAN FUND), NUVEEN HIGH YIELD INCOME FUND, LP (FKA BAYCITY HIGH YIELD INCOME FUND, L.P.), NUVEEN LONG-SHORT CREDIT FUND, LP (AS SUCCESSOR IN INTEREST TO BAYCITY LONG-SHORT CREDIT MASTER FUND LTD.), NUVEEN SENIOR LOAN FUND, LP (AS SUCCESSOR IN INTEREST TO BAYCITY SENIOR LOAN MASTER FUND LTD.), CALIFORNIA STREET CLO IX LIMITED PARTNERSHIP, CALIFORNIA STREET CLO XII, LTD. (FKA SYMPHONY CLO XII LTD.), MUNICIPAL EMPLOYEES ANNUITY AND BENEFIT FUND OF CHICAGO, NUVEEN CREDIT STRATEGIES INCOME FUND (FKA NUVEEN MULTI STRATEGY INCOME AND GROWTH FUND 2-JQC), NUVEEN DIVERSIFIED DIVIDEND AND INCOME FUND, NUVEEN FLOATING RATE INCOME OPPORTUNITY FUND, NUVEEN FLOATING RATE INCOME FUND, NUVEEN SENIOR INCOME FUND, NUVEEN SHORT DURATION CREDIT OPPORTUNITIES FUND , NUVEEN FLOATING RATE INCOME FUND, NUVEEN HIGH YIELD INCOME FUND (FKA NUVEEN SYMPHONY CREDIT OPPORTUNITIES FUND), PENSIONDANMARK PENSIONSFORSIKRINGSAKTIESELSKAB, PRINCIPAL DIVERSIFIED REAL ASSET CIT (FKA DIVERSIFIED REAL ASSET CIT), PRINCIPAL DIVERSIFIED REAL ASSET FUND, SCOF 2, LTD., SYMPHONY CLO XIV, LTD., SYMPHONY CLO XV, LTD., SYMPHONY CLO XVI, LTD. (FKA SYMPHONY XVI FUNDING LLC), SYMPHONY CLO XVII, LTD., SYMPHONY CLO XVIII, LTD., SYMPHONY FLOATING RATE SENIOR LOAN

FUND, TCI-SYMPHONY CLO 2016-1, LTD., TCI-SYMPHONY CLO 2017-1, LTD., ZAIS CLO 1 LIMITED, ZAIS CLO 11 LIMITED, ZAIS CLO 2 LIMITED, ZAIS CLO 5 LIMITED, ZAIS CLO 6 LIMITED, ZAIS CLO 7 LIMITED, ZAIS CLO 8 LIMITED, ZAIS CLO 9 LIMITED, ZAIS CLO 13 LIMITED,  CEDAR FUNDING II CLO LTD, CEDAR FUNDING IV CLO LTD, CEDAR FUNDING V CLO LTD, CEDAR FUNDING VI CLO LTD, and CEDAR FUNDING VIII CLO LTD,

                    Plaintiffs,


        v.


REVLON, INC., REVLON CONSUMER PRODUCTS CO., BEAUTYGE I, BEAUTYGE II, LLC, BRANDCO ALMAY 2020 LLC, BRANDCO CHARLIE 2020 LLC, BRANDCO CND 2020 LLC, BRANDCO CURVE 2020 LLC, BRANDCO ELIZABETH ARDEN 2020 LLC, BRANDCO GIORGIO BEVERLY HILLS 2020 LLC, BRANDCO HALSTON 2020 LLC, BRANDCO JEAN NATE 200 LLC, BRANDCO MITCHUM 2020 LLC, BRANDCO MULTICULTURAL GROUP 2020 LLC, BRANDCO PS 2020 LLC, BRANDCO WHITE SHOULDERS 2020 LLC, JEFFERIES FINANCE LLC, JEFFERIES LLC, ARES CORPORATE OPPORTUNITIES FUND V LP, ASOF HOLDINGS II LP, ASSF IV AIV B HOLDINGS III LP, ANGELO, GORDON & CO LP, CYRUS CAPITAL PARTNERS LP, DEUSTCHE BANK AG CAYMAN ISLANDS BRANCH, DIAMETER CAPITAL PARTNERS LP, GLENDON CAPITAL MANAGEMENT LP, KING STREET CAPITAL MANAGEMENT, LP, NUT TREE CAPITAL MANAGEMENT LP, OAK HILL ADVISORS LP & 140 SUMMER PARTNERS MASTER FUND LP, and JOHN DOE LENDERS 1-100, fictitiously named parties, true names being unknown,

                    Defendants.

# TABLE OF CONTENTS

NATURE OF THE ACTION ................................................................................................. 1

THE PARTIES...................................................................................................................... 11

JURISDICTION AND VENUE ........................................................................................... 30

STATEMENT OF FACTS ................................................................................................... 31

I.      The 2016 Credit Agreement.................................................................... 31

II.     The 2019 Term Loan Agreement and the Resulting Event of Default ............... 33

III.    In 2020, RCPC Puts in Motion its Scheme to Issue New Debt Facilities but the Majority of the 2016 Term Lenders Object ............................................. 38

IV.     In 2020, RCPC Issues the Sham Revolver in Breach of the 2016 Credit Agreement and Solely to Manipulate Voting on Amendments to that Agreement ......................................................................................................... 42

V.      Revlon and the Conspiring Lenders Breach the 2016 Credit Agreement by Implementing the 2020 Amendment without Consent from the Majority Facility Lenders ................................................................................................ 50

        A.      The Economic Terms of the 2020 Amendment Adversely Affected the 2016 Term Lenders Relative to the Sham Revolver Holders ............ 51

        B.      The Purported Waiver of Events of Default in the 2020 Amendment Adversely Affected the 2016 Term Lenders Relative to the Sham Revolver Holders ................................................................. 53

VI.     Based on the Invalid 2020 Amendment, Defendants Complete the 2020 Transaction....................................................................................................... 54

        A.      Citibank Purports to Release the Liens on the BrandCo IP, RCPC Transfers the BrandCo IP to the BrandCo Entities, and RCPC Leases Its Back ......................................................................................... 55

        B.      RCPC Issues the New Loan Facilities and Imposes the 2020 Pari Passu Lien and Intercreditor Agreement................................................. 56

        C.      Conditions Precedent to Closing the 2020 BrandCo Credit Agreement Were Never Satisfied ........................................................... 59

        D.      The 2020 Transaction Destroyed the Value of the 2016 Term Loans........................................................................................................ 60

VII.    Citibank Refuses to Resign as Administrative Agent and Collateral Agent for the 2016 Credit Agreement and Continues to Act on Its Conflicts of Interest............................................................................................................... 61

VIII.    The Chapter 11 Cases ............................................................................................ 65

FIRST CAUSE OF ACTION ............................................................................................ 67

SECOND CAUSE OF ACTION ........................................................................................ 69

THIRD CAUSE OF ACTION ............................................................................................ 71

FOURTH CAUSE OF ACTION ........................................................................................ 74

FIFTH CAUSE OF ACTION ............................................................................................. 76

SIXTH CAUSE OF ACTION ............................................................................................ 78

SEVENTH CAUSE OF ACTION ...................................................................................... 80

EIGHTH CAUSE OF ACTION ......................................................................................... 82

NINTH CAUSE OF ACTION ........................................................................................... 83

TENTH CAUSE OF ACTION ........................................................................................... 85

ELEVENTH CAUSE OF ACTION ................................................................................... 86

TWELFTH CAUSE OF ACTION ..................................................................................... 87

THIRTEENTH CAUSE OF ACTION ............................................................................... 88

FOURTEENTH CAUSE OF ACTION .............................................................................. 89

FIFTEENTH CAUSE OF ACTION ................................................................................... 92

SIXTEENTH CAUSE OF ACTION .................................................................................. 93

SEVENTEENTH CAUSE OF ACTION ............................................................................ 94

RESERVATION OF RIGHTS ........................................................................................... 97

PRAYER FOR RELIEF .................................................................................................... 97

Plaintiffs in the above-captioned proceeding ("Plaintiffs"), by and through their undersigned counsel, hereby bring this Adversary Proceeding Complaint against the above-captioned Defendants. Plaintiffs allege on personal knowledge as to their own acts and deeds, and otherwise on information and belief, as follows:

## NATURE OF THE ACTION[2]

1.      This Adversary Proceeding seeks to avert the severe and irreparable harms that Plaintiffs are poised to suffer due to a concerted scheme orchestrated by debtor Revlon Consumer Products Corporation ("RCPC"), its affiliates, and a series of accomplice investment funds and financial institutions to improperly manipulate Revlon's capital structure and strip hundreds of millions of dollars of collateral that should be available to secure Plaintiffs' claims in these bankruptcy cases. Plaintiffs are by all rights first-priority lienholders on that collateral—which includes a variety of Revlon's valuable intellectual property assets for some of the most recognizable brands in the world—and this lawsuit asks the Court to confirm that fact. If allowed to stand, Defendants' unlawful practice would reward Revlon and the other Defendants for wrongfully circumventing existing credit agreements to the detriment of good-faith lenders like Plaintiffs.

2.      In particular, in breach of their contractual and common law duties, Defendants perpetrated a series of transactions to (i) divest Plaintiffs of their first-priority liens on highly valuable assets they bargained for as security to support a nearly $2 billion loan to RCPC; (ii) collateralize a new $880 million loan to RCPC with first-priority liens *on those very same assets* in favor of the BrandCo Lenders who, as a result, claim they have displaced Plaintiffs as

---

[2] Capitalized terms not defined in the Nature of the Action section shall have the meanings ascribed to them elsewhere in this Adversary Proceeding Complaint.

first-priority lienholders on those assets; and (iii) enrich RCPC with cash (and now debt).  Now, absent judicial intervention, the BrandCo Lenders are poised to reap the fruits of Defendants' scheme by wrongfully seeking to recover in these bankruptcy proceedings as first-priority lien holders on collateral in which they have no valid interest and on debt that RCPC had no valid basis to issue.

3.      The stakes could not be higher:  if Defendants' scheme is not declared void, prospective debtors, acting in concert with ends-oriented creditors, will be emboldened to circumvent legal obligations protecting collateral in existing credit agreements, manipulate their capital structure, and thereby unlawfully prejudice good faith lenders just as Defendants are attempting to do here.

4.      Plaintiffs hold interests in more than 50% of the term loans outstanding under a Term Credit Agreement, which RCPC entered into in the fall of 2016 (the "2016 Credit Agreement") to fund its acquisition of a leading global beauty company, Elizabeth Arden Inc. ("Elizabeth Arden").  The 2016 Credit Agreement included both (i) a secured $1.8 billion term loan facility (the "2016 Term Loan Facility"); and (ii) provisions for the issuance of supplemental revolver loans to fund RCPC's business operations.

5.      The key component of the 2016 Credit Agreement, which made the entire lending arrangement possible, was the first-priority liens on highly valuable collateral that secured the term loans.  An important piece of that collateral was Revlon's intellectual property assets, including its trademarks and other rights associated with many of the best known, well-established beauty brands in the world.  The value attributed to those household brand names—including Elizabeth Arden itself—was and remains very material relative to the value of the entire Revlon enterprise, and the lenders under the 2016 Term Loan Facility (the "2016 Term Lenders"), like Plaintiffs,

premised their investments on the quality of, and their access to, that valuable collateral.  The 2016 Credit Agreement, accordingly, prohibited RCPC from stripping the 2016 Term Lenders of their critical first-priority liens over much of Revlon's key collateral without first obtaining valid consents.

6.      In 2019 and 2020, however, RCPC undertook two transactions to improperly evade these prohibitions on asset-stripping.  First, in August 2019, RCPC borrowed an additional $200 million from Ares Corporate Opportunities Fund V, L.P., ASOF Holdings II, L.P., and ASSF IV AIV B Holdings III, L.P. (collectively, "Ares") pursuant to a new credit agreement (the "2019 Credit Agreement").  As a necessary precondition of Ares' decision to lend, RCPC siphoned off a portion of the collateral securing the 2016 Term Loan Facility and pledged it instead as collateral to Ares under the 2019 Credit Agreement (the "2019 Transaction").

7.      RCPC did this by transferring intellectual property associated with its valuable American Crew brand (the "American Crew IP")—the top men's grooming brand in the country—to a new subsidiary where that intellectual property purportedly was no longer collateral for the 2016 Credit Agreement.  Allegedly free from those restrictions, RCPC's new subsidiary then provided Ares with a first-priority lien on the American Crew IP.  The new subsidiary then leased back to RCPC the right to use the American Crew IP, which continued its sale and marketing of American Crew products without any change.  RCPC undertook this transaction in breach of Section 7.10 of the 2016 Credit Agreement, which bars such sale-leaseback transactions, giving rise to an Event of Default.

8.      The second transaction followed in May 2020 (the "2020 Transaction").  By then, Revlon was facing the prospect of insolvency—its quarterly operating and net losses were substantial, its quarterly net sales and adjusted EBITDA were in steep decline, and the trading

3

prices on RCPC's debt plummeted, falling to 40 cents on the dollar for the 2016 Term Loan debt by May 7, 2020.

9.      As a result, Revlon set in motion a bigger, bolder, and more egregious scheme than the 2019 Transaction, structured to further divest Plaintiffs of their first-priority liens on the collateral that had been pledged under the 2016 Credit Agreement. Working in close coordination with a favored minority group of the 2016 Term Lenders that also planned to participate in the 2020 Transaction (the "Conspiring Lenders"), RCPC devised a multi-part transaction that purported to strip away *most of* the remaining intellectual property collateral securing the 2016 Credit Agreement so that it could secure $880 million in *additional* new debt borrowed from those same Conspiring Lenders, among others. Most importantly, the collateral pledged away as part of this 2020 Transaction included the highly valuable intellectual property assets that were material to the 2016 Credit Agreement, including the trademarks and other rights associated with Elizabeth Arden, Almay, Mitchum, CND, crème of Nature, Lottabody, Roux, Fancifull, Curve, Charlie, and several other brands (together with the American Crew IP, the "BrandCo IP").

10.     In 2020, the Conspiring Lenders were keenly aware that RCPC faced the prospect of insolvency and their 2016 loans were underwater. They participated in the 2020 Transaction because it carried the promise of converting their underwater loans into fully secured, senior loans with much higher value. And in the event RCPC eventually declared bankruptcy, they would be better positioned with purportedly first-priority, undiluted access to the valuable BrandCo IP collateral. In other words, the 2020 Transaction positioned the Conspiring Lenders to try to take a deteriorating investment and convert it into an unlawful windfall *in these very bankruptcy cases*. The scheme unfolded in five parts:

4

11.    *First*, RCPC and the Conspiring Lenders devised a plan to try to circumvent the 2016 Term Lenders' consent rights in bad faith.  Both RCPC and the Conspiring Lenders knew that transferring the BrandCo IP—and divesting the other 2016 Term Lenders of their interest in it—was prohibited under the 2016 Credit Agreement absent amendments.  Such amendments required—at a minimum—the consent of the Lenders holding a majority of RCPC's outstanding 2016 Term Loan debt.  But the Conspiring Lenders held only a minority of that debt—they could not consent to an amendment on their own.  And they faced united opposition from a group of more than 50% of the 2016 Term Lenders, who entered into a joint cooperation agreement and made clear they would oppose Defendants' proposed amendments (the "Co-Op Lenders").

12.    Undeterred, RCPC and the Conspiring Lenders tried to devise an end-run around the 2016 Credit Agreement's consent requirements:  RCPC—with Citibank's assistance (as Administrative and Collateral Agent)—would issue new, unfunded revolver commitments (not real loans, just illusory commitments) under the 2016 Credit Agreement to the Conspiring Lenders.  RCPC and the Conspiring Lenders then claimed that these new "commitments" would increase the Conspiring Lenders' voting rights such that they would have a voting majority.  And, reflecting its intent to manipulate lender voting, RCPC planned to obtain the exact amount of commitments necessary to purportedly inch over a 50.0% consent threshold.

13.    The 2016 Term Lenders immediately challenged RCPC's issuance of the revolver commitments, identifying them as a sham mechanism designed to facilitate asset stripping despite objections from the majority of actual secured lenders.  RCPC responded by tweaking its plan (in form, but not in substance):  it announced that loans under the new revolver commitments would now be drawn down, in a transparent effort to create *the appearance* of a valid business purpose.  But the sham remained.

14.     Indeed, no rational lender would have lent new *bona fide* money to RCPC under the 2016 Credit Agreement—the 2016 Term Loans were trading at around 43 cents on the dollar and were certain to move much lower if the transaction went through.  And, in fact, no lender did.  Rather, Revlon and the Conspiring Lenders arranged for these new revolver "loans" to be replaced by the soon-to-be-issued loans under the new BrandCo debt facilities, all secured by the BrandCo IP.  In fact, *exactly fifteen days after they were issued*, the Sham Revolver commitments disappeared.  These revolver "loans" served no legitimate business purpose; rather, their sole purpose was to manipulate consent thresholds and disenfranchise the majority 2016 Term Lenders so that Defendants could consummate their scheme to divest the 2016 Term Lenders of their first-priority liens on the BrandCo IP.

15.     The issuance of the Sham Revolver violated the 2016 Credit Agreement in multiple ways.  Section 2.25 of the Credit Agreement, for example, prohibited RCPC from issuing the Sham Revolver Commitments where there was an Event of Default.  Because the 2019 Transaction had triggered an uncured Event of Default, RCPC was therefore barred from issuing the Sham Revolver.  Issuing the Sham Revolver also constituted a flagrant breach of the implied covenant of good faith and fair dealing, since it was intended solely to deprive Plaintiffs of the benefit of their bargain under the 2016 Credit Agreement by eviscerating their consent rights and divesting them of their first-priority liens on the BrandCo IP.

16.     *Second*, after rigging the vote through the Sham Revolver, RCPC and the Conspiring Lenders unlawfully crafted and implemented amendments to the 2016 Credit Agreement that purportedly would transform the 2020 Transaction from an impermissible transaction into a permissible one (the "2020 Amendment").  These amendments purported to (i) authorize the release of the BrandCo IP as collateral; (ii) waive any then-existing Defaults or

Events of Default under the 2016 Credit Agreement that would otherwise exist as a result of the American Crew transaction or the contemplated 2020 Transaction; and (iii) direct Citibank, N.A. ("Citibank," "Agent" "Administrative Agent,") (as Administrative Agent) to undertake the acts necessary to strip the 2016 Term Lenders of their security interests in the BrandCo IP and implement the 2020 Transaction.

17.     The terms of the 2020 Amendment underscore RCPC's and the Conspiring Lenders' bad faith—they *knew* that they could not undertake the 2020 Transaction in the face of the 2016 Credit Agreement's plain language, so they crafted the amendments they needed and exploited the Sham Revolver to implement them against the will of the majority of 2016 Term Loan Lenders.

18.     Defendants, moreover, were so desperate to manufacture *some* basis—*any* basis—to adopt the 2020 Amendment that they ignored the Credit Agreement's requirements that where, as here, an amendment adversely affects the holders of one debt facility (e.g., the 2016 Term Loan Facility) under the 2016 Credit Agreement as opposed to another (e.g., the Sham Revolver), the majority holders *of the adversely affected facility* (the "Majority Facility Holders") must consent to the amendment.  Knowing that obtaining those consents would be impossible, Defendants instead claimed that a simple majority vote of the Lenders was required and that they had manufactured a majority through the Sham Revolver.  In short, Defendants purported to amend the 2016 Credit Agreement without the necessary votes or consents to do so.  These purported "amendments" plainly have no force and effect.  Nevertheless, Defendants simply rammed the 2020 Amendment through, acting as if—through sheer force of will—they could do what the 2016 Credit Agreement plainly prohibits them from doing.

7

19.    *Third*, after disenfranchising the majority 2016 Term Lenders and in reliance on the 2020 Amendment they had forced through, RCPC and the Conspiring Lenders coordinated with Citibank to effectuate what they referred to as a "pre-DIP DIP" that would manipulate Revlon's capital structure, enrich RCPC and the Conspiring Lenders, and irreparably harm the remaining 2016 Term Lenders.  Indeed, RCPC issued three new facilities, which purportedly resulted in the BrandCo Lenders exclusively holding liens on the BrandCo IP while Plaintiffs were divested of their bargained-for first-priority liens.  In particular:  (i) RCPC issued $880 million in new debt purportedly secured with a first-priority lien on the released and transferred BrandCo IP ("2020 New Money Facility"), a portion of which RCPC used at closing to retire the $200 million term loan issued to Ares under the 2019 Credit Agreement; and (ii) to entice Ares and the Conspiring Lenders to participate in the unlawful 2020 Transaction, RCPC purported to "roll-up" approximately $953 million of 2016 Term Loan Facility into "new" loan facilities with second and third liens in the BrandCo IP (the "2020 Roll-Up Facility" and "2020 Junior Roll-Up Facility," respectively, and, with the 2020 New Money Facility, the "2020 Facilities").  RCPC's issuance of the 2020 Facilities left Plaintiffs without *any* security interest in the BrandCo IP and massively diluted the value of Plaintiffs' debt under the 2016 Term Loan Facility.  Not content with the damage already done, RCPC, the Conspiring Lenders, and Jefferies, working with Citibank, had the audacity to also grant a massive pari passu lien to the 2020 Facility Lenders on all of the collateral remaining to secure the 2016 Credit Agreement after the theft of the BrandCo IP (the "Pari Passu Lien").

20.    *Fourth,* after trampling the rights of the 2016 Term Lenders and making a mockery of the 2016 Credit Agreement, RCPC conspired with Citibank and Jefferies to try to wash its hands of its brazen misconduct by manufacturing a pre-emptive self-pardon.  As mentioned above,

8

through the 2020 Amendment, RCPC and Citibank purported to waive, on behalf of the 2016 Term Lenders, *any* default or Event of Default that would result from RCPC or its subsidiaries undertaking the 2020 Transaction. Then, in an effort to further hamstring Plaintiffs, RCPC, Citibank (in its capacity as Administrative Agent under the 2016 Credit Agreement), and Jefferies (in its purported capacity as Administrative Agent under the 2020 BrandCo Credit Agreement), entered into an intercreditor agreement that purports to restrict the 2016 Term Lenders' ability to enforce their rights (the "2020 Pari Passu Intercreditor Agreement").

21.     *Last*, having transferred away the BrandCo IP and using it to secure the new 2020 Facilities instead of the 2016 Term Loan Facility, RCPC and the BrandCo Entities entered into additional agreements whereby the BrandCo Entities leased the BrandCo IP back to RCPC so it could continue using it as though the 2020 Transaction had never happened. Like the sale-leaseback agreement included in the 2019 Transaction, this sale-leaseback agreement also constituted a breach of Section 7.10 of the 2016 Credit Agreement and a further Event of Default thereunder.

22.     All told, RCPC, the Conspiring Lenders, the BrandCo Lenders, Jefferies, and the BrandCo Entities perpetrated a scheme to re-order Revlon's capital structure and divest Plaintiffs of their first-priority lien interests in the BrandCo IP even though:

- The transfer of the American Crew IP in 2019, for the benefit of Ares, was an Event of Default under the 2016 Credit Agreement;

- The 2016 Lenders provided notice to RCPC of that existing Event of Default;

- The Co-Op Lenders put RCPC on notice that they would not consent to the 2020 Transaction;

- Despite being prohibited from issuing the Sham Revolver, RCPC—with the assistance of the Conspiring Lenders—issued it anyway solely to rig the voting and

disenfranchise the majority 2016 Term Lenders of their contractual right to reject the 2020 Amendment that would divest them of their security on their loans;

- The 2020 Amendment was invalidly approved by a "majority" of lenders only by including the votes of the Sham Revolver lenders who were not entitled to vote and who had no actual economic interest under the 2016 Credit Agreement that they were voting to amend;

- The 2020 Amendment, in all events, required consent from *the majority of the 2016 Term Lenders* (not including the lenders under the Sham Revolver), and thus was invalidly adopted notwithstanding the vote of the Sham Revolver lenders; and

- The 2020 Transaction, like the 2019 Transaction, incorporated a sale-leaseback that plainly violated the 2016 Credit Agreement's prohibition of such transactions.

23.     On these facts—which the BrandCo Lenders incredibly described in Court as "a vanilla fact pattern"—RCPC and the other Defendants have up-ended Revlon's capital structure to potentially devastating and irreparable effect through flagrant breaches of their contractual and common law obligations.  Unless the constituent parts of the 2020 Transaction—including the 2020 Amendment—are declared void *ab initio*, their scheme will have its intended inequitable consequence: the 2016 Term Lenders—the only parties who respected their legal obligations—unlawfully will be deprived in these bankruptcy cases of their rightful first-lien priority position on the BrandCo IP.  In short, Defendants cannot be rewarded for carrying out their unconscionable acts and disregarding their legal obligations—likewise, market participants cannot be encouraged to repeat Defendants' playbook.

24.     There is no reasonable dispute, moreover, that the invalidity of the 2020 Transaction lies at the heart of these bankruptcy cases.  The value of the BrandCo IP is high relative to Debtors' outstanding debt.  The invalidity of the liens resulting from the 2020 Transaction therefore has substantial implications for numerous stakeholders in these cases.  As counsel for the Debtors said with respect to the 2020 Transaction:  "if this is going to become a dispute, it should be raised and addressed immediately."

10

25. Through this Adversary Proceeding, Plaintiffs thus invoke this Court's jurisdiction to unwind the 2020 Transaction so that its drastic, inequitable consequences can be averted before it is too late and these bankruptcy cases can be resolved based on a proper recognition of the creditors' respective rights. Plaintiffs respectfully submit that the Court should grant the equitable relief sought here, including by declaring each component of the 2020 Transaction void *ab initio*, thus confirming Plaintiffs' exclusive first-priority liens on all of the BrandCo IP, giving them the benefit of their bargain when they agreed to loan money to RCPC under the 2016 Credit Agreement.

## **THE PARTIES**

26. Plaintiff AIMCO CLO 10 Ltd is an entity organized under the laws of the Cayman Islands with its principal place of business in the Cayman Islands.

27. Plaintiff AIMCO CLO, Series 2017-A is an entity organized under the laws of the Cayman Islands with its principal place of business in the Cayman Islands.

28. Plaintiff AIMCO CLO, Series 2018-B is an entity organized under the laws of the Cayman Islands with its principal place of business in the Cayman Islands.

29. Plaintiff AIMCO CLO, Series 2015-A is an entity organized under the laws of the Cayman Islands with its principal place of business in the Cayman Islands.

30. Plaintiff AIMCO CLO, Series 2018-A is an entity organized under the laws of the Cayman Islands with its principal place of business in the Cayman Islands.

31. Plaintiff Allstate Insurance Company is an entity organized under the laws of Illinois with its principal place of business in Northbrook, Illinois

32. Plaintiff Antara Capital Master Fund LP is an entity organized under the laws of the Cayman Islands with a principal place of business in New York, New York.

11

33.     Plaintiff Halcyon Loan Advisors Funding 2013-1 LTD is an entity organized under the laws of the Cayman Islands with its principal place of business in New York.

34.     Plaintiff Halcyon Loan Advisors Funding 2013-2 LTD is an entity organized under the laws of the Cayman Islands with its principal place of business in New York.

35.     Plaintiff Halcyon Loan Advisors Funding 2014-1 LTD is an entity organized under the laws of the Cayman Islands with its principal place of business in New York.

36.     Plaintiff Halcyon Loan Advisors Funding 2014-2 LTD is an entity organized under the laws of the Cayman Islands with its principal place of business in New York.

37.     Plaintiff Halcyon Loan Advisors Funding 2014-3 LTD is an entity organized under the laws of the Cayman Islands with its principal place of business in New York.

38.     Plaintiff Halcyon Loan Advisors Funding 2015-1 LTD is an entity organized under the laws of the Cayman Islands with its principal place of business in New York.

39.     Plaintiff Halcyon Loan Advisors Funding 2015-2 LTD is an entity organized under the laws of the Cayman Islands with its principal place of business in New York.

40.     Plaintiff Halcyon Loan Advisors Funding 2015-3 LTD is an entity organized under the laws of the Cayman Islands with its principal place of business in New York.

41.     Plaintiff Halcyon Loan Advisors Funding 2017-1 LTD is an entity organized under the laws of the Cayman Islands with its principal place of business in New York.

42.     Plaintiff Halcyon Loan Advisors Funding 2017-2 LTD is an entity organized under the laws of the Cayman Islands with its principal place of business in New York.

43.     Plaintiff Benefit Street Partners CLO II LTD is an entity organized under the laws of the Cayman Islands with its principal place of business in the Cayman Islands.

12

44.     Plaintiff Benefit Street Partners CLO III LTD is an entity organized under the laws of the Cayman Islands with its principal place of business in the Cayman Islands.

45.     Plaintiff Benefit Street Partners CLO IV LTD is an entity organized under the laws of the Cayman Islands with its principal place of business in the Cayman Islands.

46.     Plaintiff Benefit Street Partners CLO IX LTD is an entity organized under the laws of the Cayman Islands with its principal place of business in the Cayman Islands.

47.     Plaintiff Benefit Street Partners CLO V LTD is an entity organized under the laws of the Cayman Islands with its principal place of business in the Cayman Islands.

48.     Plaintiff Benefit Street Partners CLO VI-B, LTD is an entity organized under the laws of the Cayman Islands with its principal place of business in the Cayman Islands.

49.     Plaintiff Benefit Street Partners CLO VII LTD is an entity organized under the laws of the Cayman Islands with its principal place of business in the Cayman Islands.

50.     Plaintiff Benefit Street Partners CLO VIII LTD is an entity organized under the laws of the Cayman Islands with its principal place of business in the Cayman Islands.

51.     Plaintiff Benefit Street Partners CLO X LTD is an entity organized under the laws of the Cayman Islands with its principal place of business in the Cayman Islands.

52.     Plaintiff Benefit Street Partners CLO XII LTD is an entity organized under the laws of the Cayman Islands with its principal place of business in the Cayman Islands.

53.     Plaintiff ACIS CLO 2014-5 Ltd is an entity organized under the laws of the Cayman Islands with its principal place of business in New York.

54.     Plaintiff Battalion CLO IX Ltd is an entity organized under the laws of the Cayman Islands with its principal place of business in New York.

13

55.     Plaintiff Battalion CLO VII Ltd is an entity organized under the laws of the Cayman Islands with its principal place of business in New York.

56.     Plaintiff Battalion CLO VIII Ltd is an entity organized under the laws of the Cayman Islands with its principal place of business in New York.

57.     Plaintiff Battalion CLO X Ltd is an entity organized under the laws of the Cayman Islands with its principal place of business in New York.

58.     Plaintiff Battalion CLO XI Ltd is an entity organized under the laws of the Cayman Islands with its principal place of business in New York.

59.     Plaintiff Battalion CLO XII Ltd is an entity organized under the laws of the Cayman Islands with its principal place of business in New York.

60.     Plaintiff Battalion CLO XIV Ltd is an entity organized under the laws of the Cayman Islands with its principal place of business in New York.

61.     Plaintiff Big River Group Fund SPC LLC is an entity organized under the laws of Bermuda with its principal place of business in New York.

62.     Plaintiff Blue Falcon Limited is an entity organized under the laws of Cayman Islands with its principal place of business in New York.

63.     Plaintiff Brigade Collective Investment Trust – Brigade Diversified Credit CIT is an entity organized under the laws of Pennsylvania with its principal place of business in New York.

64.     Plaintiff Brigade Credit Fund II Ltd. is an entity organized under the laws of the Cayman Islands with its principal place of business in New York.

65.     Plaintiff Brigade Debt Funding I, Ltd. is an entity organized under the laws of the Cayman Islands with its principal place of business in New York.

14

66.     Plaintiff Brigade Debt Funding II, Ltd. is an entity organized under the laws of the Cayman Islands with its principal place of business in New York.

67.     Plaintiff Brigade Distressed Value Master Fund Ltd. is an entity organized under the laws of the Cayman Islands with its principal place of business in New York.

68.     Plaintiff Brigade Opportunistic Credit LBG Fund Ltd. is an entity organized under the laws of the Cayman Islands with its principal place of business in New York.

69.     Plaintiff City of Phoenix Employees' Retirement Plan is an entity organized under the laws of Arizona with its principal place of business in New York.

70.     Plaintiff Delta Master Trust is an entity organized under the laws of Georgia with its principal place of business in New York.

71.     Plaintiff FCA Canada Inc. Elected Master Trust is an entity organized under the laws of Canada with its principal place of business in New York.

72.     Plaintiff FCA US LLC Master Retirement Trust is an entity organized under the laws of Michigan with its principal place of business in New York.

73.     Plaintiff FedEx Corporation Employees' Pension Trust is an entity organized under the laws of Tennessee with its principal place of business in New York.

74.     Plaintiff Future Directions Credit Opportunities Fund is an entity organized under the laws of Australia with its principal place of business in New York.

75.     Plaintiff Illinois State Board of Investment is an entity organized under the laws of Illinois with its principal place of business in New York.

76.     Plaintiff JP Morgan Chase Retirement Plan Brigade Bank Loan is an entity organized under the laws of New York with its principal place of business in New York.

77.     Plaintiff JP Morgan Chase Retirement Plan Brigade HY Bond is an entity organized under the laws of New York with its principal place of business in New York.

78.     Plaintiff Los Angeles County Employees Retirement Association is an entity organized under the laws of California with its principal place of business in New York.

79.     Plaintiff Mediolanum Best Brands – Global High Yield is an entity organized under the laws of Ireland with its principal place of business in New York.

80.     Plaintiff Northrop Grumman Pension Master Trust (Account A – HY) is an entity organized under the laws of Massachusetts with its principal place of business in New York.

81.     Plaintiff Panther BCM, LLC – Class A is an entity organized under the laws of New York with its principal place of business in New York.

82.     Plaintiff SC Credit Opportunities Mandate, LLC is an entity organized under the laws of New York with its principal place of business in New York.

83.     Plaintiff SEI Global Master Fund plc the SEI High Yield Fixed Income Fund is an entity organized under the laws Ireland with its principal place of business in New York.

84.     Plaintiff SEI Institutional Investments Trust - High Yield Bond Fund is an entity organized under the laws of Pennsylvania with its principal place of business in New York.

85.     Plaintiff SEI Institutional Managed Trust - High Yield Bond Fund is an entity organized under the laws of Pennsylvania with its principal place of business in New York.

86.     Plaintiff SEI Institutional Managed Trust - Multi-Strategy Alternative Fund is an entity organized under the laws of Pennsylvania with its principal place of business in New York.

87.     Plaintiff The Coca-Cola Company Master Retirement Trust is an entity organized under the laws of Georgia with its principal place of business in New York.

88.     Plaintiff U.S. High Yield Bond Fund is an entity organized under the laws of Canada with its principal place of business in New York.

89.     Plaintiff CastleKnight Master Fund LP is an entity organized under the laws of the Cayman Islands with its principal place of business in New York.

90.     Plaintiff Corre Opportunities Qualified Master Fund LP is an entity organized under the laws of the Cayman Islands with its principal place of business in New York.

91.     Plaintiff Corre Horizon Fund, LP is an entity organized under the laws of the Cayman Islands with its principal place of business in New York.

92.     Plaintiff Corre Horizon II Fund, LP is an entity organized under the laws of the Cayman Islands with its principal place of business in New York.

93.     Plaintiff Ellington CLO II LTD is an entity organized under the laws of the Cayman Islands with its principal place of business in New York.

94.     Plaintiff Ellington CLO I LTD is an entity organized under the laws of the Cayman Islands with its principal place of business in New York.

95.     Plaintiff Ellington CLO III LTD is an entity organized under the laws of the Cayman Islands with its principal place of business in New York.

96.     Plaintiff Greywolf CLO II LTD is an entity organized under the laws of the Cayman Islands with its principal place of business in New York.

97.     Plaintiff Greywolf CLO IV LTD (Re-issue) is an entity organized under the laws of the Cayman Islands with its principal place of business in New York.

98.     Plaintiff Greywolf CLO V LTD is an entity organized under the laws of the Cayman Islands with its principal place of business in New York.

17

99.    Plaintiff Arch Investment Holdings IV LTD is an entity organized under the laws of Bermuda with its principal place of business in Bermuda.

100.    Plaintiff Cardinal Fund LP is an entity organized under the laws of Delaware with its principal place of business in New York.

101.    Plaintiff GIM Credit Master Lux Sarl (fka) HPS GIM Credit Master Lux Sarl (FKA) Highbridge GIM Credit Master Lux Sarl is an entity organized under the laws of Luxembourg with its principal place of business in Luxembourg.

102.    Plaintiff HPS Loan Management 10 2016 LTD is an entity organized under the laws of the Cayman Islands with its principal place of business in the Cayman Islands.

103.    Plaintiff HPS Loan Management 11 2017 LTD (fka) Jordy Warehouse 2016 LTD is an entity organized under the laws of the Cayman Islands with its principal place of business in the Cayman Islands.

104.    Plaintiff HPS Loan Management 2013 2 LTD (fka) Highbridge Loan Management 2013 LTD (FKA LOMBARDI 2013 2 LLC) is an entity organized under the laws of the Cayman Islands with its principal place of business in the Cayman Islands.

105.    Plaintiff HPS Loan Management 3 2014 LTD (fka) Highbridge Loan Management 3 2014 LTD is an entity organized under the laws of the Cayman Islands with its principal place of business in the Cayman Islands.

106.    Plaintiff HPS Loan Management 4 2014 LTD (fka) Highbridge Loan Management 4 2014 LTD is an entity organized under the laws of the Cayman Islands with its principal place of business in the Cayman Islands.

18

107.    Plaintiff HPS Loan Management 5 2015 LTD (fka) Highbridge Loan Management 5 2015 LTD is an entity organized under the laws of the Cayman Islands with its principal place of business in the Cayman Islands.

108.    Plaintiff HPS Loan Management 6 2015 LTD (fka) Highbridge Loan Management 6 2015 LTD is an entity organized under the laws of the Cayman Islands with its principal place of business in the Cayman Islands.

109.    Plaintiff HPS Loan Management 7 2015 LTD (fka) Highbridge Loan Management 7 2015 LTD is an entity organized under the laws of the Cayman Islands with its principal place of business in the Cayman Islands.

110.    Plaintiff HPS Loan Management 8 2016 LTD (fka) Highbridge Loan Management 8 2016 LTD is an entity organized under the laws of the Cayman Islands with its principal place of business in the Cayman Islands.

111.    Plaintiff HPS Loan Management 9 2016 LTD is an entity organized under the laws of the Cayman Islands with its principal place of business in the Cayman Islands.

112.    Plaintiff Institutional Credit Fund Subsidiary LP (fka) HPS Institutional Credit Fund Subsidiary LP is an entity organized under the laws of the Cayman Islands with its principal place of business in the Cayman Islands.

113.    Plaintiff Liquid Loan Opportunities Master Fund LP (fka) Highbridge Liquid Loan Opportunities Master Fund LP (Highbridge Capital Management LLC) is an entity organized under the laws of the Cayman Islands with its principal place of business in the Cayman Islands.

114.    Plaintiff Watford Asset Trust I is an entity organized under the laws of Delaware with its principal place of business in Delaware.

115.    Plaintiff Zurich American Life Insurance Company – ZALICO VL Series Account – 2 is an entity organized under the laws of Illinois with its principal place of business in Illinois.

116.    Plaintiff Zurich American Insurance Company is an entity organized under the laws of New York with its principal place of business in Illinois.

117.    Plaintiff Livello Capital Special Opportunities Master Fund LP is an entity organized under the laws of the Cayman Islands with its principal place of business in New York.

118.    Plaintiff JMP Credit Advisors CLO III R LTD (fka) JMP Credit Advisors CLO III LTD is an entity organized under the laws of the Cayman Islands with its principal place of business in Georgia.

119.    Plaintiff JMP Credit Advisors CLO IV LTD is an entity organized under the laws of the Cayman Islands with its principal place of business in Georgia.

120.    Plaintiff JMP Credit Advisors CLO V LTD is an entity organized under the laws of the Cayman Islands with its principal place of business in Georgia.

121.    Plaintiff Venture 28A CLO Limited is an entity organized under the laws of the Cayman Islands with its principal place of business in New York.

122.    Plaintiff Venture 31 CLO Limited is an entity organized under the laws of the Cayman Islands with its principal place of business in New York.

123.    Plaintiff Venture 32 CLO Limited is an entity organized under the laws of the Cayman Islands with its principal place of business in New York.

124.    Plaintiff Venture 33 CLO Limited is an entity organized under the laws of the Cayman Islands with its principal place of business in New York.

125.    Plaintiff Venture XII CLO Limited is an entity organized under the laws of the Cayman Islands with its principal place of business in New York.

126.     Plaintiff Venture XIII CLO Limited is an entity organized under the laws of the Cayman Islands with its principal place of business in New York.

127.     Plaintiff Venture XIV CLO Limited is an entity organized under the laws of the Cayman Islands with its principal place of business in New York.

128.     Plaintiff Venture XIX CLO Limited is an entity organized under the laws of the Cayman Islands with its principal place of business in New York.

129.     Plaintiff Venture XV CLO Limited is an entity organized under the laws of the Cayman Islands with its principal place of business in New York.

130.     Plaintiff Venture XVI CLO Limited is an entity organized under the laws of the Cayman Islands with its principal place of business in New York.

131.     Plaintiff Venture XVII CLO Limited is an entity organized under the laws of the Cayman Islands with its principal place of business in New York.

132.     Plaintiff Venture XVIII CLO Limited is an entity organized under the laws of the Cayman Islands with its principal place of business in New York.

133.     Plaintiff Venture XX CLO Limited is an entity organized under the laws of the Cayman Islands with its principal place of business in New York.

134.     Plaintiff Venture XXI CLO Limited is an entity organized under the laws of the Cayman Islands with its principal place of business in New York.

135.     Plaintiff Venture XXII CLO Limited is an entity organized under the laws of the Cayman Islands with its principal place of business in New York.

136.     Plaintiff Venture XXIII CLO Limited is an entity organized under the laws of the Cayman Islands with its principal place of business in New York.

21

137.    Plaintiff Venture XXIX CLO Limited is an entity organized under the laws of the Cayman Islands with its principal place of business in New York.

138.    Plaintiff Venture XXV CLO Limited is an entity organized under the laws of the Cayman Islands with its principal place of business in New York.

139.    Plaintiff Venture XXX CLO Limited is an entity organized under the laws of the Cayman Islands with its principal place of business in New York.

140.    Plaintiff New Generation Loan Fund Limited Partnership is an entity organized under the laws of Massachusetts with its principal place of business in Massachusetts.

141.    Plaintiff Nuveen Asset Management LLC, on behalf of all entities under its management, is an entity organized under the laws of Delaware with its principal place of business in Illinois.

142.    Plaintiff Nuveen Alternative Investment Funds SICAV-SIF - Nuveen US Senior Loan Fund (fka BayCity Alternative Investment Funds SICAV-SIF - BayCity US Senior Loan Fund) is an entity organized under the laws of Luxembourg with its principal place of business in Ireland.

143.    Plaintiff Nuveen High Yield Income Fund, LP (fka BayCity High Yield Income Fund, L.P.) is an entity organized under the laws of Delaware with its principal place of business in New York.

144.    Plaintiff Nuveen Long-Short Credit Fund, LP (as successor in interest to BayCity Long-Short Credit Master Fund Ltd.) is an entity organized under the laws of Delaware with its principal place of business in New York.

145.    Plaintiff Nuveen Senior Loan Fund, LP (as successor in interest to BayCity Senior Loan Master Fund Ltd.) is an entity organized under the laws of Delaware with its principal place of business in New York.

146.    Plaintiff California Street CLO IX Limited Partnership is an entity organized under the laws of the Cayman Islands with its principal place of business in the Cayman Islands.

147.    Plaintiff California Street CLO XII, Ltd. (fka Symphony CLO XII Ltd.) is an entity organized under the laws of the Cayman Islands with its principal place of business in the Cayman Islands.

148.    Plaintiff Municipal Employees Annuity and Benefit Fund of Chicago is an entity organized under the laws of Illinois with its principal place of business in Illinois.

149.    Plaintiff Nuveen Credit Strategies Income Fund (fka Nuveen Multi Strategy Income and Growth Fund 2-JQC) is an entity organized under the laws of Massachusetts with its principal place of business in Illinois.

150.    Plaintiff Nuveen Diversified Dividend and Income Fund is an entity organized under the laws of Massachusetts with its principal place of business in Illinois.

151.    Plaintiff Nuveen Floating Rate Income Opportunity Fund is an entity organized under the laws of Massachusetts with its principal place of business in Illinois.

152.    Plaintiff Nuveen Floating Rate Income Fund is an entity organized under the laws of Massachusetts with its principal place of business in Illinois.

153.    Plaintiff Nuveen Senior Income Fund is an entity organized under the laws of Massachusetts with its principal place of business in Illinois.

154.    Plaintiff Nuveen Short Duration Credit Opportunities Fund is an entity organized under the laws of Massachusetts with its principal place of business in Illinois.

23

155.    Plaintiff Nuveen Floating Rate Income Fund is an entity organized under the laws of Massachusetts with its principal place of business in Illinois.

156.    Plaintiff Nuveen High Yield Income Fund (fka Nuveen Symphony Credit Opportunities Fund) is an entity organized under the laws of Massachusetts with its principal place of business in Illinois.

157.    Plaintiff PENSIONDANMARK PENSIONSFORSIKRINGSAKTIESELSKAB is an entity organized under the laws of Denmark with its principal place of business in Denmark.

158.    Plaintiff Principal Diversified Real Asset CIT (fka Diversified Real Asset CIT) is an entity organized under the laws of Delaware with its principal place of business in Iowa.

159.    Plaintiff Principal Diversified Real Asset Fund is an entity organized under the laws of Delaware with its principal place of business in Iowa.

160.    Plaintiff SCOF 2, Ltd.is a lender of a record organized under the laws of the Cayman Islands with its principal place of business in the Cayman Islands.

161.    Plaintiff Symphony CLO XIV, Ltd. is an entity organized under the laws of Cayman Islands with its principal place of business in the Cayman Islands.

162.    Plaintiff Symphony CLO XV, Ltd. is an entity organized under the laws of Cayman Islands with its principal place of business in the Cayman Islands.

163.    Plaintiff Symphony CLO XVI, Ltd. (fka Symphony XVI Funding LLC) is an entity organized under the laws of Cayman Islands with its principal place of business in the Cayman Islands.

164.    Plaintiff Symphony CLO XVII, Ltd. is an entity organized under the laws of Cayman Islands with its principal place of business in the Cayman Islands.

24

165.    Plaintiff Symphony CLO XVIII, Ltd. is an entity organized under the laws of Cayman Islands with its principal place of business in the Cayman Islands.

166.    Plaintiff Symphony Floating Rate Senior Loan Fund is an entity organized under the laws of Ontario with its principal place of business in Ontario.

167.    Plaintiff TCI-Symphony CLO 2016-1, Ltd. is an entity organized under the laws of the Cayman Islands with its principal place of business in New York.

168.    Plaintiff TCI-Symphony CLO 2017-1, Ltd. is an entity organized under the laws of the Cayman Islands with its principal place of business in New York.

169.    Plaintiff ZAIS CLO 1 LIMITED is an entity organized under the laws of the Cayman Islands with its principal place of business in New Jersey.

170.    Plaintiff ZAIS CLO 11 LIMITED is an entity organized under the laws of the Cayman Islands with its principal place of business in New Jersey.

171.    Plaintiff ZAIS CLO 2 LIMITED is an entity organized under the laws of the Cayman Islands with its principal place of business in New Jersey.

172.    Plaintiff ZAIS CLO 5 LIMITED is an entity organized under the laws of the Cayman Islands with its principal place of business in New Jersey.

173.    Plaintiff ZAIS CLO 6 LIMITED is an entity organized under the laws of the Cayman Islands with its principal place of business in New Jersey.

174.    Plaintiff ZAIS CLO 7 LIMITED is an entity organized under the laws of the Cayman Islands with its principal place of business in New Jersey.

175.    Plaintiff ZAIS CLO 8 LIMITED is an entity organized under the laws of the Cayman Islands with its principal place of business in New Jersey.

176.   Plaintiff ZAIS CLO 9 LIMITED is an entity organized under the laws of the Cayman Islands with its principal place of business in New Jersey.

177.   Plaintiff ZAIS CLO 13 LIMITED is an entity organized under the laws of the Cayman Islands with its principal place of business in New Jersey.

178.   Plaintiff Cedar Funding II CLO Ltd is an entity organized under the laws of the Cayman Islands with its principal place of business in Iowa.

179.   Plaintiff Cedar Funding IV CLO Ltd is an entity organized under the laws of Cayman Islands with its principal place of business in Iowa.

180.   Plaintiff Cedar Funding V CLO Ltd is an entity organized under the laws of Cayman Islands with its principal place of business in Iowa.

181.   Plaintiff Cedar Funding VI CLO Ltd is an entity organized under the laws of Cayman Islands with its principal place of business in Iowa.

182.   Plaintiff Cedar Funding VIII CLO Ltd is an entity organized under the laws of Cayman Islands with its principal place of business in Iowa.

183.   Defendant Revlon, Inc. is a corporation organized under the laws of Delaware with its principal place of business in New York, New York

184.   Defendant RCPC (together with Revlon, Inc. "Revlon") is a corporation organized under the laws of Delaware with its principal place of business in New York, New York.

185.   Defendant Beautyge I ("BrandCo Holdings") is an exempted company incorporated in the Cayman Islands that acts as a holding company. Upon information and belief, BrandCo Holdings' principal place of business is in New York, New York.

186.   Defendant Beautyge II, LLC ("BrandCo") is a limited liability company organized under laws of the State of Delaware.

26

187.   Defendant BrandCo Almay 2020 LLC ("Almay BrandCo") is a limited liability company organized under laws of the State of Delaware.

188.   Defendant BrandCo Charlie 2020 LLC ("Charlie BrandCo") is a limited liability company organized under laws of the State of Delaware.

189.   Defendant BrandCo CND 2020 LLC ("CND BrandCo") is a limited liability company organized under laws of the State of Delaware.

190.   Defendant BrandCo Curve 2020 LLC ("Curve BrandCo") is a limited liability company organized under laws of the State of Delaware.

191.   Defendant BrandCo Elizabeth Arden 2020 LLC ("Elizabeth Arden BrandCo") is a limited liability company organized under laws of the State of Delaware.

192.   Defendant BrandCo Giorgio Beverly Hills 2020 LLC ("Giorgio Beverly Hills BrandCo") is a limited liability company organized under laws of the State of Delaware.

193.   Defendant BrandCo Halston 2020 LLC ("Halston BrandCo") is a limited liability company organized under laws of the State of Delaware.

194.   Defendant BrandCo Jean Nate 2020 LLC ("Jean Nate BrandCo") is a limited liability company organized under laws of the State of Delaware.

195.   Defendant BrandCo Mitchum 2020 LLC ("Mitchum BrandCo") is a limited liability company organized under laws of the State of Delaware.

196.   Defendant BrandCo Multicultural Group 2020 LLC ("Multicultural Group BrandCo") is a limited liability company organized under laws of the State of Delaware.

197.   Defendant BrandCo PS 2020 LLC ("PS BrandCo") is a limited liability company organized under laws of the State of Delaware.

198.     Defendant BrandCo White Shoulders 2020 LLC ("White Shoulders BrandCo") is a limited liability company organized under laws of the State of Delaware.

199.     Defendants Almay BrandCo, Charlie BrandCo, CND BrandCo, Curve BrandCo, Elizabeth Arden BrandCo, Giorgio Beverly Hills BrandCo, Halston BrandCo, Jean Nate BrandCo, Mitchum BrandCo, Multicultural Group BrandCo, PS BrandCo, and White Shoulders BrandCo (the "BrandCo Subsidiaries") and BrandCo are all sister companies, each of which is a wholly owned subsidiary of BrandCo Holdings (together with BrandCo and the BrandCo Subsidiaries, the "BrandCo Entities"). The BrandCo Entities are wholly owned, indirectly, by RCPC.

200.     Defendant Jefferies Finance, LLC is a limited liability company organized under the laws of the State of Delaware. Jefferies Finance LLC is 50% owned by Jefferies Group LLC and 50% by Massachusetts Mutual Life Insurance Co. Jefferies Group LLC is a wholly owned subsidiary of Jefferies Financial Group Inc., which is incorporated in the State of New York and has its principal place of business in New York, New York. Massachusetts Mutual Life Insurance Co. is a Massachusetts mutual company with its principal place of business in Springfield, Massachusetts. Jefferies Finance LLC is Administrative Agent and Collateral Agent on behalf of all the BrandCo Lenders (as defined herein).

201.     Defendant Jefferies LLC (together with Jefferies Finance, LLC, "Jefferies") is a limited liability company organized under the laws of the State of Delaware. Jefferies LLC is a wholly owned subsidiary of the Jefferies Group LLC, which in turn is a wholly owned subsidiary of Jefferies Financial Group Inc., which is incorporated in the State of New York and has its principal place of business in New York, New York. Jefferies LLC is Lead Arranger and Bookrunner for the 2020 BrandCo Credit Agreement.

202.   Defendant Ares Corporate Opportunities Fund V, L.P. is a limited partnership organized under the laws of Delaware and has its principal place of business in Los Angeles, California.

203.   Defendant ASOF Holdings II, L.P. is a limited partnership organized under the laws of Delaware and has its principal place of business in Los Angeles, California.

204.   Defendant ASSF IV AIV B Holdings III, L.P. is a limited partnership organized under the laws of Delaware and has its principal place of business in Los Angeles, California. Defendants Ares Corporate Opportunities Fund V, L.P., ASOF Holdings II, L.P., and ASSF IV AIV B Holdings III, L.P. are referred to collectively herein as "Ares".

205.   Defendant Angelo, Gordon & Co. L.P. is a limited partnership organized under the laws of Delaware and has its principal place of business in New York, New York.

206.   Defendant Cyrus Capital Partners, L.P. is a limited partnership organized under the laws of Delaware and has its principal place of business in New York, New York.

207.   Defendant Deutsche Bank AG Cayman Islands Branch is a branch of a German bank, with its principal United States office located in New York, New York.

208.   Defendant Glendon Capital Management, L.P. is a limited partnership organized under the laws of Delaware and has its principal place of business in Santa Monica, California.

209.   Defendant King Street Capital Management, L.P. is a limited partnership organized under the laws of Delaware and has its principal place of business in New York, New York.

210.   Defendant Nut Tree Capital Management, L.P. is a limited partnership organized under the laws of Delaware and has its principal place of business in New York, New York.

211.   Defendant Oak Hill Advisors, L.P. is a limited partnership organized under the laws of Delaware and has its principal place of business in New York, New York.

29

212.    Defendant 140 Summer Partners Master Fund, L.P. is a limited partnership organized under the laws of the Cayman Islands and has its principal place of business in New York, New York.

213.    Defendants John Doe Lenders 1-100, fictitiously named parties, their true names being unknown, are entities who are lenders to RCPC under the 2020 BrandCo Credit Agreement. If their names become known, all subsequent proceedings shall be taken under the true name and all prior proceedings shall be deemed amended accordingly.

214.    Defendants Angelo, Gordon & Co. L.P.; Deutsche Bank AG Cayman Islands Branch; Glendon Capital Management, L.P.; King Street Capital Management, L.P.; Oak Hill Advisors, L.P. are referred to herein as the "Conspiring Lenders."

215.    The Conspiring Lenders, together with Defendants ASOF Holdings II, L.P; Cyrus Capital Partners, L.P.; Nut Tree Capital Management, L.P.; 140 Summer Partners Master Fund, L.P., and John Doe Lenders 1-100 are lenders to RCPC under the 2020 BrandCo Credit Agreement ("BrandCo Lenders").  The BrandCo Lenders, together with Revlon, Jefferies, Ares, and the BrandCo Entities, are referred to collectively herein as the "Defendants."

## JURISDICTION AND VENUE

216.    The United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 157 and 1334(b).  This is a civil proceeding arising under Title 11 of the United States Code, 11 U.S.C. §§ 101-1532, or arising in or related to cases under Title 11, namely *In re Revlon Inc., et al.*, Case No. 22-10760 (DSJ), currently pending before this Court.  Plaintiffs' claims for equitable subordination for the claims and interests of the BrandCo Lenders to the claims and interests of

Plaintiffs arise under 11 U.S.C. § 510(c). The remainder of the state law claims set forth herein are related to the Bankruptcy Case within the meaning of 28 U.S.C. § 1334(b).

217. This adversary proceeding constitutes a "core" proceeding as defined in 28 U.S.C. § 157.

218. Plaintiffs consent to the entry of final orders or judgments pursuant Fed. R. Bankr. P. 7008.

219. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409 because Revlon has a Chapter 11 action pending in this district and this adversary proceeding arises under Title 11 or is related to Revlon's Chapter 11 case.

## STATEMENT OF FACTS

### I.     The 2016 Credit Agreement

220. On June 16, 2016, Revlon agreed to a cash acquisition of all outstanding shares of Elizabeth Arden, a leading global beauty company. Nearly three months later, on September 7, 2016, Revlon, Inc. and its direct, wholly owned operating subsidiary RCPC acquired Elizabeth Arden for $1.03 billion, which became a wholly owned subsidiary of RCPC.

221. Lacking the cash on hand to acquire Elizabeth Arden, Revlon entered into two credit facilities to finance the merger and to help service the existing debt of the merged entity. In connection with and substantially concurrently with the closing of the merger, Revlon entered into the 2016 Credit Agreement, dated September 7, 2016, which established a seven-year, $1.8 billion 2016 Term Loan Facility. Revlon also entered into another credit agreement, which established a five-year $400 million senior secured asset-based revolving credit facility (the "2016 ABL Facility"). The 2016 Credit Agreement additionally allowed for the establishment of its own

revolving credit facility (the "2016 Revolving Facility"), but it was not established at closing nor in the nearly four years preceding the 2020 Transaction.

222.     The 2016 Term Loan Facility provided the vast majority of the $1.03 billion that Revlon used to acquire Elizabeth Arden.  The remaining proceeds of the 2016 Term Loan Facility were used to refinance or retire indebtedness of RCPC and Elizabeth Arden, including debt that financed RCPC's $665 million 2015 acquisition of The Colomer Group, a beauty care company that owned brands including American Crew, Inc. ("American Crew").

223.     Citibank was appointed Administrative Agent and Collateral Agent for the lenders under the 2016 Credit Agreement.

224.     As part of the 2016 Credit Agreement, Revlon also entered into a Term Loan Guarantee and Collateral Agreement, dated September 7, 2016 (the "2016 Guarantee and Collateral Agreement"), which among other things, granted to the Collateral Agent, for the benefit of the Secured Parties, including the 2016 Term Lenders, a security interest in certain property of RCPC and its subsidiaries.

225.     The 2016 Term Loan Facility was secured by two groups of liens.  The first group of liens were on the accounts, inventory, equipment, chattel paper, documents, instruments, deposit accounts, real estate and certain investment property, and general intangibles (other than intellectual property) of RCPC and its subsidiaries.  These liens were second in priority only to the liens thereon securing the 2016 ABL Facility.  By contrast, the second group of liens securing the 2016 Term Loan Facility, which were liens on all *other* property—including intellectual property

and the capital stock of its subsidiaries—ranked *first* in priority and were senior to the liens thereon securing the 2016 ABL Facility.[3]

226.    The first-priority liens on the intellectual property of RCPC, Elizabeth Arden, and subsidiary guarantors constituted crucial security for the lenders under the 2016 Term Loan Facility (the "2016 Term Lenders"). The 2016 Term Lenders specifically bargained with Revlon, Inc. and RCPC to acquire first-priority liens on the intellectual property of RCPC and its domestic subsidiaries, especially Elizabeth Arden and its domestic subsidiaries whose acquisition the 2016 Term Loan Facility was financing.

227.    As Revlon's SEC filings acknowledge, "[Revlon's] trademarks, patents and other intellectual property rights are extremely important to [Revlon's] success and its competitive position."  The intellectual property of cosmetics, skin care, fragrance, and personal care companies like Revlon are valuable assets.  Under other names, the products of Revlon and its trademarked brands would sell at a fraction of the price and volume they currently do.  Elizabeth Arden's intangible property, alone, is worth *hundreds of millions* of dollars and constitutes more than half of Elizabeth Arden's total value.[4]

## II.    The 2019 Term Loan Agreement and the Resulting Event of Default

228.    On August 6, 2019, RCPC entered into a new senior secured term loan facility (the "2019 Term Loan Facility") governed by a 2019 Credit Agreement with Ares Management LLC

---

[3] Revlon 2016 Annual Report at 53 ("The liens securing the 2016 Term Loan Facility on all other property, including capital stock, intellectual property and certain other intangible property (the 'Term Loan Collateral'), rank first in priority to the liens thereon securing the 2016 [ABL] Facility, while the liens thereon securing the 2016 [ABL] Facility rank second in priority to the liens thereon securing the 2016 Term Loan Facility."), *available at* https://investors.revlon.com/static-files/3fa032da-21e1-4d4a-97d6-39764b2929cb

[4] In the Consolidated Financial Statements appended to Revlon's 2016 Annual Report, the company conducted a Purchase Price Allocation to record the estimated fair values of the net assets acquired in the Elizabeth Arden transaction. Intangible assets and goodwill comprised $332.8 million and $202.0 million, respectively, or more than half of the $1.03 billion acquisition consideration. *Id.* at F-18.

and/or certain of its affiliated funds, investment vehicles, or managed or advised accounts, in an initial aggregate principal amount of $200 million. The maturity date of the 2019 Term Loan Facility was set so that it could be earlier, but in no event later, than the maturity date of the 2016 Term Loan Facility.

229.   The 2019 Term Loan Facility was secured by a first-priority lien on the American Crew IP. The first-priority lien on the American Crew IP that had secured the 2016 Term Loan Facility was released, and the American Crew IP was transferred away from RCPC to a new subsidiary that did not guarantee the 2016 Term Loans. A new lien on the American Crew IP was granted to Ares.

230.   The stripping of the 2016 Term Lenders' lien on the American Crew IP was effectuated as part of a sale-leaseback transaction (the "American Crew IP Sale-Leaseback"), which breached the 2016 Credit Agreement.

231.   Section 7.10 of the 2016 Credit Agreement provides that RCPC "shall not, and shall not permit any of its Restricted Subsidiaries to . . . [e]nter into any arrangement with any Person providing for the leasing by the Borrower or any of its Restricted Subsidiaries of real or personal Property which is to be sold or transferred by the Borrower or any of its Restricted Subsidiaries (a) to such Person or (b) to any other Person to whom funds have been or are to be advanced by such Person on the security of such Property or rental obligations of the Borrower or any of its Restricted Subsidiaries . . . ." (2016 Credit Agreement § 7.10.)

232.   An exception to the sale-leaseback prohibition exists for Property whose "Fair Market Value . . . does not exceed the greater of (i) $100,000,000 and (ii) 3.0% of Consolidated Total Assets at the time of such event in the aggregate for all such arrangements." (2016 Credit Agreement § 7.10.) This exception did not apply to the American Crew IP Sale-Leaseback. The

fair market value of the American Crew IP far exceeded $100,000,000, which was greater than 3.0% of Consolidated Total Assets. Indeed, in an April 2020 lender presentation, Revlon reported that in 2019 alone, American Crew was worth $300 million based on $79 million in annual net sales and $35 million in annual direct contribution margin.

233. The American Crew IP Sale-Leaseback divested the 2016 Term Lenders of key collateral and stripping away their first-priority lien on the American Crew IP *without* their consent. Absent such consent, the 2016 Credit Agreement expressly prohibited RCPC and its Restricted Subsidiaries from transferring the American Crew IP and leasing it back.

234. In correspondence with counsel for the Co-Op Lenders, neither Revlon nor Citibank claimed that the Fair Market Value of the American Crew IP was $100,000,000 or less, although they were given every opportunity to do so. Nor is it conceivable that Ares would have accepted primary collateral with a Fair Market Value of $100,000,000 or less to secure its $200,000,000 new-money loan, particularly at a time when the 2016 Term Loans were trading at a material discount from par (*i.e.*, mid-seventy percent). Rather, Ares demanded and received collateral of sufficient value to cover the $200 million it was advancing. Indeed, on information and belief, Ares representatives relayed to market participants that Ares valued the American Crew IP at more than $200 million. Ares' valuation of the American Crew IP was based on materials obtained from Revlon.

235. On April 6, 2020, counsel for the Co-Op Lenders requested "a detailed description of the steps taken and analysis performed by the Borrower and its board of directors (including any special committees thereof) with respect to the Proposed Refinancing Transactions, including . . . any valuations prepared or received by the Borrower and/or [Revlon, Inc.] (or their respective

boards of directors) with respect to" various intellectual property assets related to the Elizabeth Arden and American Crew brands and certain other portfolio brands.

236.    On April 22, 2020, counsel for Revlon replied that "no valuations have been prepared or received by the Borrower and/or [Revlon, Inc] (or their respective boards of directors) with respect to the Specified Brand Assets . . . ."

237.    On April 27, 2020, counsel for the Co-Op Lenders replied that the Co-Op Lenders "find it hard to believe [there are no such written materials], including because certain of those assets were collateral with respect to the 2019 term loan facility provided by Ares . . ." and further requested that Revlon "please provide [the Co-Op Lenders] with the value of the American Crew intellectual property as of the date it was transferred in connection with the Ares Financing, as well as an explanation of how the Ares Financing did not violate Section 7.10 of the 2016 Credit Agreement."

238.    On April 28, 2020, counsel for Revlon ignored the explicit request for the value of the American Crew IP, responding, without expounding, that the American Crew IP Sale-Leaseback "was not a sale leaseback transaction in violation of Section 7.10" because (Revlon claimed) "Section 7.10, by its express terms, has no application to licenses of intellectual property or the transaction structure used in the Ares Financing."

239.    Revlon's position was inconsistent with the plain language of the 2016 Credit Agreement.  Section 7.10 applies to "real or personal Property" and "Property" is defined as "*any right or interest in or to property or assets of any kind whatsoever*, whether real, personal or mixed and *whether tangible or intangible*, including Capital Stock."  (2016 Credit Agreement § 1.01, at 49 (emphasis added).)  Under Section 7.10, the American Crew IP is unquestionably a "right or interest in or to property or assets of any kind whatsoever."

36

240.     Moreover, Revlon's conclusory assertion that Section 7.10 did not apply to the American Crew IP Sale-Leaseback's "structure" is incorrect.  Section 7.10 of the 2016 Credit Agreement states, "the Borrower shall not, and shall not permit any of its Restricted Subsidiaries to . . . [e]nter into any arrangement with any Person providing for the leasing by the Borrower or any of its Restricted Subsidiaries of real or personal Property which is to be sold or transferred by the Borrower or any of its Restricted Subsidiaries . . . to such Person . . . ."  (2016 Credit Agreement § 7.10.)  Under the American Crew IP Sale-Leaseback, RCPC transferred the American Crew IP to BrandCo, a "Person."  In turn, BrandCo leased the American Crew IP back to RCPC.  Therefore, the American Crew IP Sale-Leaseback violated Section 7.10.

241.     The American Crew IP Sale-Leaseback was an Event of Default under the 2016 Credit Agreement.  Section 8.1 of the 2016 Credit Agreement provides that it is an Event of Default "[i]f any of the following events shall occur and be continuing . . . : The Borrower or any Subsidiary Guarantor shall default in the observance or performance of any agreement contained in . . . Section 7."  Therefore, RCPC's breach of Section 7.10 of the 2016 Credit Agreement was and is an Event of Default under Section 8.1 of the 2016 Credit Agreement.

242.     Even if the plain language of the 2016 Credit Agreement did not bar the American Crew IP Sale-Leaseback (it did), the transaction violated the covenant of good faith and fair dealing inherent in the 2016 Credit Agreement.  Under New York law, which governs the 2016 Credit Agreement, each party to a contract has an implied duty of good faith and fair dealing in its performance and its enforcement of the contract.  The covenant embraces a pledge that no parties shall do anything that will have the effect of destroying or injuring the right of the other parties to receive the fruits of the contract.

243.   The American Crew IP Sale-Leaseback was an entirely circular sale-leaseback transaction with no legitimate business purpose.[5]  The illegitimate purpose of the American Crew IP Sale-Leaseback was to strip the 2016 Term Loan Facility lenders' lien on the American Crew IP so that the American Crew IP could instead be pledged to Ares as part of the 2019 Transaction.

244.   The American Crew IP Sale-Leaseback was designed to deprive 2016 Term Lenders of the protection of the first-priority liens that they specifically bargained for, and upon which they relied in extending credit to RCPC.   In other words, RCPC misappropriated the American Crew IP so that it could induce another lender to extend credit to RCPC using the same assets that already had been pledged to the 2016 Term Loan Lenders.

245.   In its role as Agent to the Lenders, Citibank was required to execute various documents to enable consummation of the American Crew IP Sale-Leaseback.  Citibank must have been aware that, without the 2016 Term Lenders' consent, the transaction would constitute a breach of the 2016 Credit Agreement and an Event of Default thereunder.  Nonetheless, Revlon and Citibank failed to obtain such consent from the 2016 Term Lenders.

## III.   In 2020, RCPC Puts in Motion its Scheme to Issue New Debt Facilities but the Majority of the 2016 Term Lenders Object

246.   In early 2020, Revlon put in motion its plan to undertake a transaction that would strip the 2016 Term Lenders of their lien on some of the most important collateral securing their loans, by transferring this collateral to a new set of subsidiaries so it could be repledged to secure additional debt issued under a new, separate term credit agreement.

---

[5] The 2020 Amendment concedes that such transactions serve no legitimate business purpose. It expressly states, "for the avoidance of doubt," "financing arrangements" are *not* "legitimate business purposes" that might be exempted from negative covenants barring the contribution and/or licensing of intellectual property.  (Amendment No. 1 to 2016 Credit Agreement § 7.7(s).)

247.     On March 9, 2020, Revlon, Inc. entered into a commitment letter with Jefferies Finance LLC to effectuate the transaction, and simultaneously announced the commitment through issuance of a Form 8-K disclosure.

248.     From the outset, Revlon recognized that its brazen plan would require the Lenders' approval of amendments to the 2016 Credit Agreement that Revlon needed to effectuate the transaction (the "2020 Amendment").  Indeed, without amending the 2016 Credit Agreement (including to authorize the release of the BrandCo IP liens thereunder) it would have been impossible for RCPC to raise new debt facilities because it needed the BrandCo IP to serve as collateral on the new facilities.

249.     Consistent with that recognition, Section 1 of the 2020 Amendment provided: "Each Consenting Lender… hereby (i) consents to the Indebtedness and Liens to be incurred on the Amendment Effective Date by the Brandco Loan Parties under, and the other transactions contemplated by, the Brandco Loan Documents, (ii) authorizes and directs the Collateral Agent to release its Liens on any BrandCo Collateral (as defined in the BrandCo Credit Agreement) securing the Obligations and (iii) hereby waives any Default or Event of Default that would otherwise result from the Brandco Loan Parties entering into the Brandco Loan Documents, and completing the transactions contemplated thereby (including, without limitation, any Specified Borrower Repurchases), on the Amendment Effective Date, and any other Default or Event of Default that may exist or may have existed prior to the Amendment Effective Date."

250.     In other words, reflecting RCPC's and the other parties' awareness that the new debt facilities were impossible to implement as a result of the liens already on the BrandCo IP under the 2016 Credit Agreement, the 2020 Amendment provided that: (i) the consenting Lenders would purportedly consent to the new debt facilities; (ii) the consenting Lenders would authorize

and direct Citibank to release its liens on the BrandCo IP under the 2016 Credit Agreement; and

(iii) the consenting Lenders would waive *any past or future* Default or Event of Default under the

2016 Credit Agreement, including those that arise out of the 2020 Transaction.

251.    As contemplated by the 2020 Amendment and pursuant to Section 10.1 of the 2016

Credit Agreement, the basic terms of the 2020 Transaction required—at a minimum—the consent

of the "Required Lenders" defined in the 2016 Credit Agreement as "holders of more than 50% of

. . . the sum of (i) aggregate unpaid principal amount of the Term Loans then outstanding, (ii) the

Revolving Commitments then in effect, if any . . . ."   (2016 Credit Agreement § 1.01, at 52.)[6]

Because there were no Revolving Commitments when the 2020 Amendment was announced, the

2020 Amendment required—at a minimum—the consent of holders of more than 50% of the

aggregate unpaid principal amount of the 2016 Term Loans then outstanding.

252.    In an April 14, 2020 Form 8-K filing with the Securities and Exchange Commission

(the "SEC"), Revlon, Inc. and RCPC acknowledged this fact:

- "[T]he funding of the Facilities is contingent on Products Corporation receiving the consent of lenders *holding more than 50% of the loans outstanding under the 2016 Term Loan Facility . . . .*"

- "The effectiveness of the Extension Amendment, and therefore the completion of the 2020 Refinancing Transactions, is contingent on Products Corporation receiving the consent of lenders *holding more than 50% of the loans outstanding under the 2016 Term Loan Facility.*"

Thus, in statements to the SEC, Revlon, Inc. and RCPC unequivocally acknowledged that the 2020

Amendment (and thus the 2020 Transaction) required the consent of a majority of 2016 Term

Lenders.

---

[6] The 2020 Amendment also required the consent of the "Majority Facility Lenders." *See infra* Part V.

253.   In or around this time, Revlon was facing the prospect of insolvency.  It reported an operating loss of $186.2 million and net loss of $213.9 million in the first quarter of 2020. Its reported net sales in the first quarter of 2020 declined 18.1% from the same prior-year period and adjusted EBITDA decreased 26.8%.   In March 2020, Revlon announced a worldwide organizational restructuring consisting of cost-cutting, primarily through the elimination of approximately 1,000 jobs.  By May 7, 2020, the trading prices on RCPC's debt reflected significant insolvency risk.  The 2016 Term Loan debt, for example, was trading at approximately 82 cents on the dollar on January 24, 2020, but had dropped to 40 cents as of May 7, 2020.

254.   Against this backdrop, Revlon hoped that it would be able to secure lender support for the 2020 Amendment and new debt facilities by providing benefits to a subset of the 2016 Term Lenders—the Conspiring Lenders—and effectively elevating those lenders over the other 2016 Term Lenders.   It saw an opportunity to raise debt by persuading its existing creditors to engage in a hostile and unlawful restructuring of its capital structure.  At the same time, Revlon's struggles and its willingness to ignore its legal obligations presented certain lenders the chance to convert their deteriorating investment into new debt on superior terms and with a putative first-priority lien position on Revlon's key assets in the increasingly likely event that Revlon would enter insolvency proceedings.

255.   The problem for Revlon, as it learned, was that many creditors under the 2016 Term Loan Agreement were unwilling to partake in this nefarious scheme.  Indeed, the Conspiring Lenders prepared to support the Amendment ultimately held *less* than half of the aggregate unpaid principal amount of Term Loans then outstanding.

256.   The Co-Op Lenders—who constituted *more* than 50% of the 2016 Term Lenders and who did not want the collateral securing their loans to be stripped away—expressly opposed

41

the amendment and committed to vote against it in a formal cooperation agreement. Because the Co-Op Lenders constituted the Required Lenders under the 2016 Credit Agreement, their opposition was sufficient to block an amendment. Lacking support from a majority of 2016 Term Lenders, Revlon could have chosen to negotiate with them to explore a mutually beneficial solution. Instead, Revlon sought to subvert the 2016 Credit Agreement and impose its will unilaterally and without regard to the rights of the lenders who opposed the transaction.

**IV.      In 2020, RCPC Issues the Sham Revolver in Breach of the 2016 Credit Agreement and Solely to Manipulate Voting on Amendments to that Agreement**

257.    Up until this point in time, Revlon had spent months crafting and negotiating the transaction without any revolving loan component. Upon realizing that RCPC would be unable to amend the 2016 Credit Agreement because of opposition from the Co-Op Lenders who held majority voting power, RCPC and the Conspiring Lenders engineered a brazenly pretextual transaction to generate a sham revolving commitment to be provided by certain Conspiring Lenders (the "Sham Revolver") that would never be drawn and that would come into existence *solely* to manufacture a majority that supported the 2020 Amendment—and then *disappear* into thin air.

258.    RCPC's issuance of the Sham Revolver in bad faith, solely to manipulate the voting on the 2020 Amendment, violated Section 2.25 of the 2016 Credit Agreement and the implied duty of good faith and fair dealing incorporated into all contracts governed by New York law.

259.    Revlon's motive underlying the issuance of the Sham Revolver commitments was obvious. Shortly after RCPC noticed its request to establish the Sham Revolver, one prominent financial reporting service reported, "UPDATE . . . : Revlon Seeks to Issue Incremental Debt to Dilute Majority Term Lender Group Opposing Refinancing Amendment."

42

260.   On April 23, 2020, RCPC sent a notice to Citibank, as Administrative Agent, requesting to establish the Sham Revolver in the amount of $100 million.  In its notice, RCPC falsely claimed the Sham Revolver "will be used to increase liquidity to the Borrower and its Subsidiaries and for general corporate purposes."  Although Section 2.25(a) of the 2016 Credit Agreement sets forth a ten-business day notice period prior to giving effect to any Revolving Commitments, Citibank halved the notice period, at RCPC's request, without consulting lenders under the facility.

261.   Putting to rest any claim that the Sham Revolver was issued for any reason other than vote manipulation, RCPC requested that it become effective on April 30, 2020—the *same day* of the then-deadline to vote on the 2020 Amendment.  Nor could increased liquidity have been the company's true motivation.  The 2020 Amendment that RCPC was then seeking to effectuate would eliminate the 2016 Revolving Facility in its entirety and terminate RCPC's access to any revolving loans under the 2016 Credit Agreement, such that the Sham Revolver was not even going to exist for any meaningful period of time.

262.   On April 25, 2020, in view of these events, the Co-Op Lenders "direct[ed] Citibank, N.A. to resign as Agent under the 2016 Credit Agreement."  On April 27, 2020, Citibank stated it was continuing to evaluate whether it would continue to serve as Agent.

263.   On April 28, 2020, counsel for the Co-Op Lenders wrote Citibank:

> The Proposed Revolving Commitments appear to be a sham, contemplated solely to manipulate voting on the Proposed Amendment.
>
> It is clear that the Borrower is attempting to use the newly-conceived Revolving Commitments in a transparent attempt to enlarge the pool of eligible voting Lenders, and thereby manipulate the vote on the Proposed Amendment. At a minimum, such nefarious conduct by a

> Borrower breaches the implied duty of good faith and fair dealing
> implicit in every contract.

In this letter and in numerous other contexts, counsel for the Co-Op Lenders had explained to Citibank that RCPC, with Citibank, was breaching the 2016 Credit Agreement.  Neither Citibank nor RCPC provided any meaningful response—rather, on April 29, 2020, Citibank merely stated that it "offers no opinion or comment with respect to [Co-op Lenders'] speculation regarding possible Events of Default or other misconduct by the Borrower in connection with the Proposed New Revolving Commitments or Proposed Amendment."

264.   After counsel for Citibank provided the April 28, 2020 letter to RCPC, RCPC modified the 2020 Amendment.  The modifications permitted RCPC to draw $65 million under the Sham Revolver, but then provided that just 10 to 15 business days later, $65 million could be drawn down under the new term loan facility for the *exclusive purpose* of repaying the Conspiring Lenders' loans outstanding under the Sham Revolver.  That is, rather than creating an undrawn Sham Revolver "commitment" that would be eliminated immediately after it served its purpose of rigging the vote on the amendment, RCPC pivoted to "drawing" $65 million under the Sham Revolver and immediately repaying it with the money it would obtain under its new $880 million First Lien Term Loan (the "2020 New Money Term Loan").  Despite these changes, the modified, circular design of the transaction left no doubt that the Sham Revolver was to be issued solely to subvert the expressed will of the Co-Op Lenders and to improperly defeat their contractual right to block amendments to the 2016 Credit Agreement that were not approved by a majority of actual lenders.

265.   Indeed, the Sham Revolver served no legitimate business purpose.  It was substantially more expensive than alternative financing, including the new term loan to be created

under the 2020 Amendment.  Outstanding amounts under the Sham Revolver bore exorbitant interest at a rate of (x) LIBOR plus 16% or (y) an Alternate Base Rate ("ABR") plus 15%, at RCPC's option.  RCPC also paid upfront fees and commitment fees to the Sham Revolver's Conspiring Lenders.  By contrast, RCPC had access to significantly cheaper capital via an already-established $30 million Senior Line of Credit with MacAndrews & Forbes Group LLC that, when drawn, accrued interest at less than half the rate of the Sham Revolver.  Upon information and belief, RCPC never drew on this significantly cheaper funding source or exhausted other existing sources of liquidity.  Finally, removing any doubt regarding the true purpose of the Sham Revolver, RCPC issued the exact amount of revolving commitments necessary to turn an estimated 51.5% majority opposing the transaction into an estimated 49.9% minority.

266.    In addition to constituting a breach of the implied covenant of good faith and fair dealing, the issuance of the Sham Revolver and the Conspiring Lenders' votes pursuant thereto were invalid for the independent reason that the 2016 Credit Agreement prohibited RCPC from issuing the Sham Revolver while an Event of Default exists.

267.    Under the 2016 Credit Agreement, the Borrower may by written notice to the Administrative Agent elect to request the establishment of Revolving Commitments. Section 2.25(a) of the 2016 Credit Agreement states:

> The Borrower may by written notice to the Administrative Agent elect to request the establishment of . . . Revolving Commitments . . . hereunder, in an aggregate amount for all such New Loan Commitments. Such New Loan Commitments shall become effective as of such Increased Amount Date; provided, that: ***no Event of Default shall exist on such Increased Amount Date immediately after giving effect to such New Loan Commitments*** . . . .

(*Id.* § 2.25(a)-(b) (emphasis added).)  Under the 2016 Credit Agreement, accordingly, the Sham

Revolver could not become effective if an Event of Default existed on the date it was proposed to

be established.

268.    In the meantime, on April 29, 2020—prior to the date the Sham Revolver was to

become effective—counsel for the Co-Op Lenders sent Citibank, as the Administrative Agent of

the 2016 Credit Agreement, a Notice of Event of Default pursuant to Section 9.5 of the 2016 Credit

Agreement. This Notice stated that:

> The undersigned Lenders hereby notify the Agent that the transfer
> of the American Crew IP by the Borrower to its Non-Guarantor
> Subsidiary, Beautyge II, LLC (the 'IP Transferee'), and the
> licensing back of the American Crew IP by the IP Transferee to the
> Borrower, in connection with the Ares Financing constitutes a
> breach of Section 7.10 of the 2016 Credit Agreement. This breach
> of Section 7.10 of the 2016 Credit Agreement constitutes an Event
> of Default under Section 8.1(c) of the 2016 Credit Agreement.

269.    Under Section 2.25, accordingly, that Event of Default prevented the Sham

Revolver from becoming effective, and the Conspiring Lenders could not have had the votes to

adopt the 2020 Amendment.  Further, neither RCPC nor Citibank provided notice to all 2016 Term

Lenders of the Event of Default arising out of the 2019 Transaction.  If they had provided such

notice, on information and belief, the 2020 Amendment would have failed notwithstanding the

issuance of the Sham Revolver because more Lenders would have known about the continuing

Event of Default and thus voted against the amendment.

270.    Because an Event of Default existed when RCPC declared the Sham Revolver

effective, in violation of a condition precedent to its issuance, the attempted issuance of the Sham

Revolver was a breach of Section 2.25 of the 2016 Credit Agreement, and constituted a further

Event of Default.

271.    On April 29, 2020, notwithstanding the foregoing, Citibank posted a memorandum stating that the deadline for Lenders to vote to consent to the 2020 Amendment was 5:00 p.m. on May 1, 2020.

272.    On April 30, 2020, the Co-Op Lenders again alerted Citibank that, in light of the Event of Default, Citibank could not allow the issuance of the Sham Revolver and that doing so would constitute a further Event of Default.  On the same date, Citibank executed and delivered a Joinder Agreement and other documentation purporting to establish the Sham Revolver in the amount of $65 million, of which RCPC drew $63.5 million.

273.    On May 1, 2020, prior to the 5:00 p.m. voting deadline, counsel for over 50% of the 2016 Term Lenders sent a letter to counsel for certain Conspiring Lenders, notifying them that "[b]ecause of the pre-existing Event of Default, the additional commitments are not effective, and the loans purported to be made by the Borrower under those commitments were not made pursuant to the 2016 Credit Agreement and are not Loans or Obligations under the 2016 Credit Agreement." The letter further stated that "the sham creation of New Revolver Commitments, undertaken solely as a subterfuge to negate the contractual rights of the majority of Lenders opposed to the proposed refinancing and associated amendments to the 2016 Credit Agreement, was inappropriate, undertaken in bad faith, and completed in breach of the plain terms of the 2016 Credit Agreement." Finally, the letter put the Conspiring Lenders on notice that they "may now be held responsible for [their] role in abetting this manipulation through [the] creation of" the Sham Revolver and for their role in bringing about any improper amendment of the 2016 Credit Agreement.

274.    Citibank tabulated the votes consenting to the 2020 Amendment. The Conspiring Lenders, who were holders of less than 50% of the aggregate unpaid principal amount of the 2016 Term Loan Facility, consented to the 2020 Amendment.  The 2020 Amendment did not have the

consent of either the Majority Term Loan Facility Lenders or the Required Lenders (the latter, because the improperly established Sham Revolver could not have been permissibly included in the vote count). Nonetheless, Citibank included the Sham Revolver in its calculations and Defendants claimed without any valid basis that the 2020 Amendment had sufficient votes.

275.    As noted above, the Conspiring Lenders were not simply bystanders who voted their preferences; they were active participants in this wrongful scheme. Not only did they have full knowledge that RCPC was establishing the Sham Revolver, but a subset of the Conspiring Lenders lent into it. It was RCPC *and* the Conspiring Lenders, guided by the experts at Jefferies, who contrived the issuance of the Sham Revolver to disenfranchise the Co-Op Lenders who constituted the Required Lenders. Thus, the Conspiring Lenders, who negotiated the Sham Revolver with RCPC, acted with full knowledge that the Sham Revolver had been established in bad faith, in breach of the 2016 Credit Agreement and was being used to manipulate the vote for the 2020 Amendment. Being parties to the 2016 Credit Agreement, the Conspiring Lenders, whose participation in RCPC's issuance of the Sham Revolver was in bad faith, thus violated the express consent requirements under Section 10.1 of the Credit Agreement and the implied duty of good faith and fair dealing incorporated into all contracts governed by New York law.

276.    Similarly, Citibank had a significant conflict of interest, which at least partially explains its behavior. In April 2018, RCPC amended its $400 million 2016 ABL Facility to add $41.5 million in new senior secured Tranche B Revolving Commitments. Citibank was one Tranche B Lender. The Tranche B Revolving Commitments were first in, last out and the Tranche A Revolving Commitments were last in, first out, meaning that Tranche B Revolving Commitments, including Citibank's commitment, were drawn first and paid last. Upon any event

48

of default triggering a prepayment of debt, Tranche B would be paid after Tranche A. However, Tranche B was to mature on April 18, 2020, earlier than Tranche A.

277.    Contemporaneously with amending the 2016 Credit Agreement for which Citibank served as Administrative Agent and Collateral Agent for the Lenders, RCPC sought to extend the Tranche B maturity date by one month to May 18, 2020. In exchange, the Tranche B Lenders would receive an amended interest rate 0.75% higher than the original rate for the Tranche B Revolving Commitments, subject to a LIBOR floor of 0.75%. Citibank agreed to act as a Replacement Lender for a Non-Extending Lender under the 2016 ABL Facility, substantially increasing its fully drawn, Tranche B Revolving Commitments thereunder to $26.25 million, to be repaid a month later, on the new maturity date.

278.    Citibank would hold significant risk for that extra month: If a mandatory prepayment was triggered under the 2016 ABL Facility prior to maturity, Citibank, as a Tranche B Lender, would be repaid last. Moreover, as a Lender under the 2016 ABL Facility, Citibank's lien on the valuable intellectual property of Elizabeth Arden and other valuable RCPC brand assets was behind that of the 2016 Term Lenders. A default under either the 2016 ABL Facility or 2016 Term Loan Facility would put Citibank's $26.25 million Tranche B Loan behind a $400 million Tranche A facility in priority and, as to the intellectual property of Elizabeth Arden and other RCPC brand assets, behind the 2016 Term Lenders. Thus, Citibank had a stake in the success of the 2020 Amendment and a reason to deny the 2016 Term Lenders their right to call a default: a default could cause Citibank to lose up to $26.25 million.

279.    Thus, based on its loan to RCPC, Citibank was conflicted. At the same time, Citibank (i) executed documents that purported to establish the Sham Revolver, (ii) purported to

49

allow holders of the Sham Revolver to be included in the vote for the 2020 Amendment, and

(iii) purported to ratify the amendment to the 2016 Credit Agreement in favor of Revlon and itself.

## V.   Revlon and the Conspiring Lenders Breach the 2016 Credit Agreement by Implementing the 2020 Amendment without Consent from the Majority Facility Lenders

280.   The 2020 Amendment was invalid because it was effectuated only by counting the

votes of holders of illusory commitments under the invalid Sham Revolver.  As such, the 2020

Amendment did not have the consent of the Required Lenders as required under Section 10.1 of

the 2016 Credit Agreement and was therefore void *ab initio*.

281.   Even if the votes of the Conspiring Lenders holding the Sham Revolver counted to

establish Required Lender consent to the 2020 Amendment (which they could not), the 2020

Amendment was nonetheless void *ab initio* because it required approval of the Majority Facility

Lenders; *i.e.*, more than 50% of the lenders on the 2016 Term Loan Facility (as distinct from the

Sham Revolver facility).

282.   The 2016 Credit Agreement provides that, subject to certain restrictions, the

Borrower and the Required Lenders under the 2016 Credit Agreement may amend, supplement,

or modify such agreement, "provided, . . . that the consent of the applicable Majority Facility

Lenders shall be required with respect to any amendment that by its terms adversely affects the

rights of Lenders under such Facility in respect of payments hereunder in a manner different from

such amendment that affects other Facilities."  (2016 Credit Agreement § 10.1 (the "Section 10.1

Proviso").)

283.   Because only one facility (the 2016 Term Loan Facility) existed prior to the invalid

Sham Revolver, the Section 10.1 Proviso previously had no effect on voting.  Upon the purported

establishment of the Sham Revolver, however, two facilities would exist.  Therefore, the Section

10.1 Proviso would prevent any amendment that "by its terms adversely affects the rights of [the 2016 Term] Lenders . . . in respect of payments hereunder in a manner different from such amendment that affects [the Sham Revolver]" without the consent of the applicable Majority Facility Lenders; here, the Co-Op Lenders who held more than 50% of the aggregate unpaid principal amount of the 2016 Term Loan Facility and thus constituted the Majority Facility Lenders.

### A. The Economic Terms of the 2020 Amendment Adversely Affected the 2016 Term Lenders Relative to the Sham Revolver Holders

284.    The economic terms of the 2020 Amendment "adversely affect[ed] the rights of [the 2016 Term] Lenders . . . in respect of payments hereunder in a manner different from such amendment that affects [the Sham Revolver]."

285.    The 2020 Amendment, for example, enriched the Conspiring Lenders who were holders of the Sham Revolver.  In particular, the 2020 Amendment gave rise to a "roll up" transaction whereby cash from the new loan facilities that would be issued pursuant to the 2020 Transaction would be used to repurchase the 2016 Term Loans of only the Conspiring Lenders, including those who held Sham Revolver interests.

286.    This "roll up" transaction breached provisions of the 2016 Credit Agreement that prevent RCPC and its affiliates from repurchasing Term Loans in a manner that disproportionally favored certain Term Lenders over others.  Under Section 10.6(h) of the 2016 Credit Agreement, RCPC and its affiliates could repurchase Term Loans in only two ways.  First, RCPC could conduct "Open Market Purchases" of no more than 20% of the Term Loans.  Second, RCPC could employ a Dutch Auction process to purchase Term Loans from the 2016 Term Lenders.[7]

---

[7] A "Dutch Auction" is "[a]n auction in which several identical items are offered simultaneously, one to a bidder, and sold to the highest bidders for the amount of the lowest winning bid."  Black's Law Dictionary (11th ed. 2019).

287.    RCPC could not rely on either of these mechanisms to undertake the roll up.  The roll up went to hand-picked 2016 Term Lenders, did not involve purchases on the open market, and exceeded 20% of the outstanding 2016 Term Loans.  In addition, the targeted purchases from only those Lenders who participated in the 2020 Transaction was plainly not a Dutch Auction, which had to be made available to all 2016 Term Lenders.

288.    Recognizing that the 2016 Credit Agreement prohibited the "roll up" transaction, RCPC sought to eliminate those prohibitions through the 2020 Amendment both by redefining "Dutch Auction" to include the roll up and waiving the requirement to make it available to all 2016 Term Lenders.  Permitting the roll up directly affected the 2016 Term Lenders, but had no effect on any other facility—specifically, the Revolving Credit Facility—under the 2016 Credit Agreement.

289.    As a result of the 2020 Amendment, accordingly, the lenders who participated in the Sham Revolver enjoyed the immediate repurchase of their 2016 Term Loans as a result of the amendments whereas the 2016 Term Lenders who did not participate in the 2020 Transaction did not receive any such payment.

290.    Further, the 2020 Amendment gave the Conspiring Lenders—including those who held Sham Revolver interests—the right to cause the borrower to make additional repurchases of their 2016 Term Loans but afforded no such rights to the 2016 Term Lenders who did not participate in the 2020 Transaction.  And, the reordering of priorities and provision of benefits by the 2020 Amendment affected 2016 Term Lenders only—it had no adverse effect on the holders of the Sham Revolver commitments, all of whom were Conspiring Lenders.

291.    In order to validly be adopted under Section 10.1 of the 2016 Credit Agreement, accordingly, the 2020 Amendment required the consent of the Majority Facility Lenders, which

Revlon and the Conspiring Lenders failed to obtain.  As a result, the 2020 Amendment breached the Section 10.1 Proviso and was void *ab initio*.

> ### B.   The Purported Waiver of Events of Default in the 2020 Amendment Adversely Affected the 2016 Term Lenders Relative to the Sham Revolver Holders

292.    In view of the exposure that Defendants' scheme had created, the 2020 Amendment also proposed to "waive[] any Default or Event of Default that would otherwise result from the BrandCo Loan Parties entering into the BrandCo Loan Documents, and completing the transactions contemplated thereby (including, without limitation, any Specified Borrower Repurchases), on the Amendment Effective Date, and any other Default or Event of Default that may exist or may have existed prior to the Amendment Effective Date."  (Amendment No. 1 to 2016 Credit Agreement § 1(a) (the "Purported Waiver").)  Were it effective, the Purported Waiver would waive all existing Events of Default—including those arising out of the 2019 Transaction and the issuance of the Sham Revolver—in what would amount to a pre-emptive self-pardon of RCPC's unlawful conduct.

293.    The Purported Waiver, however, is not effective.  Like the 2020 Amendment's economic terms, the Purported Waiver adversely affected the 2016 Term Lenders relative to the Sham Revolver holders and therefore required the consent of the Majority Facility Lenders, which was not obtained.

294.    *First*, the 2016 Term Lenders, and only the 2016 Term Lenders, had a right to assert that RCPC breached the 2016 Credit Agreement by, among other things, entering into the American Crew Sale-Leaseback and by issuing the Sham Revolver in bad faith and notwithstanding an existing Event of Default.

53

295.     The Sham Revolver lenders were not affected by the putative waiver of Events of Default arising from the Sham Revolver or any aspect of the 2020 Transaction.   The Sham Revolver was created as part of the vote-rigging scheme that underpinned the effort to implement the 2020 Amendment over the objection of the Required Lenders and the Majority Facility Lenders.   The holders of the Sham Revolver—by participating in and benefitting from this manipulative process, with full knowledge of the circumstances—had unclean hands, had no basis to assert that the Borrower violated the 2016 Credit Agreement, and in fact *benefitted* from the Purported Waiver.

296.     *Second*, the Purported Waiver had no practical effect on the Sham Revolver lenders' rights in respect of payment because the Sham Revolver was not at risk of not being repaid. Its brief shelf life of 10 to 15 business days reduced the Sham Revolver's risk to nothing, while the 2016 Term Lenders have been left exposed for years to a heightened risk of non-payment. The Purported Waiver thus adversely affected the 2016 Term Lenders in respect of payments, while holders of the Sham Revolver's Revolving Commitments were not affected at all.

297.     In order to validly be adopted, the 2020 Amendment thus required the consent of the Majority Facility Lenders under Section 10.1 of the Credit Agreement, but Revlon and the Conspiring Lenders failed to obtain that consent.   As a result, their implementation of the 2020 Amendment—including the Purported Waiver—breached the Section 10.1 Proviso and the 2020 Amendment was void and unenforceable.

**VI.     Based on the Invalid 2020 Amendment, Defendants Complete the 2020 Transaction**

298.     Upon effectuating the 2020 Amendment against the will of the majority 2016 Term Lenders, Defendants wrongfully relied on the terms of the 2020 Amendment to cause RCPC to complete the remaining components of the 2020 Transaction.

**A.      Citibank Purports to Release the Liens on the BrandCo IP, RCPC Transfers the BrandCo IP to the BrandCo Entities, and RCPC Leases Its Back**

299.     Section 1(C) of the 2020 Amendment states: "In addition to the foregoing, pursuant to Section 9.4 of the [2016] Credit Agreement, each Consenting Lender hereby further authorizes, instructs, and directs the Administrative Agent and Collateral Agent (i) to execute and deliver and file all releases, notices of termination, filings, and any other documents necessary, advisable or desirable to effectuate the Disposition of the BrandCo Collateral or otherwise implement transaction contemplated by this Amendment and the BrandCo Loan Documents (including, without limitation, any Specified Borrower Repurchases) and (ii) to undertake any other filings, steps or actions as the Administrative Agent or the Collateral Agent in its sole discretion determines are necessary, advisable or desirable in carrying out, or in furtherance of, of such transactions and this direction."

300.     On May 7, 2020, in reliance on Section 1(C)(i)-(ii) of the 2020 Amendment and giving effect to those purported directions, Citibank purported to improperly release the liens held for the benefit of the 2016 Term Lenders on the BrandCo IP.

301.     With those liens now released, RCPC essentially replicated the American Crew IP Sale-Leaseback on a much larger scale and with respect to the BrandCo IP.  Indeed, RCPC (i) contributed the BrandCo IP into the BrandCo Entities; and (ii) RCPC then leased back the BrandCo IP to provide for its continued use by RCPC and its subsidiaries (the "2020 BrandCo IP Sale-Leaseback").  As a result, the 2020 BrandCo IP Sale-Leaseback violated the prohibition against such transactions set forth in Section 7.10 of the 2016 Credit Agreement.  Thus, exactly like the 2019 Transaction, the 2020 Transaction is predicated on the misappropriation of collateral pledged to the lenders under the 2016 Term Loan Facility.

**B.      RCPC Issues the New Loan Facilities and Imposes the 2020 Pari Passu Lien and Intercreditor Agreement**

302.    On or around May 7, 2020, RCPC, the BrandCo Lenders (which included the Conspiring Lenders), and Jefferies entered into a new credit agreement (the "2020 BrandCo Credit Agreement"). The 2020 BrandCo Credit Agreement gave rise to three new facilities (the 2020 Facilities), pursuant to which the BrandCo Entities granted liens to Jefferies (as Administrative Agent under the 2020 BrandCo Credit Agreement) on the BrandCo IP—the very same assets that had been stripped as collateral from the 2016 Term Loan Facility.

303.    *First*, RCPC issued a senior secured term loan facility in an initial aggregate principal amount of $815 million (the 2020 New Money Facility), plus the amount of certain fees that were capitalized. All of the assets of the BrandCo Entities (including their equity and the BrandCo IP) were pledged to secure the 2020 New Money Facility on a first-priority basis. The 2020 New Money Facility is also secured on a pari passu basis by the remaining assets securing the 2016 Term Loan Facility.

304.    As explained *supra*, $65 million was initially withheld from the 2020 New Money Facility and made available 10 days after closing, for 5 days, exclusively to buy out the Sham Revolver, at which point the aggregate principal amount outstanding under the 2020 New Money Facility became $880 million. On May 28, 2020, the 15th day after closing, the Sham Revolver was paid down using the $65 million withheld and then drawn under the 2020 New Money Facility. The funds not used to buy out the Sham Revolver were used to repay in full approximately $200 million of indebtedness outstanding under the 2019 Term Credit Agreement and pay fees and expenses in connection with the consummation of the transaction. The remaining funds were to

provide liquidity for general corporate purposes, including repurchasing and retiring outstanding senior notes issued by RCPC at an interest rate of 5.75%.

305.    *Second*, RCPC received commitments in respect of a senior secured term loan facility in an aggregate principal amount of $950 million (the 2020 Roll-Up Facility).  All of the assets of the BrandCo Entities (including their equity and the BrandCo IP) were pledged to secure the 2020 Roll-Up Facility on a second-priority basis.  The 2020 Roll-Up Facility was also secured on a pari passu basis by the assets securing the 2016 Term Loan Facility.  The proceeds of the 2020 Roll-Up Facility are available prior to the third anniversary of the closing date to purchase at par an equivalent amount of 2016 Term Loans held by the lenders participating in the 2020 New Money Facility.

306.    *Third*, RCPC issued a senior secured term loan facility in an initial aggregate principal amount of $3 million (the "2020 Junior Roll-Up Facility"). All of the assets of the BrandCo Entities (including their equity and the BrandCo IP) were pledged to secure the 2020 Junior Roll-Up Facility on a third-priority basis.  The 2020 Junior Roll-Up Facility is also secured on a pari passu basis by the assets securing the 2016 Term Loan Facility.  The proceeds of the 2020 Junior Roll-Up Term Loan were used to purchase at par an equivalent amount of term loans under the 2016 Term Loan Facility held by the lenders participating in the 2020 New Money Facility.  Further, all guarantors of the 2016 Term Loan Facility guarantee the 2020 Facilities. The 2016 Term Lenders were given the option to enter into the 2016 Extended Term Loans by extending the maturity of their loans to June 30, 2025.

307.    Consistent with how it rigged the vote for the 2020 Amendment by issuing the Sham Revolver, Revlon also coercively structured the vote for the 2020 Amendment to ensure that the 2020 BrandCo Credit Agreement would be effectuated.  Rather than allowing Lenders to vote

57

separately on whether to consent to the amendment and participate in the 2020 Facilities, Revlon allowed only those Lenders consenting to the amendment to participate in the 2020 Facilities. Revlon's threat was clear:  If a lender did not consent to the amendment, Revlon would strip the lender's collateral and the lender would be ineligible to lend into the 2020 Facilities that would usurp the lender's original secured claim.  As a prominent financial reporting service reported, "[t]he resulting transaction involved a coercive new financing that has crushed the debt held by a sizeable group of term loan holders, favoring holders willing to lend the company new money on generous terms."

308.    As with the purported release of the liens on the BrandCo IP under the 2016 Credit Agreement, the issuance of the 2020 Facilities relied on Section 1(C) of the 2020 Amendment. But for the 2020 Amendment purporting to authorize Citibank to "execute, deliver and file all releases, notices of termination, filings, and any other documents necessary advisable or desirable to effectuate the Disposition of the BrandCo Collateral or otherwise implement the transaction contemplated by this Amendment and the BrandCo Loan Documents," the 2020 Facilities—which are the transactions contemplated by the BrandCo Loan Documents—never would have existed.

309.    Further, recognizing the obvious import of the 2020 Transaction and the exposure it created for Defendants, Citibank and Jefferies Finance LLC entered into the Pari Passu Intercreditor Agreement as one last component to the 2020 Transaction.  The 2020 Pari Passu Intercreditor Agreement purports to severely limit the 2016 Term Lenders' ability to enforce their rights or give effect to their security.

310.    In doing so, Citibank and Jefferies Finance LLC relied on Section 1(b) of the 2020 Amendment, which provided that "[b]y execution and delivery of a Consent or this Amendment, as applicable, each Consenting Lender hereby authorizes, instructs, and directs the Administrative

Agent and the Collateral Agent to enter into a pari passu intercreditor agreement in the form attached hereto as Annex C with the administrative agent and collateral agent under the BrandCo Credit Agreement."

### C.  Conditions Precedent to Closing the 2020 BrandCo Credit Agreement Were Never Satisfied

311.   The 2020 BrandCo Credit Agreement provided for two relevant "Conditions Precedent to Closing":  *First*, "No event of default or contravention under the 2016 Term Facility . . ." *Second*, "The effectiveness of the 2016 Term Loan Amendments."

312.   Neither condition precedent was satisfied, rendering the 2020 BrandCo Credit Agreement ineffective because: (i) there were defaults or contraventions under the 2016 Term Loan Facility when the 2020 BrandCo Credit Agreement was executed; and (ii) "the 2016 Term Loan Amendments"—i.e., the 2020 Amendment—was invalid.

313.   The then-existing defaults or contraventions under the 2016 Term Loan Facility included:  (i) the Event of Default under Section 7.10 of the 2016 Credit Agreement arising out of the 2019 Transaction; (ii) the breaches of Section 2.25 of the 2016 Credit Agreement arising out of the issuance of the Sham Revolver; (iii) the breaches of the implied covenant arising out of the issuance of the Sham Revolver; and (iv) the breaches of Section 10.1 arising out of the adoption of the 2020 Amendment without the required consents.  As explained *supra* in Part V, the 2020 Amendment—and the Purported Waiver therein—did not effectively waive these defaults or contraventions because it did not itself receive sufficient consents to become effective.  The condition precedent requiring an absence of such defaults or contraventions under the 2016 Term Facility was thus never satisfied and the 2020 BrandCo Credit Agreement was ineffective.

314.    For the same reason, the 2020 Amendment was invalid because it was not adopted with sufficient consents.  As a result, the "2016 Term Loan Amendments," as contemplated by the BrandCo Credit Agreement, never were effective and that condition precedent for the effectiveness of the 2020 BrandCo Credit Agreement never was satisfied.

### D.    The 2020 Transaction Destroyed the Value of the 2016 Term Loans

315.    Market data from when the 2020 Transaction was announced through its completion showed that the 2020 Transaction gutted the value of the 2016 Term Loans.

316.    On March 9, 2020, RCPC entered into a commitment letter with Jefferies Finance LLC to effectuate the 2020 Transaction, and simultaneously announced the commitment in a Form 8-K disclosure that described the transaction structure.

317.    In recognition of the effect of the transaction—misappropriating key collateral underpinning the 2016 Term Loan Facility and stripping away Plaintiffs' lien on that collateral—the secondary market for 2016 Term Loans precipitously dropped.  The secondary market price precipitously dropped again after Revlon's Form 10-K announcement on May 11, 2020, that four days earlier, the 2020 Amendment had been effectuated and that RCPC had entered into the 2020



BrandCo Credit Agreement with Revlon, Inc., Jefferies, as administrative agent and collateral agent, and the Conspiring Lenders.

318.    The precipitous drop in the market price of the 2016 Term Loans reflected what RCPC knew when it constructed the 2020 Transaction: Misappropriating a material amount and massively diluting what remained of the collateral securing the loans extended by the 2016 Term Lenders—collateral that those lenders bargained for and upon which they based their lending decisions—had a devastating effect on the value of the 2016 Term Loans.  The natural and obvious consequence of the transaction was to impede the 2016 Term Lenders' ability to collect on their loans and enforce their security rights.   RCPC brought about this result knowingly and purposefully, as it was a central and inevitable piece of the 2020 Transaction.  Upon execution of the transaction, Moody's downgraded the 2016 Term Loan from Caa2(LGD3) to Ca(LGD5), "reflect[ing] that the removal of the BrandCo collateral and the dilution of the security interest in the remaining collateral will weaken recovery prospects."  Its assessment of estimated "Loss Given Default" jumped from 30%-50% to 70%-90%.

## VII.    Citibank Refuses to Resign as Administrative Agent and Collateral Agent for the 2016 Credit Agreement and Continues to Act on Its Conflicts of Interest

319.    On May 20, 2020, counsel for the Co-Op Lenders again directed Citibank to resign as Administrative Agent and Collateral Agent for the 2016 Credit Agreement.

320.    On May 22, 2020, Citibank sent a letter to the 2016 Term Lenders stating that it would resign as Administrative Agent and Collateral Agent under the 2016 Credit Agreement.

321.    The Co-Op Lenders then sought to replace Citibank with another representative. The Co-Op Lenders took immediate steps to fill the role, including selecting and submitting to RCPC the identities of at least two experienced Successor Agents.  In response, Revlon indicated

that it was facilitating Citibank's replacement, but instead delayed the succession. For the first two weeks of June 2020, Revlon claimed it was evaluating which candidate it preferred to act as Successor Agent. In reality, it was stalling to prevent the appointment of a Successor Agent who could pursue remedies on behalf of the Co-Op Lenders.

322.   On June 19, 2020, notwithstanding Revlon's delay tactics, the Co-Op Lenders appointed a Successor Agent—UMB Bank, National Association. Citibank refused to sign an agreement to document and facilitate the transaction without first obtaining a release from the Successor Agent.

323.   On June 21, 2020, Citibank's counsel distributed a draft Successor Agent Appointment and Agency Transfer Agreement ("Successor Agreement"). UMB Bank's counsel responded with comments three days later. On June 30, counsel to Revlon circulated its comments on the Successor Agreement, which included UMB Bank's deletion of the self-dealing release demanded by Citibank. Revlon did not assert any objection to UMB stepping in to serve as Successor Agent. Accordingly, no later than June 30, 2020, and on several dates thereafter, RCPC (the Borrower) consented to the 2016 Term Lenders' appointment of UMB Bank as Successor Agent under the 2016 Credit Agreement.

324.   Pursuant to the Required Lenders' appointment of UMB in accordance with the requirements of Section 9.9(a) of the 2016 Credit Agreement, and with RCPC's consent, UMB Bank is the Successor Agent. Nonetheless, Citibank has not facilitated a smooth transition of the agent role. For example, on July 20, 2020—a month after circulating the original draft agreement—Citibank unilaterally reinserted its unwarranted release into the Successor Agreement, and refused to sign the document without a release. Moreover, on July 29, 2020, Citibank—unlike the Borrower—refused to approve a transfer of 2016 Term Loans to UMB Bank.

325.   On August 12, 2020, the Co-Op Lenders, as the Required Lenders under the 2016 Credit Agreement, sent a further Notice of Event of Default. Among other things, this Notice explained that various aspects of the 2020 Transaction constituted further Events of Default under the 2016 Credit Agreement, including, among other things, (1) RCPC's entry into the 2020 Amendment in violation of Section 10.1 of the 2016 Credit Agreement, (2) RCPC's incurrence of the loans under the 2020 BrandCo Credit Agreement in violation of Section 7.2 of the 2016 Credit Agreement, (3) RCPC's incurrence of liens securing the new indebtedness under the 2020 BrandCo Credit Agreement, in violation of Section 7.3 of the 2016 Credit Agreement, and (4) the purported release of liens upon and transfer of the BrandCo IP to Non-Guarantor Subsidiaries, and the leasing back of the BrandCo IP to RCPC in violation of Section 7.10 of the 2016 Credit Agreement.

326.   In the August 12, 2020 Notice of Event of Default, the Required Lenders under the 2016 Credit Agreement further directed UMB Bank, which had replaced Citibank as Administrative Agent and Collateral Agent under the 2016 Credit Agreement, to declare the 2016 Term Loan "due and payable" as of the date of the notice.

327.   Citibank, however, has refused to recognize any of these Events of Default, refused to recognize its own replacement by UMB Bank, and has refused to resign as Agent under the 2016 Credit Agreement despite being directed to do so by the overwhelming majority of the 2016 Term Lenders.

328.   Citibank has also failed to recognize any assignments of the 2016 Term Loans, preventing the remaining Lenders from freely assigning their debt and other interest holders from obtaining such assignments.

329.   On September 6, 2022, counsel for Plaintiffs sent a letter to counsel for Citibank.

The letter explained Citibank's conflicts of interest in detail and stated:

> The Ad Hoc Group hereby requests again that Citibank (i) acknowledge and confirm its prior resignation and removal as Administrative Agent under the 2016 Credit Agreement and its replacement by UMB Bank, N.A.; or (ii) alternatively, resign, effective immediately, as Administrative Agent under the 2016 Credit Agreement.  As you are certainly aware, the record reflects that Citibank has, in fact, already resigned and has been replaced as Administrative Agent.  Citibank cannot reasonably or in good faith purport to continue to serve in that position in view of its malfeasance, its failure to perform the customary obligations of an administrative agent in connection with Revlon's restructuring and bankruptcy, and its disabling conflicts of interest.
> . . . .
> On these facts, the record will show that Citibank materially breached the 2016 Credit Agreement, has willfully abused its position as Administrative Agent to the detriment of the Lenders, and cannot reasonably insist on continuing to serve in that capacity.  If Citibank does not recognize UMB as the incumbent Administrative Agent, it must immediately resign and consent to the appointment of a successor agent acceptable to the 2016 Term Loan Lenders.  This would allow UMB or another party to act on behalf of the Lenders without conflicts of interest, including in connection with the Chapter 11 Cases, any challenge to the BrandCo Transaction, and the Subrogation Claim.

330.   In response, Citibank did not provide any substantive defense or explanation of its conduct, offering instead only a one-paragraph general denial of any wrongdoing.

331.   Even if Citibank were still the Administrative and Collateral Agent under the 2016 Credit Agreement, it cannot bring suit on behalf of all Lenders under that agreement because it has disabling conflicts of interest.  Where the nature of the claim is such that its prosecution pits one group of lenders against another, an agent has an inherent conflict of interest and, in those circumstances, individual lenders have the right to bring their own suits.

64

332.    That is the situation here.  The Complaint, among other things, seeks to invalidate the Sham Revolver, the 2020 Amendment, and the transactions undertaken pursuant thereto.  Such claims necessarily pit one group of lenders against another—i.e., the 2016 Term Lenders against the Conspiring Lenders.  Citibank also faces the prospect of liability for its own actions, including participating in and facilitating Defendants' scheme.

333.    It also would be futile to request that Citibank institute this proceeding on behalf of all Lenders where, as alleged herein, Citibank (i) is liable for, and played an instrumental role in, Defendants' scheme to divest Plaintiffs of their security interests in the BrandCo IP; and (ii) had its own economic interest in perpetrating this scheme to Plaintiffs' detriment.  Indeed, it cannot reasonably be expected that, under these circumstances, Citibank would pursue a declaration that the very transactions it oversaw and implemented were unlawful and invalid.

334.    Regardless, on October 7, 2022, Plaintiffs requested that Citibank institute the instant suit and also timely file proofs of claim on behalf of all Lenders against all of the debtors at issue.  On October 12, 2022, Citibank declined to do so, consistent with its blatant conflicts of interest.

## VIII.  The Chapter 11 Cases

335.    On June 15, 2022, each of the Debtors declared insolvency and filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

336.    On June 16 and June 17, 2022, the Court held the first day hearings for these Chapter 11 Cases (the "First Day Hearing").  During the course of the First Day Hearing, counsel representing the Debtors and counsel representing Plaintiffs each acknowledged that intercreditor disputes concerning the validity of the 2020 Transaction, the validity and enforceability of

prepetition liens related to the BrandCo IP, and the ultimate treatment of the BrandCo IP and the value flowing from it were likely to be central issues in the bankruptcy proceedings.

337.    Indeed, in light of the significance of the value of the BrandCo IP relative to the amount of debt outstanding under the 2016 Credit Agreement and the purported 2020 BrandCo Credit Agreement, the determination of the validity and priority of the various liens and purported liens against the BrandCo IP will have tremendous implications for numerous stakeholders in the instant Chapter 11 Cases.

338.    In fact, the Final DIP Order entered on August 2, 2022, contains a specific provision at paragraph 29(b)(ix) explicitly stating that "… neither the approval of the DIP Facilities nor entry of this Final Order (including anything contained therein) is intended to or shall: … impair the Court's authority to modify any provision of the Final Order to the extent (A) (II) such provision relates to the Intercompany DIP Facility, the BrandCo License Agreements or the Adequate Protection Obligations and is premised upon the validity or priority of a prepetition claim or lien, the validity of a prepetition agreement or the inclusion of any asset in any specific Debtor's estate and (II) pursuant to a successful Challenge, such prepetition claim is disallowed, such lien is avoided, such priority is altered, such prepetition agreement is invalidated or such asset is determined to be property of another Debtor's estate or (B) (I) such provision relates to the relative rights of the Prepetition BrandCo Parties and the Prepetition 2016 Term Loan Secured Parties under this Final Order and is premised upon the validity of the Prepetition Pari Passu Term Loan Intercreditor Agreement and (II) pursuant to a successful Challenge, the Prepetition Pari Passu Term Loan Intercreditor Agreement is invalidated …."

339.    The Intercompany DIP Facility and the Adequate Protection Obligations contained in the Final DIP Order allow the BrandCo Lenders to continue to reap the benefits of their wrongful

conduct by placing additional intercompany debt on RCPC for the benefit of the BrandCo Entities and funneling additional value to the BrandCo Lenders.  By this Complaint, Plaintiffs seek to void and unwind the Intercompany DIP Facility and challenge the Adequate Protection Obligations because, for all the reasons alleged, the purported prepetition agreements on which the Intercompany DIP Facility is based are void *ab initio* or otherwise should be rescinded and unwound.

340.    Consistent with their scheme, the BrandCo Lenders—including many of the Conspiring Lenders—have asserted in these bankruptcy cases that they are entitled to the value of the BrandCo IP.  These bankruptcy cases thus set the stage for the final step of Defendants' scheme: unless the 2020 Transaction and the BrandCo Lenders' liens are declared void *ab initio*, the BrandCo Lenders will be rewarded for conspiring with RCPC and the other Defendants to up-end Revlon's capital structure amidst the prospect of insolvency in plain violation of their contractual and other legal obligations, while Plaintiffs will be deprived of a meaningful remedy against RCPC.

## **FIRST CAUSE OF ACTION**
**(Declaratory Judgment as to the 2020 Amendment and Related Transactions)**
**(Against RCPC, the BrandCo Lenders, Jefferies, and the BrandCo Entities)**

341.    Plaintiffs repeat and reallege the foregoing allegations as though they were fully set forth in this paragraph.

342.    Pursuant to the Declaratory Judgment Act of 1934, 28 U.S.C. §§ 2201-2202, this Court is authorized to issue a declaratory judgment.

343.    An actual and justiciable controversy presently exists between Plaintiffs, RCPC, the Conspiring Lenders, and the BrandCo Entities as to whether the 2020 Amendment, and the transactions executed pursuant thereto, are void *ab initio*.

344.    A judicial determination is necessary and required at this stage to adjudicate the parties' respective rights and obligations.

345.    Under Section 10.1 of the 2016 Credit Agreement, RCPC and the Conspiring Lenders failed to obtain the consent of the Required Lenders to adopt the 2020 Amendment.  The 2020 Amendment is therefore void *ab initio*.  Any vote premised on holdings from the Sham Revolver was invalid because:

- RCPC breached Section 2.25 of the 2016 Credit Agreement by issuing the Sham Revolver when there was an Event of Default arising out of the 2019 Transaction;

- Even if RCPC had any discretion to issue the Sham Revolver (it did not), RCPC breached the implied covenant of good faith and fair dealing by issuing it solely to manipulate voting and to bypass the consent rights of the majority Lenders under the 2016 Agreement;

- The Conspiring Lenders breached the implied covenant of good faith and fair dealing by participating in and facilitating the scheme to use the Sham Revolver to disenfranchise the other Lenders;

346.    In addition, regardless of whether the Sham Revolver was valid, the 2020 Amendment was not validly adopted because RCPC and the Conspiring Lenders failed to obtain the consent of the Majority Facility Lenders, as required under the Section 10.1 Proviso, and implemented the 2020 Amendment in breach of that section.  For this reason too, the 2020 Amendment is void *ab initio*.

347.    Because the 2020 Amendment was void *ab initio*, the transactions undertaken pursuant to the 2020 Amendment were void *ab initio*, including:  (i) the purported release of the liens on the BrandCo IP under the 2016 Credit Agreement; (ii) the Purported Waiver; (iii) the BrandCo IP Sale-Leaseback; (iv) the Parri Passu Intercreditor Agreement; (v) the Pari Passu Lien; (vi) the BrandCo Credit Agreement and the 2020 Facilities; and (vii) the Intercompany DIP Facility.

68

348.     Plaintiffs are thus entitled to a declaratory judgment that the Sham Revolver was null and void for any purpose under the 2016 Credit Agreement, including any consent requirements under Section 10.1 and that each component of the 2020 Transaction is void *ab initio*, including a declaration that: (i) the 2020 Amendment is void *ab initio*; (ii) the purported release of the liens on the BrandCo IP under the 2016 Credit Agreement is void *ab initio*; (iii) the Purported Waiver is void *ab initio*; (iv) the Pari Passu Intercreditor Agreement is void *ab initio*; (v) the BrandCo IP Sale-Leaseback is void *ab initio*; (vi) the Pari Passu Lien is void *ab initio*; (vii) the BrandCo Credit Agreement and the 2020 Facilities are void *ab initio*; and (viii) the Intercompany DIP Facility is void *ab initio*.

## SECOND CAUSE OF ACTION
**(Breach of Contract—Section 7.10 of the 2016 Credit Agreement)**
**(American Crew IP Sale-Leaseback Transaction)**
**(Against RCPC)**

349.     Plaintiffs repeat and reallege the foregoing allegations as though they were fully set forth in this paragraph.

350.     At all relevant times following the execution of the 2016 Credit Agreement, RCPC and the 2016 Term Lenders were parties to the 2016 Credit Agreement.

351.     Plaintiffs have performed all of the material conditions, covenants, and promises required to be performed in accordance with the terms and conditions of the 2016 Credit Agreement.

352.     Section 7.10 of the 2016 Credit Agreement states, "the Borrower shall not, and shall not permit any of its Restricted Subsidiaries to . . . [e]nter into any arrangement with any Person providing for the leasing by the Borrower or any of its Restricted Subsidiaries of real or personal Property which is to be sold or transferred by the Borrower or any of its Restricted Subsidiaries . .

69

. to such Person . . . , except for . . . any such arrangement to the extent that the Fair Market Value of such Property does not exceed the greater of (i) \$100,000,000 and (ii) 3.0% of Consolidated Total Assets at the time of such event . . . ."  (2016 Credit Agreement § 7.10.)

353.    On August 6, 2019, RCPC entered into the 2019 Term Loan Facility with Ares, in an initial aggregate principal amount of \$200 million. As part of the 2019 Term Loan Agreement, RCPC entered into the American Crew IP Sale-Leaseback. To effectuate the American Crew IP Sale-Leaseback, RCPC assigned and transferred all of its rights, title, and interests in the American Crew IP to its Restricted Subsidiary, BrandCo. RCPC entered into a license and royalty arrangement with BrandCo to provide for RCPC's exclusive non-transferrable, continued use of the American Crew IP during the term of the 2019 Term Loan Facility.

354.    The license and royalty arrangement constituted a prohibited transaction under Section 7.10.  Under the American Crew IP Sale-Leaseback, RCPC and its Restricted Subsidiary BrandCo Holdings transferred the American Crew IP to BrandCo, a "Person." BrandCo, "such Person," leased the American Crew IP to RCPC.  The American Crew IP constituted "personal Property" that was "transferred" and the license and royalty arrangement constituted a "lease." The Fair Market Value of the American Crew IP exceeded both \$100,000,000 and 3.0% of Consolidated Total Assets at the time of such event in the aggregate. Therefore, the American Crew IP Sale-Leaseback violated Section 7.10.

355.    Prior to the American Crew IP Sale-Leaseback, the American Crew IP had been owned by a Guarantor Subsidiary of RCPC. The 2016 Term Lenders had a first-priority lien on the American Crew IP.  By contributing the American Crew IP from one of RCPC's Guarantor Subsidiaries, on whose assets the 2016 Term Lenders had a first-priority lien, to BrandCo, on

70

whose assets Ares had first-priority liens, RCPC stripped away the 2016 Term Lenders' first-priority lien on the American Crew IP.

356.    As a direct and proximate result of RCPC's breach of Section 7.10 of the 2016 Credit Agreement, Plaintiffs suffered the loss of unique and valuable collateral securing their loan to RCPC, and the damages suffered by Plaintiffs are such that there is no complete or adequate remedy at law.

357.    In the alternative to the declaratory relief sought pursuant to the First Cause of Action (*see supra* ¶¶ 341-48), Plaintiffs seek and are entitled to (i) specific performance of the 2016 Credit Agreement, including Sections 4.17, 7.2, 7.3, 7.10, and 10.1 therein, and specific performance of the 2016 Guarantee and Collateral Agreement, including Sections 3.1 and 6.7 therein, pursuant to which Plaintiffs are entitled to first-priority liens and property interests over the BrandCo IP that 2016 Term Lenders bargained for in connection with the 2016 Credit Agreement; and (ii) rescission of the American Crew IP Sale-Leaseback.

## THIRD CAUSE OF ACTION
### (Breach of Contract—Section 2.25, 2016 Credit Agreement)
### (Against RCPC)

358.    Plaintiffs repeat and reallege the foregoing allegations as though they were fully set forth in this paragraph.

359.    At all relevant times following the execution of the 2016 Credit Agreement, RCPC and the 2016 Term Lenders were parties to the 2016 Credit Agreement.

360.    Plaintiffs have performed all of the material conditions, covenants, and promises required to be performed in accordance with the terms and conditions of the 2016 Credit Agreement.

361.     Under the 2016 Credit Agreement, RCPC may, by written notice to the Administrative Agent, elect to request the establishment of Revolving Commitments.  Section 2.25 of the 2016 Credit Agreement states that "[t]he Borrower may by written notice to the Administrative Agent elect to request the establishment of … Revolving Commitments … hereunder, in an aggregate amount for all such New Loan Commitments.  Such New Loan Commitments shall become effective as of such Increased Amount Date; provided, that: *no Event of Default shall exist on such Increased Amount Date immediately after giving effect to such New Loan Commitments* and the making of any New Loans pursuant thereto and any transaction consummated in connection therewith subject to the Permitted Acquisition Provisions (as defined below) and the Limited Condition Acquisition Provision, in connection with any acquisition or investment being made with the proceeds thereof" (emphasis added). Therefore, Revolving Commitments could not become effective if an Event of Default existed on the day they were to be established.

362.     On April 23, 2020, RCPC noticed to Citibank, as Administrative Agent, its request to establish the Sham Revolver in the amount of $100 million, pursuant to the terms of Section 2.25 of the 2016 Credit Agreement. The Sham Revolver was to become effective on April 30, 2020.

363.     On April 29, 2020, certain Plaintiffs sent Citibank, as the Administrative Agent of the 2016 Credit Agreement, a Notice of Event of Default pursuant to Section 9.5 of the 2016 Credit Agreement. This Notice stated, among other things, that "[t]he undersigned Lenders hereby notify the Agent that the transfer of the American Crew IP by the Borrower to its Non-Guarantor Subsidiary, Beautyge II, LLC (the 'IP Transferee'), and the licensing back of the American Crew IP by the IP Transferee to the Borrower, in connection with the Ares Financing constitutes a breach

72

of Section 7.10 of the 2016 Credit Agreement. This breach of Section 7.10 of the 2016 Credit

Agreement constitutes an Event of Default under Section 8.1(c) of the 2016 Credit Agreement."

364.    On April 30, 2020, certain Plaintiffs again alerted Citibank that, in light of the Event

of Default, Citibank could not allow the issuance of the Sham Revolver and that doing so would

constitute a further Event of Default.

365.    Notwithstanding the multiple warnings sent directly to Citibank, on April 30, 2020,

Citibank executed and delivered a Joinder Agreement and other documentation purporting to

establish the Sham Revolver in the amount of $65 million, of which RCPC drew $63.5 million.

366.    Because an Event of Default existed at the time the Sham Revolver was to be issued,

in violation of a condition precedent to its issuance, the establishment of the Sham Revolver was

invalid and therefore RCPC's purported issuance of, and drawing upon, the Sham Revolver

constituted breaches of Section 2.25 and another Event of Default by RCPC.

367.    As a result of the issuance of the Sham Revolver, the 2020 Amendment was adopted

despite the fact that the holders of less than 50% of the aggregate unpaid principal amount of the

2016 Term Loan Facility consented to it.  The 2020 Amendment thus had the consent of neither

the Majority Term Loan Facility Lenders nor the Required Lenders.  Therefore, the issuance of the

Sham Revolver proximately caused the adoption of the 2020 Amendment and the harms to the

2016 Term Lenders contained therein.

368.    As a direct and proximate result of RCPC's breach of Section 2.25 of the 2016

Credit Agreement, Plaintiffs suffered the loss of unique and valuable collateral securing their loan

to RCPC, and the damages suffered by Plaintiffs are such that there is no complete or adequate

remedy at law.

369.    In the alternative to the declaratory relief sought pursuant to the First Cause of Action (*see supra* ¶¶ 341-48), Plaintiffs seek and are entitled to (i) specific performance of the 2016 Credit Agreement, including Sections 2.25, 4.17, 7.2, 7.3, 7.10, 9.5, and 10.1 therein, and specific performance of the 2016 Guarantee and Collateral Agreement, including Sections 3.1 and 6.7 therein, pursuant to which Plaintiffs are entitled to first-priority liens and property interests over the BrandCo IP that 2016 Term Lenders bargained for in connection with the 2016 Credit Agreement; and (ii) rescission of the 2020 Amendment and the transactions undertaken pursuant thereto, including (1) the purported release of the liens on the BrandCo IP under the 2016 Credit Agreement; (2) the Purported Waiver; (3) the BrandCo IP Sale-Leaseback; (4) the Parri Passu Intercreditor Agreement; (5) the Pari Passu Lien; (6) the BrandCo Credit Agreement and the 2020 Facilities; and (7) the Intercompany DIP Facility.

## FOURTH CAUSE OF ACTION
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)
### (Against RCPC and the Conspiring Lenders)

370.    Plaintiffs repeat and reallege the foregoing allegations as though they were fully set forth in this paragraph.

371.    At all relevant times following the execution of the 2016 Credit Agreement, RCPC and the 2016 Term Lenders were parties to the 2016 Credit Agreement.

372.    Plaintiffs have performed all of the material conditions, covenants, and promises required to be performed in accordance with the terms and conditions of the 2016 Credit Agreement.

373.    Implicit in all contracts governed by New York law is a covenant of good faith and fair dealing.  The covenant of good faith and fair dealing provides that a party shall not do anything

that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

374.     To the extent RCPC had any discretion to issue the Sham Revolver, RCPC, and the Conspiring Lenders exercised that discretion in bad faith by issuing and exploiting the Sham Revolver, which destroyed Plaintiffs' rights to receive the fruits of their bargain in violation of the implied covenant of good faith and fair dealing.

375.     The Sham Revolver was issued solely to manipulate the vote on the 2020 Amendment, to overcome the expressed opposition of the majority of Lenders to the 2020 Amendment, and to deny those Lenders the right to properly exercise their consent rights.

376.     As a direct and proximate result of RCPC's and the Conspiring Lenders' breaches of the implied covenant of good faith and fair dealing, Plaintiffs suffered the loss of unique and valuable collateral securing their loan to RCPC, and the damages suffered by Plaintiffs are such that there is no complete or adequate remedy at law.

377.     If the Sham Revolver had not been issued in breach of the implied covenant of good faith and fair dealing, RCPC would not have been able to engage in their vote rigging scheme and therefore would not have been able to execute the 2020 Amendment.

378.     In the alternative to the declaratory relief sought pursuant to the First Cause of Action (*See supra* ¶¶ 341-48), Plaintiffs seek and are entitled to (i) specific performance of the 2016 Credit Agreement, including Sections 2.25, 4.17, 7.2, 7.3, 7.10, 9.5, and 10.1 therein, and specific performance of the 2016 Guarantee and Collateral Agreement, including Sections 3.1 and 6.7 therein, pursuant to which Plaintiffs are entitled to first-priority liens and property interests over the BrandCo IP that 2016 Term Lenders bargained for in connection with the 2016 Credit Agreement; and (ii) rescission of the 2020 Amendment and the transactions undertaken pursuant

75

thereto, including (1) the purported release of the liens on the BrandCo IP under the 2016 Credit

Agreement; (2) the Purported Waiver; (3) the BrandCo IP Sale-Leaseback; (4) the Parri Passu

Intercreditor Agreement; (5) the Pari Passu Lien; and (6) the BrandCo Credit Agreement and the

2020 Facilities; and (7) the Intercompany DIP Facility.

379.    In the alternative to the declaratory relief sought pursuant to the First Cause of

Action (*see supra* ¶¶ 341-48), and only to the extent it is determined that there is an adequate

remedy at law as against the Conspiring Lenders, Plaintiffs seek compensatory damages in an

amount to be proven at trial.

## FIFTH CAUSE OF ACTION
**(Breach of Contract—Section 7.10 of the 2016 Credit Agreement)**
**(BrandCo IP Sale-Leaseback Transaction)**
**(Against RCPC)**

380.    Plaintiffs repeat and reallege the foregoing allegations as though they were fully set

forth in this paragraph.

381.    At all relevant times following the execution of the 2016 Credit Agreement, RCPC

and the 2016 Term Lenders were parties to the 2016 Credit Agreement.

382.    Plaintiffs have performed all of the material conditions, covenants, and promises

required to be performed in accordance with the terms and conditions of the 2016 Credit

Agreement.

383.    Section 7.10 of the 2016 Credit Agreement states, "the Borrower shall not, and shall

not permit any of its Restricted Subsidiaries to . . . [e]nter into any arrangement with any Person

providing for the leasing by the Borrower or any of its Restricted Subsidiaries of real or personal

Property which is to be sold or transferred by the Borrower or any of its Restricted Subsidiaries . .

. to such Person . . . , except for . . . any such arrangement to the extent that the Fair Market Value

of such Property does not exceed the greater of (i) $100,000,000 and (ii) 3.0% of Consolidated

Total Assets at the time of such event . . . ."  (2016 Credit Agreement § 7.10.)

384.    On May 7, 2020, RCPC entered into the 2020 BrandCo Credit Agreement with the

BrandCo Lenders, including the Conspiring Lenders.  In connection with the 2020 BrandCo Credit

Agreement, RCPC entered into the BrandCo IP Sale-Leaseback.  To effectuate the BrandCo IP

Sale-Leaseback, RCPC assigned and transferred all of its rights, title, and interests in the BrandCo

IP to its Restricted Subsidiaries, the BrandCo Subsidiaries.  RCPC entered into license and royalty

arrangements with the BrandCo Subsisdiaries to provide for RCPC's exclusive, nontransferrable,

continued use of the BrandCo IP during the term of the 2020 BrandCo Credit Agreement.

385.    This license and royalty arrangement constituted a prohibited transaction under

Section 7.10.   Under the BrandCo IP Sale-Leaseback, RCPC and its Restricted Subsidiaries

transferred the BrandCo IP to BrandCo Subsidiaries, "Persons."   The BrandCo Subsidiaries, "such

Persons," leased the BrandCo IP to RCPC.   Under the terms of Section 7.10, the BrandCo IP

constituted "personal Property" that was "transferred" and the license and royalty arrangement

constituted a "lease."  The Fair Market Value of the BrandCo IP exceeded both $100,000,000 and

3.0% of Consolidated Total Assets at the time of such event in the aggregate.   Therefore, the

BrandCo IP Sale-Leaseback violated Section 7.10.

386.    Prior to the BrandCo IP Sale-Leaseback, the BrandCo IP had been owned by

Guarantor Subsidiaries of RCPC.  The 2016 Term Lenders had a first-priority lien on the BrandCo

IP.   In order to transfer the BrandCo IP to the BrandCo Subsidiaries, on whose assets the

Conspiring Lenders had first-priority liens, RCPC stripped away the 2016 Term Lenders' first-

priority lien on the BrandCo IP.

387.    As a direct and proximate result of RCPC's breach of Section 7.10 of the 2016 Credit Agreement, Plaintiffs suffered the loss of unique and valuable collateral securing their loan to RCPC, and the damages suffered by Plaintiffs are such that there is no complete or adequate remedy at law.

388.    In the alternative to the declaratory relief sought pursuant to the First Cause of Action (*see supra* ¶¶ 341-48), Plaintiffs seek and are entitled to (i) specific performance of the 2016 Credit Agreement, including Sections 2.25, 4.17, 7.2, 7.3, 7.10, 9.5, and 10.1 therein, and specific performance of the 2016 Guarantee and Collateral Agreement, including Sections 3.1 and 6.7 therein, pursuant to which Plaintiffs are entitled to first-priority liens and property interests over the BrandCo IP that 2016 Term Lenders bargained for in connection with the 2016 Credit Agreement; (ii) rescission of the BrandCo IP Sale-Leaseback; and (iii) rescission of the Intercompany DIP Facility.

### SIXTH CAUSE OF ACTION
**(Breach of Contract—Section 10.1 of the 2016 Credit Agreement)**
**(Against RCPC and the Conspiring Lenders)**

389.    Plaintiffs repeat and reallege the foregoing allegations as though they were fully set forth in this paragraph.

390.    At all relevant times following the execution of the 2016 Credit Agreement, RCPC and the 2016 Term Lenders were parties to the 2016 Credit Agreement.

391.    Plaintiffs have performed all of the material conditions, covenants, and promises required to be performed in accordance with the terms and conditions of the 2016 Credit Agreement.

392.    Section 10.1 of the 2016 Credit Agreement provides that, subject to certain restrictions, the Borrower and the Required Lenders under the 2016 Credit Agreement may amend,

supplement, or modify such agreement, "<u>provided</u>, . . . that the consent of the applicable Majority Facility Lenders shall be required with respect to any amendment that by its terms adversely affects the rights of Lenders under such Facility in respect of payments hereunder in a manner different from such amendment that affects other Facilities."  (2016 Credit Agreement § 10.1.)

393.    On May 7, 2020, RCPC purported to execute a series of integrated transactions, including the 2020 Amendment, the Sham Revolver issuance, the 2020 BrandCo IP Sale-Leaseback Transaction, the granting of the Pari Passu Lien, the 2020 Pari Passu Intercreditor Agreement, and the 2020 BrandCo Credit Agreement.

394.    The 2020 Amendment "adversely affect[ed] the rights of [the 2016 Term] Lenders . . . in respect of payments hereunder in a manner different from such amendment that affects [the Sham Revolver]."

395.    RCPC and the Conspiring Lenders breached Section 10.1 by implementing the 2020 Amendment without obtaining the consent of the Majority Facility Lenders (i.e., the majority of 2016 Term Lenders) where the 2020 Amendment "adversely affect[ed] the rights" of the 2016 Term Lenders "in respect of payments hereunder in a manner different from such amendment that affects" the rights of the Sham Revolver Lenders.

396.    As a direct and proximate result of RCPC's breach of Section 10.1 of the 2016 Credit Agreement, Plaintiffs suffered the loss of unique and valuable collateral securing their loan to RCPC, and the damages suffered by Plaintiffs are such that there is no complete or adequate remedy at law.

397.    In the alternative to the declaratory relief sought pursuant to the First Cause of Action (*see supra* ¶¶ 341-48), Plaintiffs seek and are entitled to (i) specific performance of the 2016 Credit Agreement, including Sections 2.25, 4.17, 7.2, 7.3, 7.10, 9.5, and 10.1 therein, and

specific performance of the 2016 Guarantee and Collateral Agreement, including Sections 3.1 and 6.7 therein, pursuant to which Plaintiffs are entitled to first-priority liens and property interests over the BrandCo IP that 2016 Term Lenders bargained for in connection with the 2016 Credit Agreement; and (ii) rescission of the 2020 Amendment and the transactions undertaken pursuant thereto, including (1) the purported release of the liens on the BrandCo IP under the 2016 Credit Agreement; (2) the Purported Waiver; (3) the BrandCo IP Sale-Leaseback; (4) the Parri Passu Intercreditor Agreement; (5) the Pari Passu Lien; (6) the BrandCo Credit Agreement and the 2020 Facilities; and (7) the Intercompany DIP Facility.

398.    In the alternative to the declaratory relief sought pursuant to the First Cause of Action (*see supra* ¶¶ 341-48), and only to the extent it is determined that there is an adequate remedy at law as against the Conspiring Lenders, Plaintiffs seek compensatory damages in an amount to be proven at trial.

## SEVENTH CAUSE OF ACTION
### (Declaratory Judgment as to the 2016 Credit Agreement)
### (Against RCPC and the BrandCo Lenders)

399.    Plaintiffs repeat and reallege the foregoing allegations as though they were fully set forth in this paragraph.

400.    Pursuant to the Declaratory Judgment Act of 1934, 28 U.S.C. §§ 2201-2202, this Court is authorized to issue a declaratory judgment.

401.    An actual and justiciable controversy presently exists between Plaintiffs, on the one hand, and RCPC and the Conspiring Lenders, on the other, concerning the 2016 Credit Agreement.

402.    At all relevant times following the execution of the 2016 Credit Agreement, RCPC and the 2016 Term Lender were parties to the 2016 Credit Agreement.

403.     As set forth above, RCPC and the Conspiring Lenders breached the 2016 Credit Agreement in several ways, including by (i) breaching Section 7.10 by undertaking the American Crew Sale-Leaseback; (ii) breaching Section 2.25 by issuing the Sham Revolver loans; (iii) breaching Section 7.10 by undertaking the BrandCo Sale-Leaseback; (iv) breaching Section 10.1(a)(C) by purporting to adopt the 2020 Amendment without the required consent of all Lenders; and (v) breaching the Section 10.1 Proviso by purporting to adopt the 2020 Amendment without the required consent of the Majority Facility Lenders.

404.     Under Section 8.1 of the 2016 Credit Agreement, an "Event of Default" has occurred "[i]f any of the following events shall occur and be continuing," which include, among other things, if:

  i.     "(c) The Borrower or any Subsidiary Guarantor shall default in the observance or performance of any agreement contained in Section 6.4(a) (solely with respect to maintaining the existence of the Borrower) or Section 7 or Holdings shall default in the observance or performance of any agreement contained in Section 7A"; or

  ii.    "(d) Any Loan Party shall default in the observance or performance of any other agreement contained in this Agreement or any other Loan Document . . . and such default shall continue unremedied for a period of 30 days after such Loan Party receives from the Administrative Agent or the Required Lenders notice of the existence of such default."

405.     Plaintiffs are entitled to a declaration that each of RCPC's breaches constituted an Event of Default under Section 8.1 of the 2016 Credit Agreement.

406.    Plaintiffs are further entitled to a declaration that each Notice of Event of Default, which the Co-Op Lenders provided to Citibank on April 29, 2020 and to UMB Bank on August 12, 2020, was a proper Notice of Event of Default under Section 9.5 of the 2016 Credit Agreement.

### EIGHTH CAUSE OF ACTION
**(Conversion)**
**(Against RCPC and the BrandCo Lenders)**

407.    Plaintiffs repeat and reallege the foregoing allegations as though they were fully set forth in this paragraph.

408.    At all relevant times following the execution of the 2016 Credit Agreement, RCPC and the 2016 Term Lenders were parties to the 2016 Credit Agreement.  As part of that transaction, the same parties were also parties to a 2016 Guarantee and Collateral Agreement pursuant to which the 2016 Term Lenders had a first lien security interest on certain valuable intellectual property, including the BrandCo IP.

409.    In May 2020, RCPC entered into a series of integrated transactions, including the 2020 BrandCo IP Sale-Leaseback, the 2020 Amendment, and a 2020 Pari Passu Intercreditor Agreement which had the effect of divesting the Co-Op Lenders of their property interests in the BrandCo IP.

410.    To the extent that these transactions are not void and unenforceable and are not rescinded, these transactions purport to change the Co-Op Lenders' property rights in the BrandCo IP.  Despite repeated requests by the Co-Op Lenders to return property rights to the BrandCo IP, RCPC has not done so.

411.    Plaintiffs have suffered substantial damages as a direct and proximate result of RCPC's conversion of its valuable collateral.  The damages suffered by Plaintiffs are such that there is no complete or adequate remedy at law.

82

412.     In the alternative to the declaratory relief sought pursuant to the First Cause of Action (*see supra* ¶¶ 341-48), Plaintiffs seek and are entitled to an order directing that (1) the BrandCo IP be returned to RCPC; (2) the BrandCo Lenders' liens on the BrandCo IP be released; and (3) Plaintiffs' liens on the BrandCo IP be restored.

413.     In the alternative to the declaratory relief sought pursuant to the First Cause of Action (s*ee supra* ¶¶ 341-48), and only to the extent it is determined that there is an adequate remedy at law as against the Conspiring Lenders, Plaintiffs seek compensatory damages in an amount to be proven at trial.

### NINTH CAUSE OF ACTION
**(Aiding and Abetting Conversion)**
**(Against Jefferies, the BrandCo Entities, and the BrandCo Lenders)**

414.     Plaintiffs repeat and reallege the foregoing allegations as though they were fully set forth in this paragraph.

415.     At all relevant times following the execution of the 2016 Credit Agreement, RCPC and the 2016 Term Lenders were parties to the 2016 Credit Agreement.  The same parties were also parties to a 2016 Guarantee and Collateral Agreement pursuant to which the 2016 Term Lenders had a first lien security interest on certain valuable intellectual property, including the BrandCo IP.

416.     In May 2020, RCPC entered into a series of integrated transactions, including the 2020 BrandCo IP Sale-Leaseback Transaction, the 2020 Amendment, and a 2020 Pari Passu Intercreditor Agreement which had the effect of divesting the C-Op Lenders of their property interests in the BrandCo IP.

417.     To the extent that these transactions are not void and unenforceable and are not rescinded, these transactions purport to change the Co-Op Lenders' property rights in the BrandCo

83

IP.  Despite repeated requests by the Co-Op Lenders to return property rights to the BrandCo IP, RCPC has not returned the BrandCo IP.

418.    Jefferies, the BrandCo Entities, and the Conspiring Lenders aided and abetted RCPC's conversion of the Co-Op Lenders' collateral by participating in the 2020 BrandCo IP Sale-Leaseback and the 2020 Amendment.

419.    Each of Jefferies, the BrandCo Entities, and the Conspiring Lenders had actual knowledge of RCPC's conversion of the Co-Op Lenders' property interests.  They each knew that the Co-Op Lenders' had first-priority security interests in the BrandCo Collateral—with the sole exception of the American Crew IP, which already had been stripped away from the 2016 Term Lenders as a result of the 2019 Transaction—and that the 2020 Transaction was being carried out in such a way that the Co-Op Lenders would be stripped of that protection without any compensation.

420.    Each of Jefferies, the BrandCo Entities, and the Conspiring Lenders provided substantial assistance to RCPC in its conversion of the Co-Op Lenders' property interests.  Each of Jefferies, the BrandCo Entities, and the Conspiring Lenders, for example, executed documents, arranged, and/or participated in transactions that were essential aspects of the 2020 Transaction, and that together brought about the deprivation of collateral that was securing the 2016 Term Loans.  Similarly, the Conspiring Lenders, by assisting in the design of the transactions and providing the commitments necessary to ensure that the 2020 New Money Term Loan would close, were essential to the completion of RCPC's conversion of the Co-Op Lenders' property.

421.    In the alternative to the declaratory relief sought pursuant to the First Cause of Action (*see supra* ¶¶ 341-48), Plaintiffs seek and are entitled to an order directing that (1) the

BrandCo IP be returned to RCPC; (2) the BrandCo Lenders' liens on the BrandCo IP be released; and (3) Plaintiffs' liens on the BrandCo IP be restored.

422.    In the alternative to the declaratory relief sought pursuant to the First Cause of Action (*see supra* ¶¶ 341-48), and only to the extent it is determined that there is an adequate remedy at law as against these Defendants, Plaintiffs seek compensatory damages in an amount to be proven at trial.

**TENTH CAUSE OF ACTION**
**(Unjust Enrichment)**
**(Against RCPC, Jefferies, the BrandCo Entities, and the BrandCo Lenders)**

423.    Plaintiffs repeat and reallege the foregoing allegations as though they were fully set forth in this paragraph.

424.    As a result of Defendants' inequitable conduct, Defendants have been unjustly enriched at the expense of the Co-Op Lenders.  When RCPC, Citibank, and the 2016 Term Lenders entered into the 2016 Credit Agreement, the 2016 Term Lenders bargained for a first-priority lien on the BrandCo IP.

425.    In April and May of 2020, RCPC, the BrandCo Entities, and the Conspiring Lenders executed a series of integrated transactions, including the 2020 BrandCo IP Sale-Leaseback, the issuance of the Sham Revolver, the 2020 Amendment, and the 2020 Pari Passu Intercreditor Agreement.  As a result of this series of transactions, the first-priority lien on the BrandCo Collateral has been unjustly taken from Plaintiffs and been provided to the BrandCo Entities and Conspiring Lenders.

426.    In the alternative to the declaratory relief sought pursuant to the First Cause of Action (*see supra* ¶¶ 341-48), Plaintiffs seek and are entitled to an order directing that (1) the

BrandCo IP be returned to RCPC; (2) the BrandCo Lenders' liens on the BrandCo IP be released; and (3) Plaintiffs' liens on the BrandCo IP be restored.

427.     In the alternative to the declaratory relief sought pursuant to the First Cause of Action (*see supra* ¶¶ 341-48), and only to the extent it is determined that there is an adequate remedy at law as against these Defendants, Plaintiffs seek compensatory damages in an amount to be proven at trial.

**ELEVENTH CAUSE OF ACTION**
**(Equitable Subordination, in the Alternative)**
**(Against the BrandCo Lenders)**

428.     Plaintiffs repeat and reallege the foregoing allegations as though they were fully set forth in this paragraph.

429.     The BrandCo Lenders' claims in these bankruptcy cases arise from the Conspiring Lenders' and the BrandCo Lenders' gross, egregious, deceptive, and inequitable conduct, including orchestrating, executing, participating in, and attempting to profit from the Sham Revolver, the 2020 Amendment, the 2020 BrandCo IP Sale-Leaseback, and the 2020 Pari Passu Intercreditor Agreement.  The BrandCo Lenders' and Conspiring Lenders' conduct in connection with the foregoing transactions was inequitable because it was deceptive, tortious, illegal, and in breach of existing, legally recognized duties arising under the 2016 Credit Agreement and other applicable law.

430.     The BrandCo Lenders' and Conspiring Lenders' misconduct resulted in injury to Plaintiffs, as creditors of RCPC, and conferred an unfair advantage on the BrandCo Lenders.  By engineering transactions designed to misappropriate the highly valuable BrandCo IP so that it could secure the 2020 New Money Facility—and by doing so in bad faith, over the objection of the majority Lenders—the Conspiring Lenders and BrandCo Lenders devastated Plaintiffs'

economic position and rendered the 2016 Term Loan Facility subordinate to the 2020 Facilities with respect to the BrandCo IP.

431.    If left unremedied, the BrandCo Lenders' and Conspiring Lenders' misconduct would enable the BrandCo Lenders to receive a windfall recovery in the ongoing Chapter 11 Cases, while Plaintiffs would be prevented from accessing any of the value to which they legally are entitled and would have access to but for the BrandCo Lenders' and Conspiring Lenders' egregious and unlawful conduct.

432.    Equitable subordination as requested herein would be consistent with the provisions and purposes of the Bankruptcy Code.

433.    The Court should exercise the full extent of its equitable power to ensure that all claims, payments, or benefits, of whatever kind or nature, which are asserted or sought by the BrandCo Lenders, directly or indirectly against the Debtors' estate, are subordinated for distribution purposes pursuant to sections 510(c) and 105(a) of the Bankruptcy Code to the allowed claims of Plaintiffs, such that no claim of the BrandCo Lenders is paid ahead of the allowed claim of any Plaintiff.

## TWELFTH CAUSE OF ACTION
**(Tortious Interference with Contract – 2016 Agreement)**
**(Against Jefferies, BrandCo Entities, Ares, and the BrandCo Lenders)**

434.    Plaintiffs repeat and reallege the foregoing allegations as though they were fully set forth in this paragraph.

435.    Defendants Jefferies, the BrandCo Entities, Ares, and the BrandCo Lenders were aware of the 2016 Credit Agreement.

436.     Defendants Jefferies, the BrandCo Entities, Ares, and the BrandCo Lenders, induced, facilitated, and/or caused RCPC to breach its obligations under the 2016 Credit Agreement.

437.     By causing RCPC to breach its obligations under the 2016 Credit Agreement, these Defendants tortiously interfered with that contract to Plaintiffs' detriment.

438.     As a direct and proximate result of that tortious interference, Plaintiffs suffered the loss of unique and valuable collateral securing their loan to RCPC, and the damages suffered by Plaintiffs are such that there is no complete or adequate remedy at law.

439.     In the alternative to the declaratory relief sought pursuant to the First Cause of Action (*See supra* ¶¶ 341-48), Plaintiffs seek and are entitled to an order directing Defendants to return the BrandCo IP to RCPC and release the BrandCo Lenders' liens on the BrandCo IP.

440.     In the alternative to the declaratory relief sought pursuant to the First Cause of Action (*See supra* ¶¶ 341-48), and only to the extent it is determined that there is an adequate remedy at law as against these Defendants, Plaintiffs seek compensatory damages in an amount to be proven at trial.

## THIRTEENTH CAUSE OF ACTION
### (Constructive Trust)
### (Against the BrandCo Entities, the BrandCo Lenders, Jefferies, and RCPC)

441.     Plaintiffs repeat and reallege the foregoing allegations as though they were fully set forth in this paragraph.

442.     Citibank was in a confidential agency relationship with the 2016 Term Lenders in its capacity as Administrative and Collateral Agent under the 2016 Term Credit Agreement.  At the same time, Citibank acted as an agent of Revlon Inc. and RCPC, who are therefore liable for the acts of their agent.

443.    RCPC expressly promised to provide the 2016 Term Lenders a first-priority lien on the BrandCo IP.  The 2016 Term Lenders took action in reliance upon RCPC's promise to provide them a first-priority lien on the BrandCo IP.

444.    The BrandCo Entities and the BrandCo Lenders would be unjustly enriched if the BrandCo Entities were permitted to retain the BrandCo IP and the BrandCo Lenders were permitted to retain their first-priority liens imposed thereon.

445.    As transferee of the BrandCo IP from Revlon Inc. and RCPC, the BrandCo Entities presently hold the BrandCo IP, and Jefferies holds any first-priority liens thereon, in constructive trust for the 2016 Term Lenders.

446.    The BrandCo Entities should be required to deliver the BrandCo IP to RCPC, and the BrandCo Lenders and Jefferies should be required to deliver their first-priority liens on the BrandCo IP to Plaintiffs.

## FOURTEENTH CAUSE OF ACTION
### (Declaratory Judgment in the Alternative as to the BrandCo Applicable Premium)
### (Against the Debtors, BrandCo Lenders and Jefferies)

447.    Plaintiffs repeat and reallege the foregoing allegations as though they were fully set forth in this paragraph.

448.    Pursuant to the Declaratory Judgment Act of 1934, 28 U.S.C. §§ 2201-2202, this Court is authorized to issue a declaratory judgment.

449.    An actual and justiciable controversy presently exists between Plaintiffs, on the one hand, and the Debtors, the BrandCo Lenders, and Jefferies, on the other, concerning the BrandCo Lenders' claims for the Applicable Premium as defined in the 2020 BrandCo Credit Agreement, dated as of May 7, 2020 governing the 2020 Facilities.

450.   In the alternative, if the 2020 BrandCo Credit Agreement is a valid and enforceable agreement not otherwise invalidated by order of the Court, the 2020 BrandCo Credit Agreement is governed by New York law.

451.   The 2020 BrandCo Credit Agreement provides for the payment of an "Applicable Premium" or "make-whole" (the "BrandCo Make-Whole") to the lenders under various circumstances, including upon an Event of Default triggered by the filing of a bankruptcy petition. (*See* 2020 BrandCo Credit Agreement § 2.19.)   The BrandCo Make-Whole is calculated by reference to the principal and interest rate, and decreases as the debt approaches maturity—it is defined as:

> an amount equal to (i) prior to May 7, 2022, the Applicable Make-Whole Amount,[8] (ii) on and after May 7, 2022 but prior to May 7, 2023, (x) 75% of the Applicable Interest Rate, *multiplied by* (y) the aggregate principal amount prepaid or repaid or required to be repaid or prepaid, (iii) on and after May 7, 2023 but prior to May 7, 2024, (x) 50% of the Applicable Interest Rate, *multiplied by* (y) the aggregate principal amount prepaid or repaid or required to be repaid or prepaid or (iv) thereafter, 0% of the aggregate principal amount prepaid or repaid or required to be repaid or prepaid.

452.   Here, the BrandCo Make-Whole was purportedly triggered on the petition date of June 15, 2022.  Accordingly, the applicable make-whole would be:  "(x) 75% of the Applicable

---

[8] "Applicable Make-Whole Amount" means with respect to any prepayment or repayment made or required to be made (including in connection with any acceleration of the Term B-1 Loans pursuant to Section 8.1), an amount equal to (i) the present value of the amount of interest that would have been paid on the principal amount of the Loans being so repaid or prepaid or required to be prepaid for the period from and including the date of such repayment, prepayment or date of required repayment or prepayment to and including May 7, 2022 (in each case, calculated on the basis of the interest rate with respect to the Loans that is in effect on the date of such repayment, prepayment or date of required repayment or prepayment and on the basis of actual days elapsed over a year of three hundred sixty-five (365) days) plus (ii) (x) 75% of the Applicable Interest Rate, multiplied by (y) the aggregate principal amount prepaid or repaid or required to be repaid or prepaid (including in connection with any acceleration of the Term B-1 Loans pursuant to Section 8.1). The present value calculation in clause (i) of the Applicable Make-Whole Amount shall be calculated using the discount rate equal to the Treasury Rate as of such repayment or prepayment date or date of required repayment plus 50 basis points.

Interest Rate, *multiplied by* (y) the aggregate principal amount prepaid or repaid or required to be repaid or prepaid."[9]

453.   In the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Dkt. No. 330] (the "Final DIP Order"), the Debtors stipulated (and the Court adopted as findings of fact and conclusions of law) that "the Prepetition BrandCo Borrower was justly and lawfully indebted and liable to the Prepetition BrandCo Secured Parties, without defense, counterclaim or offset of any kind . . . for the Applicable Premium (as defined in the [] BrandCo Credit Agreement) in the amount of $98,593,628, which became due and payable on the Petition Date as a result of commencement of the Chapter 11 Cases . . . ."  (Final DIP Order, Paragraph G.)

454.   The Final DIP Order further provides that the Debtors' stipulations, including the stipulations relating to the BrandCo Make-Whole "shall be binding upon all other parties in interest . . . unless (i) any party in interest . . . has timely filed an adversary proceeding or contested matter" by October 31, 2022 "objecting to or challenging the amount, validity, perfection, enforceability, priority or extent of the . . .  Prepetition BrandCo Credit Facility Debt . . . ."  (Final DIP Order, Paragraph 29(a).)

455.   The BrandCo Make-Whole claim is a disallowed claim for unmatured interest under 11 U.S.C. § 502(b)(2) because it is, in whole or in part, the economic equivalent of

---

[9] "Applicable Interest Rate" means "with respect to any repayment, prepayment or required prepayment, the sum of (i) the greater of (A) the Eurocurrency Rate as in effect on the date of such payment or prepayment (or, in connection with a prepayment made pursuant to Section 2.11(a), the date on which notice of such prepayment is required to be delivered) and (B) 1.50%, plus (ii) 12.50% per annum."

unmatured interest.    On information and belief, the BrandCo Make-Whole is intended to compensate the lenders under the 2020 Facilities for expected interest over the course of the loan that never matured as a result of early prepayment of an event of default.

456.    Separately, the BrandCo Make-Whole is an unenforceable penalty under New York law.  The BrandCo Make-Whole, which New York courts analyze as a liquidated damages clause, does not bear a reasonable proportion to the probable loss, nor is the amount of actual loss incapable or difficult of precise estimation.  The Brand-Co Make-Whole is a fixed rate, calculated as 75% of the Applicable Interest Rate—at least 10.5%—multiplied by the outstanding principal.  This exorbitant fixed fee of nearly $100 million does not bear a reasonable proportion to the probable loss.  Furthermore, the amount of actual loss is incapable or difficult of precise estimation.

457.    Therefore, in the alternative, if the Court determines that the 2020 BrandCo Credit Agreement is valid and enforceable, Plaintiffs are entitled to a declaratory judgment that the BrandCo Make-Whole is disallowed in its entirety.

### FIFTEENTH CAUSE OF ACTION
**(Declaratory Judgment in the Alternative as to
the 2020 Pari Passu Intercreditor Agreement)
(Against the Debtors, BrandCo Lenders and Jefferies)**

458.    Plaintiffs repeat and reallege the foregoing allegations as though they were fully set forth in this paragraph.

459.    Pursuant to the Declaratory Judgment Act of 1934, 28 U.S.C. §§ 2201-2202, this Court is authorized to issue a declaratory judgment.

460.    An actual and justiciable controversy presently exists between Plaintiffs, on the one hand, and the Debtors, the BrandCo Lenders, and Jefferies Finance LLC, on the other, concerning

the enforceability of certain provisions of the 2020 Pari Passu Intercreditor Agreement purporting to restrict the ability of the Plaintiffs to enforce their rights or give effect to their security.

461.    The Debtors and Conspiring Lenders, among others, facilitated the execution of the 2020 Pari Passu Intercreditor Agreement as part of the 2020 Transaction to further harm and impair Plaintiffs' rights.  Among other things, the 2020 Pari Passu Intercreditor Agreement purports to severely limit the 2016 Term Lenders' ability to enforce their rights or give effect to their security.

462.    These provisions, which purportedly tie Plaintiffs' hands even though they were enacted without their consent, serve no purpose other than to unlawfully insulate the Defendants' wrongdoing from legal challenges.

463.    Therefore, in the alternative, if the Court determines that the 2020 Pari Passu Intercreditor Agreement is valid and enforceable, Plaintiffs are entitled to a declaratory judgment that the provisions of the agreement that purport to restrict the Plaintiffs' ability to enforce their rights or give effect to their security are unenforceable as violative of public policy.

**SIXTEENTH CAUSE OF ACTION**
**(Declaratory Judgment in the Alternative as to the**
**BrandCo Lenders' Entitlement to Postpetition Interest)**
**(Against the Debtors, the BrandCo Lenders and Jefferies)**

464.    Plaintiffs repeat and reallege the foregoing allegations as though they were fully set forth in this paragraph.

465.    Pursuant to the Declaratory Judgment Act of 1934, 28 U.S.C. §§ 2201-2202, this Court is authorized to issue a declaratory judgment.

466.    An actual and justiciable controversy presently exists between Plaintiffs, on the one hand, and the Debtors, the BrandCo Lenders, and Jefferies, on the other, concerning whether the

BrandCo Lenders are oversecured and entitled to postpetition interest pursuant to Bankruptcy Code section 506(b).

467.    If the 2020 BrandCo Credit Agreement and related security documents are valid and enforceable agreements and not otherwise invalidated by order of the Court, then, upon information and belief, the value of the collateral securing the obligations under the 2020 BrandCo Credit Agreement is less than the aggregate amount owed to the BrandCo Lenders.

468.    Any claim against the Debtors under the 2020 BrandCo Credit Agreement should be treated as one aggregate claim under the 2020 Facilities because the BrandCo Lenders were granted one lien against RCPC, as borrower, under the 2020 Facilities.

469.    Therefore, in the alternative, if the Court determines that the 2020 BrandCo Credit Agreement is valid and enforceable, Plaintiffs are entitled to a declaratory judgment that obligations under the 2020 Facilities give rise to a single undersecured claim held by the BrandCo Lenders, which is not entitled to postpetition interest.

## SEVENTEENTH CAUSE OF ACTION
**(Declaratory Judgment in the Alternative that Adequate Protection Payments to the BrandCo Lenders Are a Violation of the 2020 Pari Passu Intercreditor Agreement) (Against the Debtors and BrandCo Lenders)**

470.    Plaintiffs repeat and reallege the foregoing allegations as though they were fully set forth in this paragraph.

471.    Pursuant to the Declaratory Judgment Act of 1934, 28 U.S.C. §§ 2201-2202, this Court is authorized to issue a declaratory judgment.

472.    An actual and justiciable controversy presently exists between Plaintiffs, on the one hand, and the Debtors and the BrandCo Lenders, on the other, concerning whether the adequate

protection payments to be made to the BrandCo Lenders under the 2020 BrandCo Credit Agreement violate the 2020 Pari Passu Intercreditor Agreement.

473.    If the 2020 Transaction is valid and the 2020 BrandCo Credit Agreement is enforceable, the relative rights and priorities of the secured parties under the 2016 Credit Agreement and the 2020 Facilities are governed by the 2020 Pari Passu Intercreditor Agreement.

474.    Further, if the 2020 BrandCo Credit Agreement is a valid and enforceable agreement not otherwise invalidated by order of the Court, the 2020 BrandCo Credit Agreement and the 2020 Pari Passu Intercreditor Agreement are both governed by New York law.

475.    Section 2.5(b) of the 2020 Pari Passu Intercreditor Agreement permits priming DIP Financing Liens with respect to the Prepetition Shared Collateral so long as (among other things):

> (D) if any First Lien Claimholders  are granted adequate protection with respect to the First Lien Obligations  subject hereto, including in the form of periodic payments, in connection with such use of cash collateral, the proceeds of such adequate protection are applied pursuant to Section 2.1(a) [the waterfall provision] of this Agreement; . . .

Section 2.5(c) of the 2020 Pari Passu Intercreditor Agreement further provides:

> (c) If any First Lien Claimholder is granted adequate protection . . . in the form of periodic or other cash payments . . . then the proceeds of such adequate protection must be applied to all First Lien Obligations pursuant to Section 2.1 [the waterfall provision]

476.    Section 2.1 of the 2020 Pari Passu Intercreditor Agreement (the waterfall provision) sets forth the priority of claims.  In general, it states that proceeds of the Shared Collateral shall be paid first to fees and expenses of the applicable collateral agents and second on a pro rata basis to the First Lien Claimholders.  It states:

> [If] any distribution is made in respect of any Shared Collateral in any Bankruptcy Case of any Grantor or any First Lien Claimholder receives any payment pursuant to any intercreditor agreement (other than this Agreement) or otherwise with respect to any Shared Collateral, the proceeds of any sale, collection or other liquidation of any Shared Collateral or Equity Release Proceeds received by any First Lien Claimholder or received by the Applicable Collateral Agent or any First Lien Claimholder pursuant to any such intercreditor agreement or otherwise . . . shall be applied by the Applicable Collateral Agent in the following order . . .

477.    Pursuant to the Final DIP Order, the Prepetition BrandCo Secured Parties are receiving adequate protection in the form of, among other things, cash and PIK interest payments with respect to the Term B-1 Loans.  The Final DIP Order provides as follows:

> As (x) Adequate Protection for any diminution in value of their interests in the Prepetition BrandCo Collateral and (y) consideration for their agreement to extension of the Intercompany DIP Facility, (a) the Prepetition BrandCo Agent, on behalf of the holders of the Term B-1 Loans, shall continue to receive quarterly payments (the "BrandCo B-1 Payments") equal to the interest payable in cash accrued since the last interest payment . . . , (b) interest paid in kind under the terms of the Prepetition BrandCo Credit Agreement shall continue to accrue and be paid in kind in respect of the Term B-1 Loans at the non-default rate that would otherwise be owed to the Prepetition BrandCo Lenders holding the Term B-1 Loans in accordance with the Prepetition BrandCo Credit Agreement and (c) default interest due under the terms of the Prepetition BrandCo Credit Agreement shall accrue and be paid in kind in respect of the Term B-1 Loans in accordance with the Prepetition BrandCo Credit Agreement . . .

(Final DIP Order ¶ 17.)

478.    Section 2.5 of the 2020 Pari Passu Intercreditor Agreement expressly states that the proceeds of any adequate protection shall be applied pursuant to the waterfall provision of Section 2.1, meaning that all adequate protection payments must be distributed ratably to the BrandCo Lenders and the 2016 Term Lenders.  Because the holders of Term B-1 Loans are receiving the

BrandCo B-1 Payments, but the 2016 Term Lenders are not receiving any cash interest payments, the BrandCo B-1 Payments are a violation of the 2020 Pari Passu Intercreditor Agreement.

479.     Therefore, in the alternative, if the Court determines that the 2020 BrandCo Credit Agreement is valid and enforceable, Plaintiffs are entitled to a declaratory judgment that any adequate protection payments made to the BrandCo Lenders constitute a violation of the 2020 Pari Passu Intercreditor Agreement and must be credited against the Intercompany DIP Obligations in accordance with the terms of the Final DIP Order.

## RESERVATION OF RIGHTS

Plaintiffs reserve the right, to the extent permitted under the Bankruptcy Code, the Federal Rules of Civil Bankruptcy Procedure, or by agreement, to assert any claims relating to the subject matter of this action or otherwise relating to the Debtor and its estate against any third party.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment against Defendants as follows:

A.  Declaring that:

1.  Each of RCPC's breaches of the 2016 Credit Agreement constituted an Event of Default under Section 8.1 of that agreement;

2.  Each Notice of Event of Default, which the Co-Op Lenders provided to Citibank on April 29, 2020, and to UMB Bank on August 12, 2020, was a proper Notice of Event of Default under Section 9.5 of the 2016 Credit Agreement;

3.  The Sham Revolver was void *ab initio* for any purpose under the 2016 Credit Agreement, including any consent requirements under Section 10.1;

4.  The 2020 Amendment is void *ab initio*;

5.  The purported release of the liens on the BrandCo IP under the 2016 Credit Agreement is void *ab initio*;

6.  The Purported Waiver is void *ab initio*;

7.  The Pari Passu Intercreditor Agreement is void *ab initio*;

8.  The BrandCo IP Sale-Leaseback is void *ab initio*;

9.  The Pari Passu Lien is void *ab initio*;

10. The BrandCo Credit Agreement and the 2020 Facilities are void *ab initio*; and

11. The Intercompany DIP Facility is void *ab initio*.

B.  In the alternative, ordering:

1.  Specific performance of the 2016 Credit Agreement, including Sections 2.25, 7.2, 7.3, 7.10, 9.5, and 10.1 therein, and specific performance of the 2016 Guarantee and Collateral Agreement, including Sections 3.1 and 6.7 therein, pursuant to which Plaintiffs are entitled to first-priority liens and property interests over the BrandCo IP that 2016 Term Lenders bargained for in connection with the 2016 Credit Agreement; and

2.  Rescission of the 2020 Amendment and the transactions undertaken pursuant thereto, including (1) the purported release of the liens on the BrandCo IP under the 2016 Credit Agreement; (2) the Purported Waiver; (3) the BrandCo IP Sale-Leaseback; (4) the Parri Passu Intercreditor Agreement; (5) the Pari Passu Lien; (6) the BrandCo Credit Agreement and the 2020 Facilities; and (7) the Intercompany DIP Facility.

C.  In the alternative, issuing a mandatory injunction directing that:

1.  the BrandCo IP be returned to RCPC;

2.  the BrandCo Lenders' liens on the BrandCo IP be released; and

3.  Plaintiffs' first-priority liens on the BrandCo IP be restored.

D.  In the alternative, awarding money damages in an amount to be determined at trial against the Conspiring Lenders, the BrandCo Lenders, Jefferies, and Ares.

E.  In the alternative, declaring that:

1.  all claims, payments, or benefits, of whatever kind or nature, which are asserted or sought by the BrandCo Lenders, directly or indirectly against the Debtors' estate, are subordinated for distribution purposes pursuant to sections 510(c) and 105(a) of the Bankruptcy Code to the allowed claims of Plaintiffs, such that no claim of the BrandCo Lenders is paid ahead of the allowed claim of any Plaintiff.

2.  the BrandCo Make-Whole is disallowed;

3.  the provisions of the 2020 Pari Passu Intercreditor Agreement that purport to restrict the Plaintiffs' ability to enforce their rights or give effect to their security are unenforceable;

98

4. obligations under the 2020 Facilities give rise to a single undersecured claim held by the BrandCo Lenders, which is not entitled to postpetition interest; and

5. any adequate protection payments made to the BrandCo Lenders constitute a violation of the 2020 Pari Passu Intercreditor Agreement and must be credited against the Intercompany DIP Obligations in accordance with the terms of the Final DIP Order.

F.  Awarding reasonable costs and expenses incurred in this action, including attorneys' fees;

G.  Awarding pre-judgment interest on all such damages, monetary or otherwise; and

H.  Awarding such other, further, and different relief as the Court may deem just and proper.


Dated: New York, New York
          October 31, 2022

BOIES SCHILLER FLEXNER LLP

By:  /s/ *Matthew L. Schwartz*

Matthew L. Schwartz
Eric J. Brenner
Katherine Zhang
55 Hudson Yards
New York, New York 10001
Tel.: (212) 446-2300
Fax: (212) 446-2350
mlschwartz@bsfllp.com
ebrenner@bsfllp.com
kzhang@bsfllp.com

Marc Ayala
Andrew P. Steinmetz
Alexander J. Law
333 Main Street
Armonk, NY 10504
Tel.: (914) 749-8400
mayala@bsfllp.com
asteinmetz@bsfllp.com
alaw@bsfllp.com