**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| REVLON, INC., *et al.*, | Case No. 22-10760 (DSJ) |
| Debtors. | (Jointly Administered) |
| AIMCO CLO 10 LTD, *et al.*, | |
| Plaintiffs, | |
| v. | Adv. Pro. No. 22-01167 (DSJ) |
| REVLON, INC., *et al.*, | |
| Defendants. | |

## DEBTORS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE ADVERSARY COMPLAINT

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, New York  10019-6064
Tel: (212) 373-3000
Fax: (212) 757-3990

**MOLOLAMKEN LLP**
430 Park Avenue
New York, NY  10022
Tel:  (212) 607-8160
Fax: (212) 607-8161

**KAPLAN RICE LLP**
142 West 57th Street, Suite 4A
New York, NY  10022
Tel: (212) 235-0300

*Counsel and Special Litigation Counsel for the Debtors and Debtors in Possession*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

PRELIMINARY STATEMENT ........................................................... 1

STATEMENT OF FACTS ................................................................. 4

    A.    The 2016 Credit Facility .................................... 5

    B.    The 2019 Transaction ....................................... 6

    C.    The 2020 BrandCo Transaction ........................... 8

    D.    The UMB Complaint ........................................ 12

    E.    The Present Adversary Complaint ....................... 14

ARGUMENT ................................................................................. 14

I.    Plaintiffs Lack Standing To Pursue Equitable Relief Claims Because Such Claims Are Derivative ................................ 15

    A.    The Debtors Have The Exclusive Authority To Pursue The Equitable Relief Claims ................................ 16

    B.    The Plaintiffs Lack Standing to Assert Equitable Subordination Claims ............. 23

    C.    Plaintiffs Have Failed To Timely Seek Standing To Assert Their Derivative Equitable Relief Claims. ...................... 24

II.    Plaintiffs' Equitable Relief Claims Are Not Permissible Under New York Law Or The Bankruptcy Code ............................ 24

    A.    Plaintiffs' Equitable Relief Claims Should Be Dismissed Under New York Law Because Money Damages Are An Available Remedy ............... 25

    B.    Plaintiffs' Equitable Relief Claims Should Be Dismissed As A Matter Of Bankruptcy Law Because Monetary Damages Are An Available Remedy ........ 28

    C.    Plaintiffs' Equitable Relief Claims Should Be Dismissed Because The Equitable Relief Sought Is Unavailable Under New York Law .......... 31

        1.    Plaintiffs' Equitable Relief Claims Fail Because they Unreasonably Delayed Pursuing Them .................. 31

i

## TABLE OF CONTENTS
### (Continued)

| | | | Page |
|---|---|---|---|

2.    Plaintiffs' Equitable Relief Claims Fail Because the Relief Is Impracticable ...... 33

3.    Plaintiffs Cannot Void Contracts to Which They are Not Parties ...... 34

4.    The BrandCo Transactions Cannot Be Declared Void *Ab Initio* ...... 35

III.   The 2019 Transaction Did Not Violate the 2016 Credit Agreement ...... 36

    A.    Section 7.10 Unambiguously Applies Only to Leases, Not Licenses ...... 37

    B.    The 2019 American Crew License Agreement Is, Under Well-Settled Principles of Intellectual Property Law, a License Not Lease ...... 40

IV.   Plaintiffs Fail to State Viable Tort or Quasi-Contract Claims Under New York Law ...... 44

    A.    Conversion (Eighth Cause of Action) and Aiding and Abetting Conversion (Ninth Cause of Action) ...... 44

    B.    Unjust Enrichment (Tenth Cause of Action) and Constructive Trust (Thirteenth Cause of Action) ...... 46

    C.    Tortious Interference with the 2016 Credit Agreement (Twelfth Cause of Action) ...... 48

V.   Plaintiffs' Remaining Causes of Action Also Fail Or Should Be Considered At Confirmation ...... 49

CONCLUSION ...... 49

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*159 MP Corp.* v. *Redbridge Bedford, LLC*,
    33 N.Y.3d 353 (N.Y. 2019) ...............................................................37

*In re 305 E. 61st St. Grp. LLC*,
    644 B.R. 75 (Bankr. S.D.N.Y. 2022) .........................................5, 17, 22

*36 Att'y St. Tenants Ass'n* v. *Casalinuoro*,
    No. 570152/04, 2005 WL 589410 (N.Y. App. Div. 1st Dep't Mar. 10, 2005)........................42

*In re Adelphia Recovery Tr.*,
    634 F.3d 678 (2d Cir. 2011)...............................................................20

*In re Ades & Berg Grp. Invs.*,
    550 F.3d 240 (2d Cir. 2008)...............................................................30

*Admiral Ins. Co.* v. *Brookwood Mgmt. #10, LLC*,
    No. 16-CV-0437(SJF)(SIL), 2018 WL 5622595 (E.D.N.Y. Mar. 30, 2018) ........................32

*Alpha Capital Anstalt* v. *ShiftPixy, Inc.*,
    432 F. Supp. 3d 326 (S.D.N.Y. 2019)...............................................26

*In re AppliedTheory Corp.*,
    493 F.3d 82 (2d Cir. 2007)...............................................................23

*Arcadia Biosciences, Inc.* v. *Vilmorin & Cie*,
    356 F. Supp. 3d 379 (S.D.N.Y. 2019)...............................................44, 46

*Ashcroft* v. *Iqbal*,
    556 U.S. 662 (2009)...............................................................15

*Atlanta Shipping Corp.* v. *Chem. Bank*,
    631 F. Supp. 335 (S.D.N.Y. 1986), *aff'd*, 818 F.2d 240 (2d Cir. 1987)...............................................................20

*Audax Credit Opportunities Offshore Ltd.* v. *TMK Hawk Parent, Corp.*,
    150 N.Y.S.3d 894 (N.Y. Sup. Ct., N.Y. Cnty. 2021)...............................................................48

*Banque Arabe Et Internationale D'Investissement* v. *Maryland Nat. Bank*,
    850 F. Supp. 1199 (S.D.N.Y. 1994)...............................................................32, 33

*State* v. *Barclays Bank of N.Y., N.A.*,
    76 N.Y.2d 533 (1990)...............................................................47

**TABLE OF AUTHORITIES**
**(Continued)**

*Baskim Holdings, Inc.* v. *Two M, Inc.*,
    2018 WL 1367354 (D. Nev. Mar. 16, 2018) .........................................................................42

*In re Bernard L. Madoff Inv. Sec. LLC*,
    740 F.3d 81 (2d Cir. 2014).............................................................................16, 18, 19

*In re Bernard L. Madoff Inv. Sec. LLC*,
    No. 08-99000 (SMB), 2015 WL 4734749 (Bankr. S.D.N.Y. Aug. 11, 2015)........................23

*In re Blockbuster Inc.*,
    No. 10-14997 BRL, 2011 WL 1042767 (Bankr. S.D.N.Y. Mar. 17, 2011) ...........................23

*Brenner* v. *Heller*,
    No. 1:11-CV-481 NAM, 2011 WL 6011786 (N.D.N.Y. Nov. 30, 2011)...............................29

*Brookfield Asset Mgmt., Inc.* v. *Rosson*,
    261 A.3d 1251 (Del. 2021) ...........................................................................17, 21

*BSP Agency LLC* v. *Katzoff*,
    632 B.R. 448 (Bankr. S.D.N.Y. 2021) ...................................................................26

*In re Cabrini Med. Ctr.*,
    No. 09-14398 ALG, 2012 WL 2254386 (Bankr. S.D.N.Y. June 15, 2012),
    *aff'd*, 489 B.R. 7 (S.D.N.Y. 2012) .......................................................................17

*In re Chateaugay Corp.*,
    10 F.3d 944 (2d Cir. 1993).............................................................................45

*In re Chateaugay Corp.*,
    944 F.2d 997 (2d Cir. 1991).............................................................................30

*In re Chiron Equities, LLC*,
    552 B.R. 674 (Bankr. S.D. Tex. 2016) ...................................................................22

*In re Chowaiki & Co. Fine Art Ltd.*,
    593 B.R. 699 (Bankr. S.D.N.Y. 2018) ...................................................................47

*In re Clear the Air, LLC*,
    631 B.R. 286 (Bankr. S.D. Tex. 2021) ...................................................................16

*Consol. Edison, Inc.* v. *Ne. Util.*,
    426 F.3d 524 (2d Cir. 2005).............................................................................44

iv

# TABLE OF AUTHORITIES
## (Continued)

Page(s)

*SEC* v. *Credit Bancorp., Ltd*,
    147 F. Supp. 2d 238 (S.D.N.Y. 2001) ....................................................................32

*Curtis* v. *Berutti*,
    176 N.Y.S.3d 423 (N.Y. Sup. Ct., Orange Cnty. 2022) ...........................................46

*Deutsche Bank Nat'l Tr. Co.* v. *Morgan Stanley Mortg. Capital Holdings LLC*,
    289 F. Supp. 3d 484 (S.D.N.Y. 2018) ...............................................................26, 33

*Dorchester Fin. Holdings Corp.* v. *Banco BRJ, S.A.*,
    2016 WL 1169508 (S.D.N.Y. Mar. 21, 2016) .........................................................36

*In re Emoral, Inc.*,
    740 F.3d 875 (3d Cir. 2014) ...............................................................................17, 22

*Fareri* v. *Rain's Int'l. Ltd.*,
    187 A.D.2d 481 (1992) ...........................................................................................36

*Ferrandino & Son, Inc.* v. *Wheaton Bldrs., Inc.*,
    920 N.Y.S. 2d 123 (N.Y. App. Div. 2d Dep't 2011) ...............................................48

*In re First Cen. Fin. Corp.*,
    377 F.3d 209 (2d Cir. 2004) ...............................................................................30, 47

*Freund* v. *Wash. Square Press, Inc.*,
    34 N.Y.2d 379 (1974) .............................................................................................27

*Gentile* v. *Rossette*,
    906 A.2d 91 (Del. 2006) .........................................................................................17

*In re GIGA WATT Inc.*,
    No. 18-03197-FPC7, 2021 WL 4436941 (Bankr. E.D. Wash. Sept. 27, 2021) .............16, 18

*Goldsmith* v. *Outdoor Advert. Co.*,
    264 N.Y.S. 189 (N.Y. Sup. Ct., Erie Cnty. 1933) ...................................................42

*Great Am. Ins. Co.* v. *Zelik*,
    No. 19-cv-1805, 2020 WL 85102 (S.D.N.Y. Jan. 6, 2020) ....................................34

*GuideOne Specialty Mut. Ins.* v. *Congregation Adas Yereim*,
    593 F. Supp. 2d 471 (E.D.N.Y. 2009) ....................................................................32

*Halebian* v. *Berv*,
    590 F.3d 195 (2d Cir. 2009) ...................................................................................15

v

**TABLE OF AUTHORITIES**
**(Continued)**

Page(s)

*Harris* v. *Provident Life and Accident Ins. Co.*,
    310 F.3d 73 (2d Cir. 2002)..................................................................................44

*In re Hatu*,
    19-05428-5-JNC, 2022 WL 1436051 (Bankr. E.D.N.C. May 5, 2022)...................................18

*Hetchkop* v. *Woodlawn at Grassmere, Inc.*,
    116 F.3d 28 (2d Cir. 1997)..................................................................................36

*Hochheiser* v. *Alin*,
    100 N.Y.S.3d 609 (N.Y. Sup. Ct., Suffolk Cnty. 2018) .........................................................47

*Horowitz* v. *Nat'l Gas & Elec., LLC*,
    2021 WL 4478622 (S.D.N.Y. Sept. 30, 2021)..................................................................35

*Hotel Capital LLC* v. *Wells Fargo Bank, Nat'l Ass'n*,
    No. 18319/11, 2012 WL 1506120 (N.Y. Sup. Ct., Kings Cnty. Apr. 26, 2012) ....................26

*IDT Corp.* v. *Morgan Stanley Dean Witter & Co.*,
    12 N.Y. 3d 132 (2009) .....................................................................................46, 47

*Jenkins* v. *XpresSpa Grp., Inc.*,
    No. 19-CV-1774 (VEC), 2020 WL 7261138 (S.D.N.Y. Dec. 10, 2020)..........................25, 27

*Kinney* v. *Gallagher*,
    524 B.R. 455 (W.D.N.Y. 2015) ............................................................................30

*In re Kovacs*,
    717 F.2d 984 (6th Cir. 1983), *aff'd sub nom. Ohio* v. *Kovacs*, 469 U.S. 274
    (1985)...........................................................................................25, 29

*In re LaFemina*,
    No. 14-43362, 2017 WL 4404254 (Bankr. E.D.N.Y. Sept. 30, 2017) ..................................31

*Lockheed Martin Corp.* v. *Retail Holdings, N.V.*,
    639 F.3d 63 (2d Cir. 2011)..................................................................................38

*Lynch* v. *Robert P. Murphy Hotel Co.*,
    115 N.Y.S. 465 (N.Y. App. Div. 1st Dep't 1909) ...................................................42

*In re Mark A. Nordlicht*,
    No. 21-CV-5990 (KMK), 2022 WL 1591788 (S.D.N.Y. May 19, 2022) .............................18

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

*In re Mark IV Indus., Inc.*,
 438 B.R. 460 (Bankr. S.D.N.Y. 2010), *aff'd*, 459 B.R. 173 (S.D.N.Y. 2011) .................30, 31

*In re Mark One Corp.*,
 619 B.R. 423 (Bankr. E.D. Cal. 2020) .........................................................................................19

*Maury* v. *Ventura in Manhattan, Inc.*,
 544 F. Supp. 3d 396 (S.D.N.Y. 2021) .........................................................................................31

*In re Miami Metals I, Inc.*,
 634 B.R. 249 (Bankr. S.D.N.Y. 2021) ...............................................................................41, 43

*Mina Inv. Holdings Ltd.* v. *Lefkowitz*,
 16 F. Supp. 2d 355, 363 (S.D.N.Y. 1998), *on reconsideration in part*, 184
 F.R.D. 245 (S.D.N.Y. 1999) ...................................................................................................35

*Mirasola* v. *Advanced Cap. Grp., Inc.*,
 905 N.Y.S.2d 180 (N.Y. App. Div. 2d Dep't 2010) ...............................................................41

*In re MortgageAmerica Corp.*,
 714 F.2d 1266 (5th Cir. 1983) .............................................................................................4, 18

*Moss* v. *First Premier Bank*,
 2020 WL 5231320 (E.D.N.Y. Sept. 2, 2020) .........................................................................36

*In re Motors Liquidation Co.*,
 777 F.3d 100 (2d Cir. 2015)....................................................................................................34

*Nasdaq, Inc.* v. *Exch. Traded Managers Grp., LLC*,
 431 F. Supp. 3d 176 (S.D.N.Y. 2019)....................................................................................26

*Nat'l Am. Ins. Co.* v. *Ruppert Landscaping Co.*,
 187 F.3d 439 (4th Cir. 1999) ..................................................................................................18

*Nat'l Rifle Ass'n of Am.* v. *Vullo*,
 49 F.4th 700 (2d Cir. 2022) ....................................................................................................15

*Newman* v. *Resnick*,
 238 N.Y.S.2d 119 (N.Y. Sup. Ct., N.Y. Cnty. 1963).............................................................34

*Oaktree Cap. Mgmt., LLC* v. *Spectrasite Holdings, Inc.*,
 No. CIV.A. 02-548 JJF, 2002 WL 32173072 (D. Del. June 25, 2002) ..................................28

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

*Onanuga* v. *Pfizer, Inc.*,
    2003 U.S. Dist. LEXIS 20298 (S.D.N.Y. Nov. 7, 2003) ........................................................15

*In re Orama Hosp. Grp., Ltd.*,
    601 B.R. 340 (Bankr. D.N.J. 2019) .......................................................................................29

*Petrone* v. *Davidoff Hutcher & Citron, LLP*,
    54 N.Y.S.3d 25 (N.Y. App. Div. 2d Dep't 2017) ..................................................................45

*Pons* v. *People's Republic of China*,
    666 F. Supp. 2d 406 (S.D.N.Y. 2009).....................................................................................48

*In re Port Morris Tile & Marble LP*,
    No. 21-12116 (MG), 2022 WL 5237917 (Bankr. S.D.N.Y. Oct. 6, 2022) ..............................18

*Poth* v. *Russey*,
    99 F. App'x 446 (4th Cir. 2004) ............................................................................................19

*Prestige Global Co.* v. *L.A. Printex Indus., Inc.*,
    No. 13-CV-02207 (AJN), 2014 WL 12783273 (S.D.N.Y. Mar. 12, 2014) ............................38

*In re Provider Meds, LP*,
    2014 Bankr. Lexis 3519 (Bankr. N.D. Tex. 2014) .................................................................21

*In re Provider Meds, LP*,
    No. 13-30678-BJH, 2014 WL 4162870 (Bankr. N.D. Tex. Aug. 20, 2014) ....................31, 36

*Pyskaty* v. *Wide World of Cars, LLC*,
    856 F.3d 216 (2d Cir. 2017).....................................................................................................33

*Rabin* v. *Mony Life Ins. Co.*,
    387 F. App'x 36 (2d Cir. 2010) ..............................................................................................46

*Rederford* v. *U.S. Airways, Inc.*,
    589 F.3d 30 (1st Cir. 2009).....................................................................................................29

*In re Refco Securities Litig.*,
    759 F. Supp. 2d 301 (S.D.N.Y. 2010).....................................................................................46

*Ritchie Cap. Mgmt., L.L.C.* v. *Gen. Elec. Cap. Corp.*,
    121 F. Supp. 3d 321 (S.D.N.Y. 2015), *aff'd*, 821 F.3d 349 (2d Cir. 2016) ...........................19

*Route 21 Associates of Belleville, Inc.* v. *MHC, Inc.*,
    486 B.R. 75 (S.D.N.Y. 2012).................................................................................29, 30, 31

### TABLE OF AUTHORITIES
#### (Continued)

Page(s)

*In re Salander*,
  472 B.R. 213 (Bankr. S.D.N.Y. 2012) ...................................................................23

*Saperstein* v. *Mechs. & Farmers Sav. Bank of Albany*,
  228 N.Y. 257 (1920) ............................................................................................34

*In re Schick*,
  232 B.R. 589 (Bankr. S.D.N.Y. 1999) ...................................................................32

*Sec. Inv. Prot. Corp.* v. *Bernard L. Madoff Inv. Sec. LLC*,
  429 B.R. 423 (Bankr. S.D.N.Y. 2010)*, aff'd sub nom. In re Madoff*, 848 F.
  Supp. 2d 469 (S.D.N.Y. 2012), *aff'd sub nom. Madoff*, 740 F.3d 81 (2d Cir.
  2014) ........................................................................................................19, 22, 23

*Sec. Inv. Prot. Corp.* v. *Stratton Oakmont, Inc.*,
  234 B.R. 293 (Bankr. S.D.N.Y. 1999) ...................................................................48

*Simon* v. *French-American Surgery Ctr., Inc.*,
  No. 162867/2014, 2018 WL 4278397 (N.Y. Sup. Ct., N.Y. Cnty. Sept. 4,
  2018) ...................................................................................................................35

*Slamow* v. *Del Col*,
  174 A.D.2d 725 (N.Y. App. Div. 2d Dep't 1991), *aff'd*, 79 N.Y.2d 1016
  (1992) ..................................................................................................................40

*Sokoloff* v. *Harriman Ests. Dev. Corp.*,
  96 N.Y.2d 409 (2001) ............................................................................................25

*Sokolow, Dunaud, Mercadier & Carreras LLP* v. *Lacher*,
  747 N.Y.S.2d 441 (N.Y. App. Div. 1st Dep't 2002) ............................................33

*Solomatina* v. *Mikelic*,
  370 F. Supp. 3d 420 (S.D.N.Y. 2019).............................................................44, 45

*Sphere Drake Ins. Ltd.* v. *Clarendon Nat. Ins. Co.*,
  263 F.3d 26 (2d Cir. 2001)......................................................................................36

*St. Paul Fire & Marine Ins.* v. *PepsiCo, Inc.*,
  884 F.2d 688 (2d Cir. 1989).............................................................................18, 22

*Strategic Growth Int'l Inc.* v. *RemoteMDx, Inc.*,
  06 CIV. 3915, 2008 WL 4179235, at *3 (S.D.N.Y. Sept. 10, 2008)......................45

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*Suber* v. *VVP Servs., LLC*,
  No. 20-CV-08177 (AJN), 2021 WL 2894810 (S.D.N.Y. July 9, 2021) .................................25

*Swift Harvest USA, LLC* v. *Dollar Gen. Corp.*,
  No. 17-CV-8644, 2018 WL 7348845 (C.D. Cal. Dec. 28, 2018) ............................................42

*Tamir* v. *Bank of New York Mellon*,
  No. 12-CV-4780 (DLI) (JO), 2013 WL 4522926 (E.D.N.Y. Aug. 27, 2013) ........................35

*In re Tampa Chain Co.*,
  35 B.R. 568 (Bankr. S.D.N.Y. 1983) ......................................................................................36

*Tom Doherty Assocs.* v. *Saban Entm't*,
  869 F. Supp. 1130 (S.D.N.Y. 1994) ........................................................................................26

*Toto* v. *Sony Music Ent.*,
  60 F. Supp. 3d 407 (S.D.N.Y. 2014) ......................................................................................41

*In re Tronox Inc.*,
  855 F.3d 84 (2d Cir. 2017) ........................................................................................17, 18, 22

*U.S. Bank Nat'l Ass'n* v. *Windstream Servs., LLC*,
  2019 WL 948120 (S.D.N.Y. Feb. 15, 2019) ...........................................................................41

*U.S. Life Ins. Co. in City of New York* v. *Blumenfeld*,
  938 N.Y.S.2d 84 (N.Y. App. Div. 1st Dep't 2012) .................................................................32

*UMB Bank, Nat'l Ass'n* v. *Revlon, Inc., et al.*,
  No. 1:20-cv-06352, ECF Doc. 1 ..............................................................................................13

*Van Valkenburgh, Nooger & Neville, Inc.* v. *Hayden Pub. Co.*,
  30 N.Y.2d 34 (1972) ................................................................................................................25

*Weizmann Inst. of Sci.* v. *Neschis*,
  229 F. Supp. 2d 234 (S.D.N.Y. 2002) .....................................................................................48

*In re Wlodarski*,
  115 B.R. 53 (S.D.N.Y. 1990) ..................................................................................................36

*Women's Interart Center, Inc.* v. *N.Y.C. Econ. Dev. Corp.*,
  97 A.D.3d 17 (N.Y. App. Div. 1st Dep't 2012) .....................................................................41

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

**Statutes**

11 U.S.C. § 101(5)(b) .................................................................................25, 29

11 U.S.C. § 502(b) ................................................................................................29

11 U.S.C. § 502(c) ................................................................................................29

11 U.S.C. § 502(c)(2) .....................................................................................25, 29

11 U.S.C. § 541(a)(1) ...........................................................................................16

42 U.S.C. § 12181 .................................................................................................31

N.Y. U.C.C. Law § 2-A-103(1)(h).......................................................................41

N.Y. U.C.C. Law § 2-A-103(1)(j) ........................................................................41

**Other Authorities**

Eric E. Bensen, Bensen on Patent Licensing Transactions § 1.02 (Matthew
   Bender, Ed. 2020) ............................................................................................42

Fed. R. Bankr. P. 2004..........................................................................................33

Fed. R. Bankr. P. 7012 ..........................................................................................15

Fed. R. Civ. P. 12(b)(6).........................................................................................15

Fed. R. Civ. P. 12(f)........................................................................................15, 49

H.R. Rep. No. 95–595 (1977)...............................................................................29

S. Rep. No. 95–595 (1978) ...................................................................................29

The above-captioned debtors and debtors in possession ("Debtors," "Revlon," or the "Company"), file this memorandum of law in support of their motion to dismiss (the "Motion") the complaint (the "Complaint"). The Debtors respectfully request entry of an order, substantially in the form attached hereto as **Exhibit A**, dismissing all claims for equitable relief asserted against the Debtors, including any claims seeking specific performance, injunctive relief, or seeking declaratory relief that specified agreements are "void" or should be "rescinded" (the First through Thirteenth Causes of Action, collectively, the "Equitable Relief Claims"), or in the alternative, striking all Equitable Relief Claims, pursuant to Federal Rules of Civil Procedure ("Rules") 12(b)(6), 12(f), and Federal Rule of Bankruptcy Procedure ("Bankruptcy Rules") (7012.)

## PRELIMINARY STATEMENT

1.      Plaintiffs seek unprecedented relief. They allege that financing transactions in 2019 and 2020 breached the 2016 Credit Agreement, and now, after waiting over two years and collecting millions of dollars in interest made possible by the challenged transactions, ask this Court to order, as an equitable remedy, the complete reformation of the Debtors' capital structure by voiding or rescinding key contracts between the Debtors and third parties, and ordering specific performance of the pre-2020 version of the 2016 Credit Agreement. None of this relief can be granted under applicable state law or basic bankruptcy principles.

2.      As discussed in the Answer and Counterclaims filed with this Motion, Plaintiffs' underlying claims for breach of contract are baseless. The features of the BrandCo Transaction Plaintiffs now seek to challenge are based on a proposal that Plaintiffs themselves originally made; indeed, they proposed doing the transaction "Without Required Lender Consent." But Plaintiffs reversed course when they saw an opportunity to profit from Revlon's distress as the COVID-19 pandemic took hold. Their challenges to the 2019 financing were never asserted until nearly *nine months* after that transaction closed, when they began looking for a pretext to disrupt the BrandCo

1

Transaction.  Seeing Revlon's peril as their opportunity, Plaintiffs attempted to drive the Company into bankruptcy during the height of the pandemic so that they could take control of the Company.

3.      As against Revlon, this Adversary Proceeding is not about damages flowing from alleged contractual breaches, because the 2016 loans have accelerated, and Plaintiffs' $874 million in loan claims are indisputably due.  Indeed, as against the Debtors, Plaintiffs *only* seek equitable relief—they do not assert any claims for damages.   Rather, Plaintiffs seek unprecedented, sweeping equitable relief to "unwind" the Debtors' entire capital structure, on which thousands of parties have relied, and somehow restore it to its pre-2020 state. Plaintiffs offer no legal support for this demand, and make no effort to explain how this would be feasible, fair, or appropriate under the principles of equity.  Years after closing the transaction, it is impossible to unscramble the egg.  That is why parties who claim "irreparable harm" seek immediate preliminary injunctive relief.  Instead of doing so, Plaintiffs only now ask this Court to "void," "rescind," and "enjoin" every component of the BrandCo Transaction and numerous related agreements.

4.      The Equitable Relief Claims—the only relief sought from the Debtors—should be dismissed for a host of reasons.  To begin, these claims are not Plaintiffs' to bring.  Plaintiffs seek equitable relief *on behalf of the non-BrandCo Debtors*, allege injuries *to the non-BrandCo Debtors*, and demand that intellectual property be "returned *to RCPC*." These Equitable Relief Claims plainly do not seek *direct* relief for Plaintiffs; they seek relief *for certain Debtors* that allegedly would *indirectly* benefit Plaintiffs. These are, by definition, derivative claims that belong to the estate. Indeed, this is the same relief that the Debtors (or the Creditors' Committee, by making a standing motion) would seek in a traditional fraudulent transfer action. Claims such as those raised by Plaintiffs that share a "similar object and purpose" as estate claims are, in fact, estate claims.  The Final DIP Order required any party seeking to assert estate claims challenging

the BrandCo Transaction to file a standing motion by October 31, 2022, but Plaintiffs ignored this
requirement and have now waived their right to do so. Plaintiffs' attempt to void the BrandCo
Transaction is especially improper here because the Creditors' Committee fully investigated these
transactions, and reached an agreement in principle with the Debtors and the BrandCo Lenders to
settle any fraudulent transfer and other claims they might have otherwise sought standing to
assert. Plaintiffs' Equitable Relief Claims are a blatant attempt to usurp the Debtors' exclusive
right to control and settle those (and other) estate claims, and to convert claims that would, to the
extent they were meritorious, benefit all creditors into ones that solely benefit Plaintiffs.

5.      The Equitable Relief Claims also fail as a matter of contract and bankruptcy law.
Under New York law, the equitable remedies sought here are not permitted because money
damages are available and quantifiable.  The Bankruptcy Code supercharges this rule, and
*statutorily mandates* that claims for equitable relief be converted into dollar amounts *unless* a
plaintiff can show under state law that monetary relief is not permitted or would be impossible to
calculate.  Plaintiffs effectively concede that monetary damages are available and calculable—
they have filed proofs of claim seeking monetary payments, and allege in the Complaint that the
harm they suffered is measurable by the drop in trading prices for their loans.  Thus, granting
Plaintiffs the relief they seek would require this Court to turn well-settled law on its head.

6.      Many other reasons also bar the Equitable Relief Claims:  Plaintiffs cannot delay
for years in seeking equitable relief in order to "wait and see" how the facts play out; they cannot
seek equitable remedies that are not possible or practicable for the Court to order; and they cannot
attempt to void contracts to which they are not parties.  Their request for a declaration that the
BrandCo Transaction and related agreements are void *ab initio* is particularly outlandish, as that
extraordinary remedy applies only where a contract is illegal, usurious, obtained by forgery, or

contrary to some substantial public policy. None of that is true here, or even alleged in the Complaint.

7.      Revlon also seeks dismissal of Plaintiffs' claim that the 2019 financing transaction breached the 2016 Credit Agreement. That claim alleges that a transfer of intellectual property to a wholly-owned BrandCo subsidiary that was then *licensed* to RCPC was a "sale-*lease*back" that violated the 2016 Credit Agreement. The claim fails because a "license" manifestly is not a "lease." This distinction is evident from the agreement's use of both terms to apply to different concepts, and numerous New York courts have explained the differences between licenses and leases. Finally, the Court should dismiss the litany of tort claims against the Debtors because they either duplicate the contract claims or are otherwise implausible.

8.      As one court remarked, allowing self-interested creditors to pursue derivative claims would "produce near anarchy." *In re MortgageAmerica Corp.*, 714 F.2d 1266, 1275–76 (5th Cir. 1983). Here, even worse, the Equitable Relief Claims are completely meritless. Granting this motion will, we submit, expedite and simplify this Adversary Proceeding and prevent Plaintiffs' baseless claims from impeding the restructuring process.

## STATEMENT OF FACTS

9.      The Debtors provide this statement of facts as context for their Motion, which seeks dismissal of the Equitable Relief Claims on the grounds that Plaintiffs cannot, under the guise of equitable relief, unwind the Debtors' pre-petition capital structure, and because certain of their contract claims can be dismissed based on the plain and unambiguous language of the 2016 Credit Agreement. Plaintiffs' tort and quasi-contract claims should be dismissed because they are duplicative of the contract claims and Plaintiffs otherwise cannot establish a plausible claim for relief as a matter of law. To the extent the recitation of facts here differs from Plaintiffs' grossly misleading account of the 2019 and 2020 financing transactions, those discrepancies are irrelevant

4

to the disposition of this Motion, which seeks relief based solely on the facts alleged in the

Complaint and applicable law. A more complete statement of facts relevant to Plaintiffs' claims is

in the Revlon defendants' Answer and Counterclaims, filed today.[1]

**A.    The 2016 Credit Facility**

10.    In September 2016, in connection with its acquisition of Elizabeth Arden, RCPC

issued $1.8 billion of secured, seven-year term loans.  (Compl. ¶ 221.)  The 2016 loans and

collateral are governed by a Term Credit Agreement among Revlon, Inc., RCPC, the lenders, and

Citibank, N.A. as Administrative Agent and Collateral Agent ("Citibank") (the "2016 Credit

Agreement") (Ex. A), and a Term Loan Guarantee and Collateral Agreement between RCPC and

its guarantor subsidiaries in favor of Citibank (the "2016 Collateral Agreement").  (Ex. B.)

11.    The 2016 loans mature in September 2023, although a "springing maturity" made

them due on November 16, 2020, if certain unsecured debt then remained outstanding.  (Ex. A

§§ 1; 2.2.)  The 2016 loans were initially secured by liens on substantially all of RCPC's and its

guarantor subsidiaries' assets, including accounts, inventory, equipment, real estate, and

intellectual and other intangible property.  (Ex. B § 3.1; Ex. A § 6.8(e); Ex. C, 40.)  Importantly,

these liens were granted to Citibank, not to Plaintiffs or other lenders, and the lenders are not

parties to the 2016 Collateral Agreement.  (Ex. B.)  The Lenders "irrevocably authorize[d]"

Citibank to release or subordinate the liens.  (Ex. A § 9.10.)

12.    The 2016 Credit Agreement permitted RCPC and its subsidiaries to incur additional

unsecured and secured debt in a broad range of circumstances and amounts.  (Ex. A.) As relevant

---

[1]    On this Motion, the Court may consider the well-pleaded allegations in the Complaint (assumed true solely for
purposes of this motion); the full content of documents incorporated by reference or relied upon in the Complaint;
and facts of which the Court may take judicial notice, including filings on its docket and in related lawsuits. *See
In re 305 E. 61st St. Grp. LLC*, 644 B.R. 75, 80 (Bankr. S.D.N.Y. 2022). Documents cited in this motion are
submitted as exhibits to the accompanying Declaration of Sean A. Mitchell and are cited as "Ex. _." Paragraphs
of the Complaint are cited as "¶ _."

here, RCPC was allowed, by notice to Citibank, to obtain new revolving loan commitments or

term loans that would be governed by the 2016 Credit Agreement and 2016 Collateral Agreement.

(*Id.* at § 2.25.)  RCPC was also permitted to raise new debt secured by the collateral for the 2016

loans or other assets.  (Ex. A § 7.3(g).)  The agreement also permitted RCPC and its subsidiaries

to dispose of or invest collateral in circumstances that would cause those assets to be no longer

pledged to support the 2016 Credit Agreement.  (*Id.* §§ 7.5, 7.7, 8.15, 10.15.)  The 2016 Credit

Agreement allowed for amendments with the consent of "Required Lenders," defined as holders

of a majority of outstanding loans and revolving loan commitments.  (*Id.* § 10.1.)

13.    Section 7.10 of the 2016 Credit Agreement generally prohibits the "leasing" by

RCPC or its restricted subsidiaries of "real or personal" property as part of a sale-leaseback

transaction.  (Ex. A § 7.10.)  Section 7.10 permitted such a transaction, however, if the fair market

value of the transferred property, "as determined in good faith" by RCPC, is less than $100 million

(Ex. A §§ 7.10, 1.1 (definition of "Fair Market Value".)   The prohibition on sale-leaseback

transactions in Section 7.10 does not apply to licenses of intellectual property.

14.    Section 8.1 of the 2016 Credit Agreement specifies certain "Events of Default."

(Ex. A § 8.1.)  After an Event of Default and a request by the Required Lenders, Citibank may

declare the loans and obligations under the 2016 Credit Agreement to "immediately become due

and payable."  (*Id.*)  Upon a bankruptcy filing of RCPC or its subsidiaries, all obligations under

the 2016 Credit Agreement automatically become due and payable, without any notice from the

Required Lenders.  (*Id.*)

**B.    The 2019 Transaction**

15.    In August 2019, to address a liquidity shortfall, Revlon entered into a three-year,

senior secured $200 million term loan with Ares Management Corp., secured by a pledge of certain

intellectual property exclusively associated with the American Crew brand (the "American Crew

6

IP") and a pari passu lien on the collateral securing the 2016 facility (the "2019 Transaction").
(Compl ¶ 7; Ex. D at 51.) Revlon publicly disclosed the terms and documents governing the 2019
Transaction two days after the closing. (Ex. E, Ex. 99.1.)

16.    In connection with the 2019 Transaction, the American Crew IP was transferred to
a newly created indirect subsidiary of RCPC, Beautyge II LLC ("AC BrandCo"). (Compl. ¶ 7.)
The transfer to AC BrandCo was limited to the American Crew IP; RCPC retained all other assets
related to the American Crew business. (Ex. F §§ 1.1, 2.1(a), 2.1(b); Ex. G §§ 1.1, 2.1(a), 2.1(b).)
As a result of this transfer, which was permitted under the 2016 Credit Agreement, the liens on
those assets under the 2016 Collateral Agreement were released. (Compl. ¶ 229.) RCPC and AC
BrandCo also entered into a License Agreement (the "2019 American Crew License Agreement")
(Ex. H) granting RCPC an exclusive right to use the American Crew IP for five years in exchange
for a royalty of 10% on net sales of American Crew branded products.[2] (Compl. ¶ 7.) Under the
express terms of the 2019 American Crew License Agreement, AC BrandCo retained sole
ownership of the American Crew IP (Ex. H §§ 2.1, 5.1) and Revlon agreed to extensive and
intrusive quality control, inspection, and auditing rights, and other provisions typical of an
intellectual property license. (Ex. H §§ 4.4, 5.3, 5.4, 6.1.)

17.    For nine months after the 2019 Transaction closed, no one—including Plaintiffs
here—challenged the transaction, sought to unwind it, or even suggested that it violated the 2016
Credit Agreement. It was only in Spring 2020, when Plaintiffs sought to block the BrandCo

---

[2]    Plaintiffs allege that the 2019 Transaction violated Section 7.10 of the 2016 Credit Agreement, which prohibits
sale-leaseback transactions involving property worth more than $100 million. They do not dispute that the
collateral could be released as a "permitted investment" under the 2016 Credit Agreement. Their sale-leaseback
claim is wrong for at least two independent reasons. *First*, as discussed in Section III of this Motion, there was
no sale-leaseback because there was no lease of the American Crew IP, there was a license. *Second*, as explained
in Revlon's Counterclaims, Revlon's CFO certified in connection with the 2019 Transaction that the American
Crew IP was worth less than $100 million.

7

Transaction, as more fully described below, that Plaintiffs contrived their allegation that the 2019

Transaction violated the "sale-leaseback" provision in the 2016 Credit Agreement.

### C.    The 2020 BrandCo Transaction

18.    In late 2019, Revlon began seeking additional financing to repay outstanding

unsecured notes and avoid a springing maturity on the 2016 loans.  (Compl. ¶¶ 221, 228.)  Revlon's

need for additional financing became more acute in the Spring of 2020 as the onset of the COVID-

19 pandemic severely hindered its business and liquidity.  (Ex. I p. 47.)

19.    As set forth in the Debtors' Counterclaims, on February 13, 2020, the Plaintiffs sent

a term sheet to the Company proposing a $750 million financing to be done "Without Required

Lender Consent."   Plaintiffs proposed that such loans would be collateralized by assets contributed

to certain "Non-Guarantor Restricted Subsidiaries"—*i.e.*, subsidiaries that did not guarantee the

2016 loans—including the "Brandcos."  Plaintiffs proposed that "such debt financing would be

structured in a way that maximizes structural and lien priority" over the 2016 lenders.  Finally,

Plaintiffs also proposed that their existing 2016 loans would be "rolled up" into the new loans

secured by the "Priming Collateral."  For over a month, Plaintiffs negotiated this structure with

the Company, until ultimately deciding in March 2020 that they would not support the Company's

financing efforts.[3]

20.    On April 14, 2020, Revlon entered into a commitment letter with a group of

supporting 2016 loan holders for a new financing that would become the BrandCo Transaction.

(Ex. CC.)  The terms of the transaction, which were publicly disclosed in an 8-K filing by Revlon

---

[3]    Plaintiffs' characterization of the negotiations leading to the BrandCo Transaction is grossly misleading.
Plaintiffs nowhere acknowledge that they participated in designing and negotiating the transaction.  Only after
the COVID-19 pandemic began to cause significant harm to Revlon's business did Plaintiffs withdraw from the
ad hoc group of lenders supporting the transaction and begin objecting, after concluding that their interests were
better served by forcing Revlon into a premature bankruptcy, where they hoped to be able to seize control of the
company.  *See* Debtors' Answer and Counterclaims, filed December 5, 2022, ¶¶ 109–118.

the same day, included $850 million in new money "B-1" BrandCo loans due June 30, 2025, secured by the American Crew IP and certain intellectual property exclusively associated with 12 other brands, (collectively, the "BrandCo IP"), as well as certain additional collateral (collectively, the "BrandCo Collateral") and pari passu liens on all other collateral securing the remaining 2016 loans.  Participating lenders could also exchange as much as $950 million of the 2016 loans for an equivalent amount of new "B-2" BrandCo loans, that would be subordinate to the new-money B-1 loans (the "Roll-Up Loans").  (*Id.*)  All 2016 Lenders, including Plaintiffs, were free to participate in both the new loans and the exchange.  (Ex. J  p. 10.) The transaction contemplated amendments to the 2016 Credit Agreement that required consent by the Required Lenders.  (*Id.*)

21.     Plaintiffs' opposition to the transaction became known to the Company in April 2020, after several Plaintiffs first received confidential information regarding the Company's deteriorating liquidity and, unbeknownst to the Company, had begun organizing other 2016 lenders to oppose any financing.  Plaintiffs succeeded in delaying the financing, causing Revlon's liquidity to worsen, and its imminent need for financing in the face of the burgeoning COVID-19 pandemic to become even more acute.  (Compl. ¶ 257.)  Accordingly, in an effort to address the Company's liquidity need caused by Plaintiffs' delay tactics, the worsening pandemic, and uncertainty if the transaction would even close, the supporting 2016 Lenders and Revlon negotiated at arms' length and then entered into an agreement to provide Revlon with a $65 million incremental revolving loan (the "Incremental Revolver") (Excerpt at Ex. K), the maximum amount of incremental indebtedness Revlon could incur under the 2019 Transaction documents.  The 2016 Credit Agreement explicitly permitted the issuance of the Incremental Revolver.  (Ex. A § 2.25.) Consistent with the express terms of the 2016 Credit Agreement, the lenders on the Incremental Revolver were included in the calculation of "Required Lenders" and were entitled to consent to

the proposed amendment. (Ex. A § 1.1 (definition of "Required Lenders").) Contrary to Plaintiffs'

allegations, the Incremental Revolver was not a "sham"; it was fully funded and used by Revlon.

The Incremental Revolver lenders did not view it as a "sham" or as though closing of the BrandCo

Transaction was assured; they priced the Incremental Revolver to reflect the very real risks

associated with making a bridge loan to a distressed company during the pandemic and demanded

a "put option" that would have required Jefferies to purchase the Incremental Revolver loans if the

BrandCo Transaction did not close. (E. Vonnegut Dep. (Ex. BB) Tr. 92:21-94:10.)

22.     The BrandCo Transaction closed on May 7, 2020, after a majority of outstanding

2016 loans (including the Incremental Revolver) consented. The transaction involved three new

secured loan facilities: (i) $880 million of new money (upsized from the original commitment of

$850 million) to retire the 2019 term loan, the Incremental Revolver, the Company's outstanding

unsecured notes due in 2021, and for general corporate purposes (including funding operations

during the pandemic); (ii) $950 million of Roll-Up Loans, which extended the maturity of the

exchanged 2016 loans by two years; and (iii) a $3 million junior roll-up facility for lenders who

did not provide new money loans but consented to the amendment. (Compl. ¶¶ 304–06.)

23.     As with the 2019 loan, in addition to granting Jefferies Finance LLC, as Pari Passu

Collateral Agent and Administrative Agent ("Jefferies") a pari passu lien on the collateral securing

the 2016 loans, Revlon also granted Jefferies three separate liens on the BrandCo Collateral

securing the three facilities under the BrandCo Credit Agreement. (Ex. L § 4(l).) To facilitate the

pledge of the BrandCo IP, Revlon transferred the BrandCo IP to a number of wholly owned

subsidiaries (the "BrandCos"). (Compl. ¶¶ 384–85.) Each BrandCo entity was an "Excluded

Subsidiary" and a "Non-Guarantor Subsidiary" under the 2016 Credit Agreement. The transfer of

the BrandCo IP to Non-Guarantor Subsidiaries, such as the BrandCos, automatically caused the

10

release of Citibank's lien on the BrandCo IP. (Ex. B § 8.15; *see also* § 10.15 [2016 CA].).

Nevertheless, as is customary, the Required Lenders directed Citibank to release its liens on the

BrandCo IP through the 2020 Amendment. (Compl. ¶¶ 249–50, 299–300.) On May 7, 2020,

Citibank executed a Confirmation of Lien Release with respect to all of the BrandCo IP and

publicly filed notices of release with the Patent and Trademark Office and the Copyright Office

(collectively, the "Lien Release Confirmations") (Compl. ¶¶ 299–300; Exs. S–V.)

24.     The BrandCo Transaction was implemented through multiple agreements (none of

which Plaintiffs are parties to), including principally:

- Amendment No. 1 to the 2016 Credit Agreement, dated as of May 7, 2020, between RCPC, the Required Lenders, and Citibank (the "2020 Amendment"). (Ex. Q.) The 2020 Amendment authorized the BrandCo Transaction and various amendments to the 2016 Credit Agreement.

- The BrandCo Credit Agreement, dated as of May 7, 2020, between RCPC, as Borrower, Jefferies, and the BrandCo Lenders (the "BrandCo Credit Agreement"). (Ex. M.) The BrandCo Credit Agreement governs the BrandCo loans.

- The Term Loan Guarantee and Collateral Agreement, dated as of May 7, 2020, between RCPC, as Borrower, each other Debtor, including the BrandCos, as Subsidiary Guarantors, and Jefferies (the "BrandCo Collateral Agreement"). (Ex. L.) Each of the Debtors guaranteed the BrandCo loans and granted liens in favor of Jefferies on substantially all of their assets, including the BrandCo IP. (Ex. M § 2.1].)

- The First Lien Pari Passu Intercreditor Agreement, dated as of May 7, 2020, among Citibank, Jefferies, and RCPC (the "Pari Passu Intercreditor Agreement"). (Ex. N.) The Pari Passu Intercreditor Agreement governs the respective rights of the 2016 Lenders and the BrandCo Lenders with respect to collateral that is shared among them, providing that both sets of lenders have a pari passu first lien on such shared collateral.

- The Upper Tier Transfer and Contribution Agreement, dated as of May 7, 2020, and the Lower Tier Transfer and Contribution Agreement, dated as of May 7, 2020, among various non-BrandCo Debtors, as transferors, and the BrandCos as transferees (*See, e.g.*, Excerpt of Elizabeth Arden Lower Tier Transfer and Contribution Agreement (Ex. P) and Excerpt of Upper Tier Transfer and Contribution Agreement (Ex. O) (together, the "Contribution Agreements").) The Contribution Agreements transferred the BrandCo IP to the BrandCos.

- Thirteen separate Intellectual Property License Agreements, each dated as of May 7, 2020, between RCPC and each BrandCo (collectively, the "Intercompany License Agreements") (*See e.g.*, Intellectual Property License Agreement between BrandCo Elizabeth Arden 2020 LLC and RCPC (Ex. R).)

- The Lien Release Confirmations, executed and filed by Citibank, on May 7, 2020. (Exs. S–V.)

25.     The BrandCo Transaction was a success. *First*, it provided the Company with much needed liquidity to sustain itself throughout the pandemic. *Second*, as a result of the transaction, Revlon repaid the 2019 term loan in full, avoided the springing maturity of the 2016 loans by providing funds for the refinancing of the 2021 Notes, and mitigated the risk of a going concern qualification and resulting cross-defaults. (Compl. ¶ 304.) By mid-2021, and continuing into early 2022, the Company saw a marked rebound in sales and revenue, and commenced efforts to de-lever by issuing additional equity. These circumstances dramatically changed in late spring 2022 as global supply chain disruptions crippled the Company's liquidity, ultimately precipitating these chapter 11 cases.

**D.     The UMB Complaint**

26.     On August 12, 2020, certain Plaintiffs purporting to represent the Required Lenders (at that time) under the 2016 Credit Agreement sent a Notice of Event of Default to UMB Bank ("UMB"). For a period of time, UMB had claimed to act as Citibank's successor under the 2016 Credit Agreement, although UMB was never appointed as agent in accordance with the terms of the 2016 Credit Agreement and has never performed and does not currently perform any such role. Notably, UMB is not a Plaintiff in this adversary proceeding. The August 12 Notice instructed UMB to accelerate the 2016 loans by declaring them "due and payable." (Ex. W ¶¶ 164–165.) Also on August 12, 2020, at Plaintiffs' direction, UMB Bank, lacking any standing to do so, sued Revlon and other defendants asserting that the 2019 and BrandCo Transactions breached the 2016

12

Credit Agreement.  Compl., *UMB Bank, Nat'l Ass'n* v. *Revlon, Inc., et al.*, No. 1:20-cv-06352, ECF Doc. 1 (the "<u>UMB Complaint</u>") (Ex. W.)

27.     The UMB Complaint is substantially identical to the Complaint here.  Through UMB, Plaintiffs alleged that the 2019 and BrandCo Transactions breached the 2016 Credit Agreement, and included claims for breach of the same provisions of the 2016 Credit Agreement that Plaintiffs allege here.   UMB sought equitable relief including rescission of the 2020 Amendment and the 2020 Pari Passu Intercreditor Agreement; a declaration that the 2016 loans were validly accelerated; and "[v]oiding" the transfer of IP to the BrandCos, the "transfer" of liens in the BrandCo collateral; and "all obligations arising under any of the facilities provided in the 2020 BrandCo Credit Agreement."  (Ex. W at 116.)  UMB also sought an award of "damages in an amount to be proven at trial to compensate the [Objecting] Lenders for the loss of the liens on collateral securing payment of their loans under the 2016 Credit Agreement."  (Ex. W ¶ 116; *cf.* Compl. ¶ D) (seeking "money damages").

28.     There is one principal difference between the UMB Complaint and the current Complaint that warrants attention.  UMB asserted actual and constructive fraudulent conveyance claims.  (Ex. W ¶¶ 402–17.)  Those claims sought a judgment that the "transfer of the BrandCo collateral to the BrandCo Entities should be voided," and that "transfer of all liens in the BrandCo Collateral and the Pari Passu Lien should be voided."  (*Id.* ¶¶ 408, 417.)  Plaintiffs in this case do not technically assert claims labeled as "fraudulent transfer" claims, but seek identical relief.  (Compl. ¶ A.3–11.)

29.     On November 9, 2020, before it had served defendants or any substantive motions had been filed, Plaintiffs directed UMB to dismiss the UMB Complaint without prejudice, supposedly because Citibank had mistakenly repaid them in full.  Nearly half of Plaintiffs in that

13

case returned the mistaken payments to Citibank immediately in 2020, but none of those "returning lenders" sought to prosecute or refile their challenges to the BrandCo Transaction.

### E.    The Present Adversary Complaint

30.    On October 31, 2022, after over two years of inaction, Plaintiffs filed this Complaint asking this Court to return Revlon's capital structure to its pre-2020 form. (Compl. ¶ 25.) Plaintiffs assert a variety of claims that are substantially identical to the claims asserted in the UMB action, with the exception of the notably omitted fraudulent transfer claims. Plaintiffs ask the Court to declare an event of default under the 2016 Credit Agreement, and then to declare all agreements implementing the BrandCo Transaction void *ab initio*. (Compl. ¶ A.3–11.) Alternatively, Plaintiffs seek rescission of the BrandCo Transactions, including all of the transactions they seek to void. Plaintiffs, however, are not parties to any of those agreements. In seeking this relief, they ask the Court to order the BrandCos to "return[] to RCPC" the BrandCo IP, and "unwind the 2020 Transaction," although they have not moved for standing to assert claims on behalf of the Debtors whose rights they seek to usurp. (Compl. ¶¶ 412, 421, 426.) They also seek specific performance of the pre-2020 capital structure. (Compl. ¶ B.1.) Plaintiffs' Equitable Relief Claims are the *only* claims asserted against the Debtors. Plaintiffs seek money damages against the BrandCo Lenders, Jefferies, and Ares. (*Id.*) As set forth in proofs of claim filed by Plaintiffs on October 24, 2022, Plaintiffs claim (and, as a result of its bankruptcy filing, Revlon does not dispute) that their loans have been accelerated and are now due and payable.

### ARGUMENT

31.    To survive a Rule 12(b)(6) motion to dismiss, as incorporated by Bankruptcy Rule 7012(b), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)). "[N]aked assertions devoid of further factual

14

enhancement" are insufficient. *Iqbal*, 556 U.S. at 678 (citations and internal quotations marks omitted); *see also In re Abreu*, 527 B.R. 570, 578 (Bankr. E.D.N.Y. 2015). A motion to dismiss should be granted where, as here, a Complaint does not "infer 'more than the mere possibility of misconduct.'" *Nat'l Rifle Ass'n of Am.* v. *Vullo*, 49 F.4th 700, 713 (2d Cir. 2022) (quoting *Ashcroft* v. *Iqbal*, 556 U.S. at 679). As set forth below, the Complaint fails to state valid causes of action in respect of any of Plaintiffs' Equitable Relief Claims or Counts One through Six and Counts Eight through Thirteen and, therefore, such claims should be dismissed, with prejudice.

32.    In the alternative, this Court may also strike Plaintiffs' claims for equitable relief because the equitable relief requested is patently unavailable as a matter of law. Rule 12(f) authorizes a court to strike from a pleading "any redundant, immaterial, impertinent, or scandalous matter," and may, on this basis, strike requests for relief that are "not recoverable under law" or are not fashioned as "proper relief." *Onanuga* v. *Pfizer, Inc.*, 2003 U.S. Dist. LEXIS 20298, at *15 (S.D.N.Y. Nov. 7, 2003) (striking requested relief of specific performance where the proper relief was damages); *see also* Fed. R. Civ. P. 12(f).

## I.    Plaintiffs Lack Standing To Pursue Equitable Relief Claims Because Such Claims Are Derivative

33.    The Equitable Relief Claims are classic derivative claims that seek to "void" the BrandCo Transaction and claw back the BrandCo IP for the benefit of the non-BrandCo Debtors' estates. Attempting to portray themselves as victims, Plaintiffs ignore the central and dispositive issue—undoing the BrandCo Transaction, as they request, would bring assets back to the non-BrandCo Debtors' estates. Plaintiffs are bystanders to their Equitable Relief Claims: rather than seek *direct* relief for themselves, they demand, *on behalf of* the non-BrandCo Debtors, return of the BrandCo IP to the non-BrandCo Debtors and an order voiding the non-BrandCo Debtors' obligations under the BrandCo Transaction documents. Claims to recover assets and augment the

bankruptcy estate are definitionally derivative. *In re GIGA WATT Inc.*, No. 18-03197-FPC7, 2021 WL 4436941, at *6 (Bankr. E.D. Wash. Sept. 27, 2021) ("Generally, an action is derivative" if "it seeks to recover assets for the corporation or to prevent the dissipation of its assets."). The Equitable Relief Claims seek just that relief—avoidance of obligations and liens and rescission of transfers—as a fraudulent transfer claim, which can be brought *only* by a debtor. Allowing individual creditors to seek such consequential relief would not only violate basic principles of the Bankruptcy Code, which explicitly confers control of these claims to the Debtors, it would inject utter chaos into the reorganization process.

A.    **The Debtors Have The Exclusive Authority To Pursue The Equitable Relief Claims**

34.    A debtor's estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). "Every conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative, is within the reach of the bankruptcy estate." *In re Bernard L. Madoff Inv. Sec. LLC*, 740 F.3d 81, 88 (2d Cir. 2014) ("Madoff") (brackets and internal citation omitted). Derivative claims—claims "derivative" of, or "derived" from claims the debtor may assert—are property of the estate, not individual creditors. *See Madoff*, 740 F.3d at 88; *see also In re Clear the Air, LLC*, 631 B.R. 286, 294 (Bankr. S.D. Tex. 2021).

35.    "A bankruptcy court turns to state law to determine which claims belong to the bankruptcy estate." *In re 305 E. 61st St. Grp*, 644 B.R. at 83 (citing *St. Paul Fire & Marine Ins.* v. *PepsiCo, Inc.*, 884 F.2d 688, 701 (2d Cir. 1989) ("St. Paul")). Whether claims are derivative under Delaware law, where Revlon Inc. and RCPC are organized, "must turn *solely* on the following questions: (1) who suffered the alleged harm (the corporation or the stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the

stockholders individually)?" *Brookfield Asset Mgmt., Inc.* v. *Rosson*, 261 A.3d 1251, 1263 (Del. 2021) ("Brookfield") (citing *Tooley* v. *Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004)).    To bring a direct claim, a plaintiff must show it "suffered an injury that is *not dependent on* an injury to the corporation."    *Id*.    Significantly, *Brookfield* overruled *Gentile* v. *Rossette*, 906 A.2d 91 (Del. 2006), which held that a claim was direct if the plaintiff could demonstrate a "unique" harm, even though the corporation was also harmed.    *Id*. at 1265. Overruling *Gentile*, *Brookfield* emphasized that a non-derivative plaintiff must demonstrate it "can prevail *without showing an injury to the corporation*."    *Id*. at 1266.

36.    Bankruptcy law recognizes the same principles.    "Derivative claims in the bankruptcy context are those that arise from harm done to the estate."    *In re Tronox Inc*., 855 F.3d 84, 100 (2d Cir. 2017) ("Tronox") (internal quotation marks omitted).    A derivative injury includes "a secondary effect from harm done to [the debtor]," that is "*inseparable from*, and *predicated upon*, a legal injury to the estate."    *Id.* at 100, 102 (emphasis added).    A claim is "derivative" if the alleged injury "merely reduces assets available to pay creditors."    *In re Cabrini Med. Ctr.*, No. 09-14398 ALG, 2012 WL 2254386, at *7 (Bankr. S.D.N.Y. June 15, 2012), *aff'd*, 489 B.R. 7 (S.D.N.Y. 2012) (citing *St. Paul*, 884 F.2d at 705).    A claim is likewise "derivative" when the "recovery would serve to increase the pool of assets available to all creditors."    *In re Emoral, Inc.*, 740 F.3d 875, 881 (3d Cir. 2014).[4] Non-derivative claims "are personal to the individual creditor and *of no interest to the others*."    *Tronox*, 855 F.3d at 100.    With non-derivative claims, "the trustee will have no available causes of action to remedy the alleged harm."    *In re Port Morris Tile & Marble LP*, No. 21-12116 (MG), 2022 WL 5237917, at *10 (Bankr. S.D.N.Y. Oct. 6, 2022).

---

[4]    Fraudulent conveyance claims "are quintessentially derivative, as they definitionally seek to return assets to the estate that were wrongfully taken from it." *In re Mark A. Nordlicht*, No. 21-CV-5990 (KMK), 2022 WL 1591788, at *6 (S.D.N.Y. May 19, 2022).

37.     The Debtors' standing to assert a derivative claim "is exclusive and divests all creditors of the power to bring the claim." *See GIGA WATT*, 2021 WL 4436941, at *3; *see also Tronox*, 855 F.3d at 106.  Congress intended "to protect all creditors by making the trustee the proper person to assert claims against the debtor." *St. Paul*, 884 F.2d at 701.  "Any other result would produce near anarchy," as the "only discernable organizing principle would be first-come-first served." *In re MortgageAmerica Corp.*, 714 F.2d at 1276.

38.     The rule prohibiting individual creditors from asserting derivative claims cannot be overcome by creative pleading in a complaint.  "In distinguishing derivative claims from particularized claims . . . labels are not conclusive, since plaintiffs often try, but are not permitted, to plead around a bankruptcy." *Tronox*, 855 F.3d at 100 (2d Cir. 2017); *Madoff*, 740 F.3d at 91–92 ("We are nonetheless wary of placing too much significance on the labels appellants attach to their complaints, lest they . . . 'plead[] around' the automatic stay and permanent injunction.").

*39.*     In policing efforts to "plead around" derivative claims, courts routinely hold that creditors "lack standing to bring causes of action that are *similar in object and purpose* to claims that the trustee could bring in bankruptcy." *In re Hatu*, 19-05428-5-JNC, 2022 WL 1436051, at *10 (Bankr. E.D.N.C. May 5, 2022) (quoting *Poth* v. *Russey*, 99 Fed. Appx. 446, 457 (4th Cir. 2004) (emphasis added)); *Nat'l Am. Ins. Co.* v. *Ruppert Landscaping Co.*, 187 F.3d 439, 441 (4th Cir. 1999) (claims were derivative because they are "so similar in object and purpose to claims that the trustee could bring in bankruptcy court"); *Ritchie Cap. Mgmt., L.L.C.* v. *Gen. Elec. Cap. Corp.*, 121 F. Supp. 3d 321, 336–37 (S.D.N.Y. 2015), *aff'd*, 821 F.3d 349 (2d Cir. 2016) (aiding and abetting fraud and civil conspiracy to commit fraud claims "unavoidably" had the same focus as the trustee's fraudulent transfer claims where allegations "overwhelmingly overlap[ed]"); *Poth*, 99 F. App'x at 457 (breach of fiduciary duty claim was derivative because "the facts alleged"

18

would "support an action by [ ] trustee in bankruptcy to avoid the [] transaction as a fraudulent conveyance"); *In re Mark One Corp.*, 619 B.R. 423, 439 (Bankr. E.D. Cal. 2020) (tortious interference claims were in substance avoidance claims that could only be pursued by the trustee).

40.    In *Madoff*, the trustee brought an adversary proceeding against alleged co-conspirators, asserting claims for fraudulent transfers, avoidable preferences, and turnover under the Bankruptcy Code and New York law and released those claims in a settlement. *Madoff*, 740 F.3d at 85-86.   Individual defrauded investors sued the same defendants for civil conspiracy, conversion, and other state law claims.  *Id.*  Judge Lifland enjoined these separate actions because plaintiffs had attempted to "usurp[] causes of action belonging to the estate," and thus violated the automatic stay.  *See Sec. Inv. Prot. Corp.* v. *Bernard L. Madoff Inv. Sec. LLC*, 429 B.R. 423, 430 (Bankr. S.D.N.Y. 2010)*, aff'd sub nom. In re Madoff*, 848 F. Supp. 2d 469 (S.D.N.Y. 2012), *aff'd sub nom. Madoff*, 740 F.3d 81 (2d Cir. 2014).  The Second Circuit agreed, finding that plaintiffs' claims were derivative because, although they purported to assert direct claims and "plead around" the trustee's settlement, the plaintiffs' claims "echo[ed]" those by the Trustee, and were based on the same underlying facts.  *Madoff*, 740 F.3d at 91.  Those  alleged injuries were "inseparable from, and predicated upon, a legal injury to the estate," namely, the defendants' alleged withdrawals from the Ponzi scheme. *Id.* at 92.

41.    Here, Plaintiffs' Equitable Relief Claims unquestionably have the "same focus," share a "similar object and purpose," "overlap" with, and "echo" claims that belong to the bankruptcy estate, including fraudulent conveyance claims.  Plaintiffs seek "to unwind the 2020 Transaction," (Compl. ¶ 25), by declaring "void" each of the components of the BrandCo Transaction, including the transfer of the BrandCo IP to the BrandCos and the Debtors' incurrence of obligations under the BrandCo Credit Agreement.  (*Id.* ¶ 347.) This is the *exact same* relief that

the Debtors could seek if they pursued fraudulent transfer claims. *Atlanta Shipping Corp.* v. *Chem. Bank*, 631 F. Supp. 335, 348 (S.D.N.Y. 1986), *aff'd*, 818 F.2d 240 (2d Cir. 1987) (the "appropriate relief" in a fraudulent conveyance action "is to void the conveyance"); *see also In re Adelphia Recovery Tr.*, 634 F.3d 678, 692 (2d Cir. 2011) ("[T]he purpose of fraudulent transfer actions [is] to unwind transactions between the actual parties to the transaction.").

42.      Indeed, the Debtors, as well as the UCC, spent months investigating the BrandCo Transaction to determine whether there were colorable avoidance claims, and the UCC was prepared to file a motion for standing to bring fraudulent transfer and other claims *on behalf of the Debtors* to void the *same transactions* as those targeted by Plaintiffs.  (*See, e.g.*, Nov. 21, 2022 Hr'g Tr. (ECF No. 9.)[5]  Tellingly, when the 2016 Lenders filed the UMB Complaint in 2020, they also asserted fraudulent transfer claims as a means to void the BrandCo Transaction.  (*See* Ex. W ¶¶ 17, 402–417.)

43.      Plaintiffs' Complaint demonstrates that the Equitable Relief Claims are patently derivative.   In their attempt to "unwind the 2020 Transaction," (Compl. ¶ 25), Plaintiffs unabashedly seek relief *on behalf of* the Debtors.  To "unwind" the BrandCo Transaction, Plaintiffs ask the Court to "void" the BrandCo Credit Agreement, the BrandCo Collateral Agreements, the Contribution Agreements, the Intercompany License Agreements, the Pari Passu Intercreditor Agreement, and the 2020 Amendment—agreements that are between the *Debtors* and various third parties, and to which Plaintiffs are *not* a party.  (*See id*. ¶¶ 347, 412.)  "Indeed, the Court was unable to locate a case that ordered rescission of a contract that the plaintiff was not a party to." *In re Provider Meds, LP*, 2014 Bankr. Lexis 3519, at *40 (Bankr. N.D. Tex. 2014).   Outside of

---

[5]     The Debtors have extended the Challenge Deadline solely for the UCC because the Debtors, the UCC, and the BrandCo Lenders have reached an agreement in principle to settle those claims.

bankruptcy, the vehicle through which creditors can void transactions they are not parties to is, of course, state fraudulent transfer law. *See id.* at *57.

44.    Further, Plaintiffs do not ask the Court to return the BrandCo IP to *Plaintiffs themselves*; rather, they request that "the BrandCo IP be returned *to RCPC*." (Compl. ¶¶ 412, 421, 426 (emphasis added).)  Such relief, would increase the assets of the non-BrandCo Debtors while reducing their liabilities, benefiting *all creditors* of the non-BrandCo Debtors.  That Plaintiffs seek relief *on behalf of the non-BrandCo Debtors* proves their injuries are general and their claims derivative.  And Plaintiffs' Equitable Relief Claims unequivocally depend upon an alleged injury to the non-BrandCo Debtors—the transfer of BrandCo IP to the BrandCos—and are therefore derivative under *Brookfield*.  As a matter of Delaware law, a demand to return assets to RCPC unequivocally belongs to RCPC itself, and is therefore derivative.  *See Brookfield*, 261 A.3d at 1262-1263 (holding that, in a derivative suit, "any recovery must go to the corporation," while in a non-derivative suit "the recovery or other relief flows directly to the stockholders, not to the corporation").  Moreover, Plaintiffs' demand that assets be returned to the non-BrandCo Debtors proves that Plaintiffs cannot "prevail without showing an injury to the corporation," a fatal flaw for any argument by Plaintiffs that their claims are non-derivative.  *Id*. at 1263.

45.    Plaintiffs' Equitable Relief Claims are derivative as a matter of bankruptcy law for the same reason.  Where an alleged injury to a creditor "cannot occur without the injury to the Debtor," "this nexus makes it a derivative claim." *In re Chiron Equities, LLC*, 552 B.R. 674, 691 (Bankr. S.D. Tex. 2016); *see also St. Paul*, 884 F.2d at 704.  Plaintiffs must show that their injury stands on its own and is not dependent on any injury to the Debtors; where the alleged injury "overlaps" with, or is "embedded" in, an injury to the debtor, then the claim is derivative.  *See Sec. Inv. Prot. Corp.*, 429 B.R. at 431; *In re 305 E. 61st St. Grp.*, 644 B.R. at 85 ("But even where the

plaintiff alleges such a breach or injury, if that claim is '*confused with or embedded in*' a harm to the business entity, it cannot be maintained as a direct claim."). Plaintiffs' alleged injury is plainly derived from—and "confused with or embedded in"—the transfer by the non-BrandCo Debtors of the BrandCo IP to the BrandCos, and thus reflects a claim that "could be brought by any creditor of the debtor" so that "the trustee is the proper person to assert the claim, and the creditors are bound by the outcome of the trustee's action." *St. Paul*, 884 F.2d at 701. Plaintiffs' alleged injuries surely are not "of *no interest to the other[]*" creditors, as evidenced by the UCC's investigation and assertion of claims based on the same transactions. *Tronox*, 855 F.3d at 100.

46.    Moreover, the Equitable Relief Claims, if successful, would *directly* benefit the non-BrandCo Debtors' estates, but only *indirectly* benefit Plaintiffs. The relief requested would increase the assets of the non-BrandCo Debtors while reducing their liabilities, which would benefit *all creditors* of the non-BrandCo Debtors. That the relief Plaintiffs seek would benefit the non-BrandCo Debtors' estates generally—and *not* just Plaintiffs—proves that the Claims are derivative. *See In re Emoral, Inc.*, 740 F.3d at 881; *St. Paul*, 884 F.2d at 701 (claims that "would have the effect of bringing the property of the third party into the debtor's estate, and thus would benefit all creditors" are derivative). Plaintiffs' alleged benefit from the Equitable Relief Claims is undeniably *derived from* benefit to the non-BrandCo Debtors.

47.    If Plaintiffs' Equitable Relief Claims were direct, the Debtors could never settle estate causes of action, including avoidance actions, because Plaintiffs could always obviate any settlement by seeking to "void" the same transactions under a different theory. *See In re Salander*, 472 B.R. 213, 221 (Bankr. S.D.N.Y. 2012) (even "[a]ssuming that [plaintiff] had standing to pursue a derivative action . . . allowing it to do so now, after the trustee has already settled that claim, would 'render null' the trustee's power to settle estate claims."). Allowing such claims

would "usurp[] causes of action belonging to the estate" and block the Debtors from reaching settlements with the UCC and the BrandCo Lenders, as they have here. *Madoff*, 429 B.R. at 430.

## B. The Plaintiffs Lack Standing to Assert Equitable Subordination Claims

48. Plaintiffs' claim to equitably subordinate the BrandCo Lenders is also derivative and should similarly be dismissed. Equitable subordination is designed to vindicate the rights of the estate. It is a "remedy [that] with limited exception, can only be brought by the debtor." *In re Blockbuster Inc.*, No. 10-14997 BRL, 2011 WL 1042767, at *1 (Bankr. S.D.N.Y. Mar. 17, 2011); *In re AppliedTheory Corp.*, 493 F.3d 82, 86 (2d Cir. 2007) (equitable subordination claim was derivative and creditors' committee was required to obtain standing to pursue it).

49. The limited exception exists only where the plaintiff can establish a "particularized injury," as opposed to a general injury that impacts the estate as a whole. *In re Blockbuster Inc.*, 2011 WL 1042767, at *2. That exception has no application here: as set forth above, Plaintiffs cannot establish a particularized injury because their alleged injury is dependent upon an injury to the non-BrandCo Debtors. *See In re Bernard L. Madoff Inv. Sec. LLC*, No. 08-99000 (SMB), 2015 WL 4734749, at *17 (Bankr. S.D.N.Y. Aug. 11, 2015) (concluding that equitable subordination claim was derivative because the debtor's customers "suffered the same injury—the depletion of the customer property estate by virtue of the defendants' withdrawals from the [debtor]").

50. Because Plaintiffs' equitable subordination claim would affect the non-BrandCo Debtors' estates generally, the Debtors are the proper party to assert and settle such claims. *Id.* at *17 (concluding that the trustee, as the "steward of the customer property estate," had standing to equitably subordinate defendants' customer claims). Indeed, the Debtors have already done so, and reached an agreement in principle with the Creditors' Committee and the BrandCo Lenders to settle equitable subordination claims in the forthcoming plan. These Plaintiffs, like all parties-in-

23

interest, can object to the settlement, but they cannot upend it or usurp its claims by asserting

purportedly "independent" causes of action seeking *the exact same relief*.

<blockquote>

**C.    Plaintiffs Have Failed To Timely Seek Standing To Assert Their Derivative Equitable Relief Claims.**

</blockquote>

51.    The Final DIP Order provides that the Debtors' stipulations, admissions,

agreements, and releases contained therein shall be binding on the Debtors, "all parties in interest,"

and "any other person or entity acting or seeking to act on behalf of the Debtors' estates," unless

a party "with requisite standing," brings a timely Challenge.  (*See* Final DIP Order ¶ 29(a) (No. 22-

10760, ECF No. 330).)  Those stipulations expressly cover the validity of the BrandCo Lenders'

claims and liens.   Challenges based on estate causes of action, including any action for

"preferences, fraudulent transfers or conveyances, [or] *other avoidance power claims*" against the

BrandCo Lenders in connection with the BrandCo Transaction were required to be brought by the

end of the challenge period, which expired on October 31, 2022.  (*Id.*)

52.    To obtain standing to assert estate causes of action, Plaintiffs were required to file

a standing motion before the expiration of the challenge period.  (*Id.*).  Plaintiffs failed to file any

standing motion, much less a timely one, as required by the Final DIP Order, and therefore waived

their right to do so and are barred as a matter of law from asserting the Equitable Relief Claims or

equitable subordination claims.

**II.    Plaintiffs' Equitable Relief Claims Are Not Permissible Under New York Law Or The Bankruptcy Code**

53.    The Equitable Relief Claims should also be dismissed because monetary damages

are an available remedy, which forecloses equitable relief.  That basic principle of New York law

applies with even greater force in a chapter 11 case, because the Bankruptcy Code *mandates* that

a "right to an equitable remedy for breach of performance"—precisely what Plaintiffs claim—be

converted into a dollar amount when monetary damages are available.  *See* 11 U.S.C. §§ 101(5)(b),

502(c)(2).  When a plaintiff "is essentially seeking to obtain a money payment" from a debtor, it

cannot pursue equitable relief in bankruptcy.  *In re Kovacs*, 717 F.2d 984, 988 (6th Cir. 1983),

*aff'd sub nom. Ohio* v. *Kovacs*, 469 U.S. 274 (1985).

### A.     Plaintiffs' Equitable Relief Claims Should Be Dismissed Under New York Law Because Money Damages Are An Available Remedy

54.     As a matter of New York law, Plaintiffs cannot obtain equitable remedies for their

contract claims.  Monetary damages are readily ascertainable here.

55.     Money damages are the default, preferred remedy under New York law for breach

of contract.  *Van Valkenburgh, Nooger & Neville, Inc.* v. *Hayden Pub. Co.*, 30 N.Y.2d 34, 47

(1972); *Sokoloff* v. *Harriman Ests. Dev. Corp.*, 96 N.Y.2d 409, 415 (2001); *Suber* v. *VVP Servs.,*

*LLC*, No. 20-CV-08177 (AJN), 2021 WL 2894810, at *3 (S.D.N.Y. July 9, 2021) ("However, it is

elemental that 'damages are always the default remedy for breach of contract.'") (quoting *United*

*States* v. *Winstar Corp.*, 518 U.S. 839, 885 (1996)).  The suitability of money damages is especially

clear here, as the contract calls for the payment of money, and Plaintiffs are seeking repayment.

*See Jenkins* v. *XpresSpa Grp., Inc.*, No. 19-CV-1774 (VEC), 2020 WL 7261138, at *12 (S.D.N.Y.

Dec. 10, 2020) ("A breach of a contract to pay a sum certain gives rise to a claim for damages in

the amount of the sum certain.").  As the *Jenkins* court held:

> In this case, the very thing sought by [plaintiffs'] request for specific performance
> is payment, not a unique service for which it may be difficult to find an appropriate
> substitute.  An award of money damages equivalent to the amount [defendant] was
> obligated to pay under the contract (with added interest for the delay in payment)
> will put [plaintiffs] in the same position they would have been in absent
> [defendant's] breach.

*Id.* at *11 (internal citation omitted); *see also Deutsche Bank Nat'l Tr. Co.* v. *Morgan Stanley*

*Mortg. Capital Holdings LLC*, 289 F. Supp. 3d 484, 495 (S.D.N.Y. 2018) (finding that "[g]iven

that the ultimate form of relief—a payment of money—is the same whether the Court orders

specific performance or allows an alternative award of damages, this Court is persuaded that it would be inequitable to require specific performance").

56.     Equitable relief is only permitted where the requesting party can plausibly show that money damages are unavailable or cannot be calculated.  *See Nasdaq, Inc.* v. *Exch. Traded Managers Grp., LLC*, 431 F. Supp. 3d 176, 274 (S.D.N.Y. 2019).   When money damages are reasonably calculable, it is not within the court's discretionary power to grant equitable relief.  *Tom Doherty Assocs.* v. *Saban Entm't*, 869 F. Supp. 1130, 1135 (S.D.N.Y. 1994); *see also Hotel Capital LLC* v. *Wells Fargo Bank, Nat'l Ass'n*, No. 18319/11, 2012 WL 1506120, at *6 (N.Y. Sup. Ct., Kings Cnty.) (rescission and specific performance claims fail because "plaintiff has not demonstrated that it could not be adequately compensated by damages"); *BSP Agency LLC* v. *Katzoff*, 632 B.R. 448, 484 (Bankr. S.D.N.Y. 2021) (the ability to calculate damages indicates that damages are the appropriate remedy); *Alpha Capital Anstalt* v. *ShiftPixy, Inc.*, 432 F. Supp. 3d 326, 338 n.12 (S.D.N.Y. 2019) ("[S]pecific performance is only available in the absence of an adequate monetary remedy.").

57.     There is no credible argument that monetary damages are unavailable or not reasonably calculable in this instance.  Plaintiffs, in fact, filed proofs of claim in the bankruptcy case seeking monetary recovery for the accelerated amount of all obligations under the 2016 Credit Agreement.  Citibank filed a proof of claim against the Debtors asserting a claim on behalf of all 2016 Lenders in the aggregate amount of $874,508,728.25.  (*See* Ex. X.)  Plaintiffs and/or their affiliates have filed substantively identical proofs of claim calculating the specific amount of principal and interest owing to them.  (*See*, *e.g.*, Ex. Y (asserting $133,289,933 claim);  Ex. Z (asserting $175,623,517.03 claim.); Ex. AA (asserting $109,103,571.87 claim).)  This asserted right to accelerated damages is not new.  On August 12, 2020, before filing the UMB Complaint,

26

Plaintiffs sent a Notice of Default alleging the same defaults at issue in the Complaint and purported "to declare the 2016 Term Loan 'due and payable' as of" that date.  (*See* Ex. W ¶¶ 164–165.)  Plaintiffs then sought, in the UMB Complaint, a declaration that their purported acceleration "was proper and effective."  (*Id*. ¶¶ 224, 264, 290, 315, 342.)[6]

58.     Even in the absence of acceleration, Plaintiffs' damages at the time of the alleged breach would be calculable.  Plaintiffs say so in the Complaint.  Plaintiffs allege that the BrandCo Transaction triggered a "precipitous drop in the market price of the 2016 Term Loans" and had "a devastating effect on the value of the 2016 Term Loans." (Compl. ¶ 318; *see also* Ex. W ¶ 15 ("The impact on the 2016 Term Lenders is reflected in the trading price for the 2016 loans, which has plummeted.").)  As support, the Complaint (¶ 317) provides the following chart showing the price drop of the 2016 loans on the secondary market following the BrandCo Transaction:



---

[6]     Nor can Plaintiffs claim more than the precise amount that Debtors agreed to repay them under the 2016 Credit Agreement.  *See Freund* v. *Wash. Square Press, Inc.*, 34 N.Y.2d 379, 382, (1974) ("[I]t is . . . fundamental that the injured party should not recover more from the breach than he would have gained had the contract been fully performed."); *Jenkins*, 2020 WL 7261138, at *11-12 ("A breach of a contract to pay a sum certain gives rise to a claim for damages in the amount of the sum certain.").

59.    Plaintiffs' own allegations belie any claim that damages cannot be calculated with reasonable certainty.  Courts have quantified damages associated with alleged breaches of debt documents in precisely this manner—by comparing debt-trading prices before and after the alleged breach occurred—and on that basis denied equitable relief.  *See Oaktree Cap. Mgmt., LLC* v. *Spectrasite Holdings, Inc.*, No. CIV.A. 02-548 JJF, 2002 WL 32173072, at *7 (D. Del. June 25, 2002) (denying injunctive relief because damages "may be calculated by comparing the pre-Tender Offer market value of the Notes with the post-Tender Offer market value of the Notes.").

B.    **Plaintiffs' Equitable Relief Claims Should Be Dismissed As A Matter Of Bankruptcy Law Because Monetary Damages Are An Available Remedy**

60.    The Bankruptcy Code imposes an even higher hurdle to Plaintiffs' request for equitable relief.  As a statutory directive that preempts any contrary state law, the Bankruptcy Code specifies that equitable remedies, even if otherwise available, are converted to a monetary claim in a bankruptcy case.

61.    The Equitable Relief Claims are simply "claims" for purposes of the Bankruptcy Code, and as with any claim, must be reduced to a dollar amount as of the Petition Date.  11 U.S.C. §§ 101(5)(b), 502(b).   "It is apparent that Congress desired a broad definition of a 'claim.'" *Kovacs*, 469 U.S. at 279 (internal citations omitted).  A "claim" includes any "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured."  11 U.S.C. § 101(5)(b).

62.    Section 502(c) of the Bankruptcy Code provides that a Court "*shall*" estimate the allowable amount of "any right to payment arising from a right to an equitable remedy for breach of performance."  The legislative history emphasizes that "[t]his subsection requires that all claims against the debtor be converted into dollar amounts."   H.R. Rep. No. 95–595 at 354 (1977)

28

(emphasis added); S. Rep. No. 95–595 at 65 (1978) (same). In other words, "Congress anticipated that parties might have equitable remedies based on a debtor's breach of an executory contract and provided a mechanism to convert those equitable remedies to claims for money." *In re Orama Hosp. Grp., Ltd.*, 601 B.R. 340, 348 (Bankr. D.N.J. 2019). "This evenhanded treatment makes sense: in the end, whether the source is law or an equitable remedy that can be reduced to payment, it is the payment that the bankruptcy court will adjust, disallow, or discharge." *Rederford* v. *U.S. Airways, Inc.*, 589 F.3d 30, 36 (1st Cir. 2009).

63.     Thus, even if a creditor is entitled to equitable remedies under state law, those remedies cannot be enforced in bankruptcy if "the breach gives rise to a right to payment" too. *See Route 21 Associates of Belleville, Inc.* v. *MHC, Inc.*, 486 B.R. 75, 90 (S.D.N.Y. 2012). This distinction reflects the reality that "[e]quity in the context of a bankruptcy proceeding is not . . . the same as equity at common law." *Brenner* v. *Heller*, No. 1:11-CV-481 NAM, 2011 WL 6011786, at *3 (N.D.N.Y. Nov. 30, 2011); *see also In re Ades & Berg Grp. Invs.*, 550 F.3d 240, 244 (2d Cir. 2008) (rejecting argument that party entitled to constructive trust claim under state law is entitled to same relief in bankruptcy).

64.     "[T]he existence of a 'right to payment' is the decisive factor" in determining whether a creditor's request for equitable relief in bankruptcy will be permitted, or whether it must be converted into a claim for money damages. *Route 21*, 486 B.R. at 87. An equitable remedy will "give rise to a right of payment"—and thus be converted to a monetary claim—when money damages is an available alternative to the equitable remedy under state law. *See, e.g.*, *In re Chateaugay Corp.*, 944 F.2d 997, 1007–08 (2d Cir. 1991) (describing test as whether the "obligation may be satisfied by an alternative right to payment" under state law); *In re Mark IV Indus., Inc.*, 438 B.R. 460, 465 (Bankr. S.D.N.Y. 2010), *aff'd*, 459 B.R. 173 (S.D.N.Y. 2011)

29

("Where the same breach gives the aggrieved party the alternative of an equitable remedy or money damages, the resulting right is a 'claim.'"); *Kinney* v. *Gallagher*, 524 B.R. 455, 464 (W.D.N.Y. 2015) ("[Plaintiff's] choice not to specifically pursue monetary damages does not change the fact that a monetary remedy is available.  [Plaintiff] cannot escape the bankruptcy discharge through attempts at artful pleading.").

65.    A debtor's inability to  pay a creditor in full does not render monetary damages unavailable, or open the door to equitable relief in bankruptcy.  The Second Circuit has made clear that the fact that a creditor will not be "made whole in the proceedings . . . does not mean its remedy is legally inadequate, simply that it is imperfect."  *In re First Cen. Fin. Corp.*, 377 F.3d 209, 215 (2d Cir. 2004).  Indeed, because debtors are typically insolvent, a counterparty could *always* argue that money damages are inadequate, and therefore *every* creditor would be entitled to equitable relief, which would completely undermine Congress' stated goal of converting equitable remedies into claims.  *See In re Provider Meds, LP*, No. 13-30678-BJH, 2014 WL 4162870, at *12 (Bankr. N.D. Tex. Aug. 20, 2014).

66.    Equitable relief is enforceable against a debtor only "where a creditor does not have the option to accept money in lieu of the equitable remedy," or where money damages are impossible to calculate. *Mark IV Indus.*, 438 B.R. at 465; *see also Maury* v. *Ventura in Manhattan, Inc.*, 544 F. Supp. 3d 396, 402 (S.D.N.Y. 2021) (injunctive relief permissible because "a violation of Title III of the ADA does not and cannot give rise to a right to payment for damages"); *Route 21*, 486 B.R. at 86 (equitable relief available when "equitable obligations imposed by a statute that did not allow the claimant to seek monetary reimbursement" but not when "debtor's obligation arises from a private contract that contains no such limitation"); *In re LaFemina*, No. 14-43362,

2017 WL 4404254, at *3-7 (Bankr. E.D.N.Y. Sept. 30, 2017) (injunction available for breach of non-compete agreement because impossible to calculate monetary damages).

67.     As discussed above, there is no question that money damages are an "available" alternative remedy to satisfy Plaintiffs' claims for breach of the 2016 Credit Agreement.  Plaintiffs' proofs of claim set forth the amount they are owed to the penny.  Even more, Plaintiffs previously conceded that money will completely satisfy their claims:  many of them expressly told the Court that they had *no claims at all*—having been discharged for value—when they thought they could keep Citibank's mistaken Payment.  (First Day Hr'g Tr. at 44, No. 22-10760, ECF No. 112.) Having claimed to not even be creditors of Revlon when they thought their loans were repaid, Plaintiffs cannot now credibly contend that money is not an available remedy.

68.     Ultimately, Plaintiffs seek repayment of their 2016 loans, and money is an available remedy.  The Equitable Relief Claims should therefore be dismissed.

**C.      Plaintiffs' Equitable Relief Claims Should Be Dismissed Because The Equitable Relief Sought Is Unavailable Under New York Law**

69.     In addition to the basic infirmity in Plaintiffs' Equitable Relief Claims that money damages are an available remedy, the equitable claims fail for several additional reasons.

**1.      Plaintiffs' Equitable Relief Claims Fail Because they Unreasonably Delayed Pursuing Them**

70.     Equitable relief is unavailable because Plaintiffs unreasonably delayed in asserting their claims.  "New York law requires a party seeking rescission of a contract to act without unreasonable delay upon learning of the grounds for rescission" *Admiral Ins. Co.* v. *Brookwood Mgmt. #10, LLC*, No. 16-CV-0437(SJF)(SIL), 2018 WL 5622595, at *24 (E.D.N.Y. Mar. 30, 2018).  This is a prima facie element of a claim for rescission.  *In re Schick*, 232 B.R. 589, 596–97 (Bankr. S.D.N.Y. 1999) (delay over two years in seeking rescission barred claim as a matter of law).  Delay is measured from the time that the plaintiff obtains knowledge or notice of the relevant

facts. *Id*. "[C]ases typically find that a delay of over one (1) year is unreasonable." *See, e.g.*, *SEC* v. *Credit Bancorp*., *Ltd*, 147 F. Supp. 2d 238, 256–57 (S.D.N.Y. 2001); *U.S. Life Ins. Co. in City of New York* v. *Blumenfeld*, 938 N.Y.S.2d 84,86-87 (N.Y. App. Div. 1st Dep't 2012); *see also GuideOne Specialty Mut. Ins* v. *Congregation Adas Yereim*, 593 F. Supp. 2d 471, 483 (E.D.N.Y. 2009) (ten month-delay unreasonable as a matter of law). Once a party learns of the facts supporting a claim to void a contract, it must "at once announce [its] purpose, and adhere to it. . . . [It] is not permitted to play fast and loose. Delay and vacillation are fatal to the right . . . ." *Banque Arabe Et Internationale D'Investissement* v. *Maryland Nat. Bank*, 850 F. Supp. 1199, 1210–11 (S.D.N.Y. 1994).

71.    Plaintiffs have unquestionably unreasonably delayed in bringing their claims. They began alleging breaches of the 2016 Credit Agreement in April 2020, *two-and-a-half years prior* to filing the instant Complaint. (Compl. ¶ 263.) Even then, the breach they alleged occurred in July 2019—nine months earlier, and more than *three years* before filing the Complaint. Plaintiffs never sought to enjoin those transactions at the time, and instead waited for the BrandCo loans to be funded before seeking acceleration. They filed the UMB Complaint in August 2020 (three months after the BrandCo loans were funded), and withdrew that lawsuit in October 2020, knowing that Revlon and other third parties would rely on the agreements. Many Plaintiffs quickly returned Citibank's mistaken payment, yet still failed to pursue any claims. Then, having told the Court at the First Day Hearing how important it was to quickly resolve their claims, they waited four more months—while boycotting Rule 2004 discovery—to finally assert their claims. This delay and vacillation "is fatal to" Plaintiffs' Equitable Relief Claims. *Banque Arabe*, 850 F. Supp. at 1210–11.

2. **Plaintiffs' Equitable Relief Claims Fail Because the Relief Is Impracticable**

72.     Two-and-a-half years after the BrandCo Transaction, the status quo ante cannot possibly be restored.  A court in equity cannot plausibly unwind all of these transactions now.

73.     Contractual agreements can only be voided by rescission where "the status quo may be substantially restored." *Pyskaty* v. *Wide World of Cars, LLC*, 856 F.3d 216, 227 (2d Cir. 2017). Rescission is unavailable where "restoration of the status quo ante is made impractical by a substantial change of position," or "by the nature of the transaction at issue." *Sokolow, Dunaud, Mercadier & Carreras LLP* v. *Lacher*, 747 N.Y.S.2d 441, 446–47 (N.Y. App. Div. 1st Dep't 2002) (citing *Rudman* v. *Cowles Commc'ns, Inc.*, 30 N.Y.2d 1, 13–14 (1971) (rejecting rescission of corporation's acquisition of publishing company where the company was fully integrated into defendant's business and it was thus "impracticable to restore the status quo")).  Similarly, specific performance is not available "where the granting of equitable relief appears to be impossible or impracticable." *Deutsche Bank Nat'l Tr. Co.*, 289 F. Supp. 3d at 501–02 (quoting *Doyle* v. *Allstate Ins. Co.*, 1 N.Y.2d 439, 443 (N.Y. 1956)).  This is true "even where defendant's inability to perform is caused by his own wrongful act." *Newman* v. *Resnick*, 238 N.Y.S.2d 119, 122 (N.Y. Sup. Ct., N.Y. Cnty. 1963) (citations omitted).  And equitable remedies become impossible or impracticable where the object of the equitable relief has been transferred to a third party:  "Equity will not and cannot compel the defendant to break [a] second contract" as a remedy for a breach. *Saperstein* v. *Mechs. & Farmers Sav. Bank of Albany*, 228 N.Y. 257, 260 (1920).

74.     Plaintiffs' Equitable Relief Claims ask the Court to unwind transactions governing $1.8 billion in loans between the Debtors and the BrandCo Lenders.  Revlon used the proceeds to repay $200 million of 2019  loans, refinance $500 million of unsecured notes, and stave off a potential bankruptcy filing in 2020 during the height of the pandemic.  Nor is it possible to "void"

33

Citibank's release of liens on the BrandCo IP. Citibank, executed and filed the Lien Release

Confirmations, fully extinguishing Citibank's liens on such property, and rendering any request

for specific performance or injunctive relief to restore liens under the 2016 Collateral Agreement

impossible. *See In re Motors Liquidation Co.*, 777 F.3d 100, 105 (2d Cir. 2015) (a lien release

was effective and final, notwithstanding agreement by all parties that the lien release was done by

mistake). Plaintiffs "irrevocably authorized" Citibank to "effect any release" of liens securing

their loans. (Ex. A § 9.10.)

75.      Plaintiffs do not explain, or even allege, that the status quo ante could be restored,

or that specific performance to enforce liens that were released is possible, much less practicable.

The entity that released the liens—Citibank—is not even a party in this case and the original liens

no longer exist. Nor can Plaintiffs rescind only those portions of the BrandCo Transaction that

they do not like, and leave other aspects in place. The agreements and consideration exchanged

in the BrandCo Transaction were integrated and interdependent, and not divisible now. *Great Am.*

*Ins. Co.* v. *Zelik*, No. 19-cv-1805, 2020 WL 85102, at *4 (S.D.N.Y. Jan. 6, 2020).

### 3.      Plaintiffs Cannot Void Contracts to Which They are Not Parties

76.      Plaintiffs' Equitable Relief Claims also fail because they are not even parties to the

contracts they seek to declare void and rescind, including the BrandCo Credit Agreement (between

Revlon Inc., RCPC, the BrandCo Lenders, and Jefferies), the BrandCo Collateral Agreements

(between the Debtors and Jefferies), the Contribution Agreements (between non-BrandCo Debtors

and the BrandCos), the Pari Passu Intercreditor Agreement (between Citibank and Jefferies), the

Lien Release Confirmation (executed and filed by Citibank), and 13 separate Intercompany

License Agreements (between RCPC and each of the BrandCos).

77.      "Generally speaking, a non-party to a contract lacks standing to challenge an

agreement in the absence of terms demonstrating that it is a third-party beneficiary." *Tamir* v. *Bank*

*of New York Mellon*, No. 12-CV-4780 (DLI) (JO), 2013 WL 4522926, at *3 (E.D.N.Y. Aug. 27, 2013). As a result, only parties or third-party beneficiaries to a contract have the capacity and standing to challenge a contract. *Simon* v. *French-American Surgery Ctr., Inc.*, No. 162867/2014, 2018 WL 4278397, at *12 (N.Y. Sup. Ct., N.Y. Cnty., Sept. 4, 2018). Plaintiffs do not allege that they are parties or third-party beneficiaries of the challenged transactions. *See Mina Inv. Holdings Ltd.* v. *Lefkowitz*, 16 F. Supp. 2d 355, 363 (S.D.N.Y. 1998), *on reconsideration in part*, 184 F.R.D. 245 (S.D.N.Y. 1999) (plaintiff failed to cite any legal authority for the proposition that "where a plaintiff's contract with another party is violated by a second contract between that other party and a third party, plaintiff is entitled to equitable relief by recission of the second contract.").

78.     In *Horowitz* v. *Nat'l Gas & Elec., LLC*, the parties entered into a sale agreement that was breached when the defendant transferred the purchased assets to a third party. No. 17-CV-7742 (JPO), 2021 WL 4478622, at *9–10 (S.D.N.Y. Sept. 30, 2021). The court refused rescission because plaintiff was not a party to the contract and "therefore ha[d] no right to seek its rescission." *Id.* at *11. Similarly, in *In re Provider Meds., LP*, a plaintiff-creditor sought to rescind license agreements that had "greatly reduce[d] the value of [plaintiffs'] collateral," but was denied because it was not a party to any of the agreements. 2014 WL 4162879, at *12 (Bankr. N.D. Tex. Aug. 20, 2014) (noting that "the Court was unable to locate a case that ordered rescission of a contract that the plaintiff was not a party to.").

### 4.     The BrandCo Transactions Cannot Be Declared Void *Ab Initio*

79.     Plaintiffs' Equitable Relief Claims seek to declare the BrandCo Transaction and other agreements void *ab initio*. But New York courts will declare a contract void *ab initio* only in extraordinary circumstances that are not present here.

80.     Under New York law, a contract that is void *ab initio* produces no legal obligation. It does not need to be performed and the promisor cannot ratify the promise. *In re Tampa Chain*

35

*Co.*, 35 B.R. 568, 578 (Bankr. S.D.N.Y. 1983); *In re Wlodarski*, 115 B.R. 53, 57 (S.D.N.Y. 1990).A void contract "never came into legal existence," and creates no enforceable obligations. *Sphere Drake Ins. Ltd.* v. *Clarendon Nat. Ins. Co.*, 263 F.3d 26, 32 (2d Cir. 2001).

81.     Courts find contracts to be void *ab initio* only in extraordinary circumstances, such as where a contract was forged, is usurious or illegal, or was procured by fraudulent inducement. *See, e.g.*, *Fareri* v. *Rain's Int'l. Ltd.*, 187 A.D.2d 481, 482 (1992) (loan agreement was usurious on its face and therefore void *ab initio*); *Moss* v. *First Premier Bank*, 2020 WL 5231320, at *4 (E.D.N.Y. Sept. 2, 2020) (same); *see also Dorchester Fin. Holdings Corp.* v. *Banco BRJ, S.A.*, 2016 WL 1169508 at *3 (S.D.N.Y. Mar. 21, 2016) (a "forged signature renders a contract void ab initio." (cleaned up)); *Hetchkop* v. *Woodlawn at Grassmere, Inc.*, 116 F.3d 28 (2d Cir. 1997) (fraud in the execution may void an alleged agreement).  Nothing remotely close to any of those predicates is present here.

82.     Agreements that violate a substantial public policy may also be void, "[b]ut because freedom of contract is itself a strong public policy in New York . . . [o]nly a limited group of public policy interests has been identified as sufficiently fundamental to outweigh the public policy favoring freedom of contract."  *159 MP Corp.* v. *Redbridge Bedford, LLC*, 33 N.Y.3d 353, 360–61 (N.Y. 2019).  Typically, the sort of public policy interests that will render a contract void are those expressed by the legislature and reflected in New York statutory law.  *See id.* Again, no such interest is present or alleged in  the Complaint.

### III.     The 2019 Transaction Did Not Violate the 2016 Credit Agreement

83.     In August 2019, Revlon closed the 2019 Transaction and raised $200 million in liquidity.  As collateral for that loan, RCPC transferred the American Crew IP to AC BrandCo. RCPC then entered into the 2019 American Crew License Agreement with AC BrandCo to continue manufacturing, distributing, and advertising American Crew products.

84.     The 2019 transaction was publicly disclosed.  None of the 2016 Lenders objected or claimed any aspect of this transaction breached the 2016 Credit Agreement.  Even now, Plaintiffs do not claim the 2016 Credit Agreement was breached by the transfer of the American Crew IP to AC BrandCo or the release of Citibank's liens on the American Crew IP.  Rather, Plaintiffs claim that the transfer and subsequent license of the American Crew IP was an impermissible "Sale-Leaseback" that breached Section 7.10 of the 2016 Credit Agreement.

85.     This objection to the 2019 Transaction was first asserted in April 2020, nearly nine months after the 2019 Transaction closed, and then only as a pretext to interfere with the BrandCo Transaction.  Plaintiffs had it right the first time—nothing in the 2019 Transaction breached the 2016 Credit Agreement.  Under the plain language of the 2016 Credit Agreement and applicable New York law, the transaction entailed a license, not a lease, of American Crew IP, and therefore was not a sale-leaseback transaction under the plain terms of the governing contract.

### A.     Section 7.10 Unambiguously Applies Only to Leases, Not Licenses

86.     Under New York law, "[w]hen an agreement is unambiguous on its face, it must be enforced according to the plain meaning of its terms." *Lockheed Martin Corp.* v. *Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011).  "Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations." *Prestige Global Co.* v. *L.A. Printex Indus., Inc.*, No. 13-CV-02207 (AJN), 2014 WL 12783273, at *3 (S.D.N.Y. Mar. 12, 2014) (citing *Law Debenture Tr. Co.* v. *Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010)).  In determining whether a contract is ambiguous, courts review the contract as a whole "to ensure that undue emphasis is not placed upon particular words and phrases." *Id*.

87.     By its express terms, Section 7.10 has no application to the sale and subsequent license of the American Crew IP.  Section 7.10 governs "Sales and Leasebacks" and limits RCPC's ability to "[e]nter into any arrangement with any Person providing for the *leasing* by the

37

Borrower. . . of real or personal Property which is to be sold or transferred by the Borrower . . ."
(Ex. A § 7.10 (emphasis added).)  Notably, Section 7.10 says nothing about licensing.

88.     As a matter of ordinary usage, the words "lease" and "license" carry distinct meanings—and that distinction is reinforced by the separate use of both terms in the 2016 Credit Agreement.  For example, the 2016 Credit Agreement contains multiple references to the term "license" in the specific context of intellectual property rights.  (*See, e.g.*, Ex. A § 1.1) (defining "Intellectual Property" to include "copyright licenses" "patent licenses" and "trademark licenses"); *id.* (defining a "Qualified Contract" as "any new intellectual property license entered into by the Borrower . . . in respect of any brand" where the revenues generated "by such license" are expected to exceed $10,000,000."); *see also*, *e.g.*, §§ 4.9 representing that Borrower "owns, or as a valid license or right to use, all Intellectual Property"), 7.3(z) (permitting liens in respect of "licenses, sublicenses, cross-licensing or pooling of, or similar arrangements with respect to, Intellectual Property"), 7.12(c) (permitting "software and other Intellectual Property licenses"), 7.13(v) (permitting encumbrances in respect of "licenses, sublicenses, cross-licensing or pooling by the Borrower . . . with respect to, Intellectual Property".)

89.     On the other hand, the 2016 Credit Agreement  contains multiple references to the term "lease" in specific contexts that do not apply to intellectual property.  (*See id.* at § 1.1 (defining "Capital Lease Obligations" as including obligations "to pay rent or other amounts under any lease"); *id.* (defining "Mortgage" as including an "assignment of leases and rents"); *id.* (defining "Real Property" to include all rights to "real property owned or leased by" Revlon); *see also id.* §§ 4.8 (representing that Revlon has "a valid leasehold interest in . . . Real Property"); 7.2(c) and 7.2(s) (limiting RCPC's ability to incur or guarantee indebtedness associated with Capital Lease Obligations related to the "construction, purchase, lease, repair, addition or

38

improvement of any property"); 7.3(s) (permitting liens in respect of "any interest or title of a lessor under any lease . . . entered . . . in the ordinary course of business"), 7.5(a) (permitting "sales, leases or other dispositions of inventory"); 7.12(h) (permitting "customary provisions restricting the subletting, assignment, pledge, or other transfer of any lease governing a leasehold interest"); 7.13 (iii) (permitting "customary net worth provisions contained in Real Property leases"); (viii) (permitting "customary provisions restricting the subletting or assignment of any lease governing a leasehold interest").)

90.     Elsewhere in the agreement, where the parties agreed on broader concepts or more generic prohibitions, they referred to *both* licenses and leases. For example, Section 7.3(e) permits certain "easements, zooming restrictions, rights-of-way, *leases*, *licenses*, covenants, conditions, restrictions and other similar encumbrances incurred in the ordinary course of business." (Ex. A § 7.3(e) (emphasis added); *see also* §§ 6.8(e)(D)(z) (excluding liens on "any *lease*, *license* or other agreement, any asset embodying rights, priorities or privileges granted under such leases, licenses or agreements . . . to the extent that a grant of a security interest therein would violate, breach or invalidate such lease, license or agreement") (emphasis added); 7.3(aa) (permitting liens arising from precautionary UCC financing statements regarding "*leases*, subleases, *licenses*, or consignments") (emphasis added); § 7.12(i) (permitting "customary restrictions and conditions contained in any agreement relating to any Disposition of Property, *leases*, subleases, *licenses*, sublicenses . . .") (emphasis added); 7.13(ix) (same).)

91.     The fact that Section 7.10 of the Credit Agreement uses the word "leasing" but not "licensing" clearly reflects the intention of the parties to limit the transfer and subsequent leases (not licenses) of property transferred by RCPC. As sophisticated contracting parties, represented by experienced and sophisticated counsel, the Loan Parties, including Plaintiffs, clearly understood

how to expressly limit both the leaseback and licensing-back of property transferred by RCPC, but only prohibited the former. There can be no doubt that if Plaintiffs had intended a broader limitation under Section 7.10, the burden was upon Plaintiffs to specify and bargain for specific language reflecting this added protection when the 2016 Credit Agreement was negotiated. *See Slamow* v. *Del Col*, 174 A.D.2d 725, 726 (N.Y. App. Div. 2d Dep't 1991), *aff'd*, 79 N.Y.2d 1016 (1992) ("The interpretation the defendant urges is contrary to the plain words utilized in the contract and language to give effect to that interpretation was readily available had it been the intention of the parties to include such a limitation."). Plaintiffs may not seek relief from this Court to essentially rewrite contractual language just because they failed to negotiate for provisions that, in hindsight, would have made the contract a better deal. *See id.* at 726–27. Accordingly, Plaintiffs' claim that the 2019 Transaction violated the 2016 Credit Agreement must be dismissed.

**B.     The 2019 American Crew License Agreement Is, Under Well-Settled Principles of Intellectual Property Law, a License Not Lease**

92.     The use of the term "lease" and not "license" in Section 7.10 reflects a clear understanding, recognized repeatedly by courts, that "leases" and "licenses" are not the same. Courts recognize the fundamental difference between "licenses" and "leases," "with 'lease[s]' generally pertaining to rights in real or tangible property, and 'license[s]' typically applying to intellectual property." *Toto* v. *Sony Music Ent.*, 60 F. Supp. 3d 407, 417 (S.D.N.Y. 2014). This distinction is also in accord with the Uniform Commercial Code which excludes "general intangibles" from "leases." *See* N.Y. U.C.C. Law §§ 2-A-103(1)(h) and (j) (defining "lease" as "a transfer of the right to possession and use of goods for a term in return for consideration" and defining "goods" as expressly excluding, among other things, "general intangibles" such as intellectual property).

93.     A lease involves the "surrender of absolute possession and control of property."
*Mirasola* v. *Advanced Cap. Grp., Inc.*, 905 N.Y.S.2d 180, 181 (N.Y. App. Div. 2d Dep't 2010);
*U.S. Bank Nat'l Ass'n* v. *Windstream Servs., LLC*, 2019 WL 948120 at *13–14 (S.D.N.Y. Feb. 15,
2019) (holding that a transaction constitutes a lease where (i) the lessor receives "exclusive control
and possession" of the property, and (ii) in exchange, the lessor provides consideration to the
lessee); *Women's Interart Center, Inc.* v. *N.Y.C. Econ. Dev. Corp.*, 97 A.D.3d 17, 22 (N.Y. App.
Div. 1st Dep't 2012) (noting that a lease grants "extensive dominion and control over the premises"
to the lessor); *In re Miami Metals I, Inc.*, 634 B.R. 249, 260 (Bankr. S.D.N.Y. 2021) (noting that
"the transfer of absolute control and possession . . . distinguishes a lease from a different
arrangement).By contrast, a license only allows a party to "do a thing which the licensor would
otherwise have a right to prevent." *Toto*, 60 F. Supp. 3d at 415 (internal quotation marks omitted).
A license is a bespoke contract that contains certain "arbitrary conditions . . . agreed to by the
parties" pertaining to the use of the intellectual property.  Eric E. Bensen, Bensen on Patent
Licensing Transactions § 1.02 (Matthew Bender, Ed. 2020); *see*, *e.g.*, *Goldsmith* v. *Outdoor
Advert. Co.*, 264 N.Y.S. 189, 192–93 (N.Y. Sup. Ct., Erie Cnty. 1933) (a contract for the exclusive
right and privilege to erect and maintain advertising sign board was a license and not a lease); *36
Att'y St. Tenants Ass'n* v. *Casalinuoro*, No. 570152/04, 2005 WL 589410, at *1 (N.Y. App. Div.
1st Dep't Mar. 10, 2005) ("[T]he parties' written agreement-affording respondent the right to
occupy the cooperative apartment premises on a probationary basis and conditioning respondent's
tenancy status upon her compliance with specified requirements-constituted a license
and not a lease."); *Lynch* v. *Robert P. Murphy Hotel Co.*, 115 N.Y.S. 465, 466 (N.Y. App. Div. 1st

Dep't 1909) (an agreement to "sublease the privilege of carriage and auto taxicabs services" from

a hotel and permit the hotel to inspect the drivers' sheets was in fact a "license" and not a "lease").[7]

94.     Here, the rights transferred by AC BrandCo to RCPC under the 2019 American

Crew License Agreement hardly constitute a "surrender of absolute control and possession" as

required under a lease.  AC BrandCo licensed only certain limited rights associated with the

American Crew IP to RCPC while retaining significant quality control rights that dictate how

RCPC manufactures, distributes, and advertises products bearing the American Crew IP.

Section 3.1 of the 2019 American Crew License Agreement outlines five discrete and limited

rights granted to RCPC, including the exclusive right to "(a) use the Licensed IP in commerce or

otherwise; (b) license others to use the Licensed IP; (c) register the Licensed IP with any federal

or state governmental authority; (d) commence an action for infringement of the Licensed IP; and

(e) defend and settle any claims that Revlon's use of the Licensed IP infringes or otherwise violates

the rights of a third party."  Meanwhile, AC BrandCo retained the right to review and approve the

quality of products bearing the American Crew IP:

> Upon [AC BrandCo's] written request, Revlon shall, at its own expense, supply
> representative samples of the Licensed Products (including related marketing,
> advertising, and promotional materials) for [AC BrandCo's] review and approval
> . . . . [AC BrandCo] shall have the right at reasonable times to inspect the
> production, service, retail or other facilities or Revlon or any sublicensees for the
> purpose of determining whether Revlon or any sublicensee is adhering to the
> requirements of this Agreement relating to the nature and quality of the Licensed
> Products and Services.

---

[7]    *See also Swift Harvest USA, LLC* v. *Dollar Gen. Corp.*, No. 17-CV-8644 (GJSx), 2018 WL 7348845, at *2 (C.D.
Cal. Dec. 28, 2018) (characterizing an assignment agreement to "use, duplicate, market, offer, sell, display,
advertise, reproduce, develop or manufacture" the assigned items as a "license-back"); *Baskim Holdings, Inc.* v.
*Two M, Inc.*, 2018 WL 1367354, at *3 (D. Nev. Mar. 16, 2018) (characterizing a transaction as "license-back"
whereby a company assigned its rights in a trademark to plaintiff, a company formed to hold the trademark;
plaintiff then licensed the use of the trademark back to the company).

(2019 American Crew License Agreement § 6.1.)  Section 6.3 further requires RCPC to notify AC BrandCo within three days of any potential recall of products and consult with AC BrandCo about this decision.  AC BrandCo must then approve all aspects of Revlon's handling of the recall.  In addition, RCPC is subject to specific requirements to maintain and promote the goodwill associated with the American Crew IP.  For example, Section 5.2 requires RCPC to spend the lesser of $18 million or 20% of annual net sales of the licensed products on "marketing, advertising, selling and distributing" products bearing the American Crew IP.

95.    AC BrandCo's involvement in the quality control process is a far cry from the "transfer of absolute control and possession" required under a lease.  *Cf. In re Miami Metals I, Inc.*, 634 B.R. at 260.  The limited rights granted to RCPC, combined with the restrictions imposed on RCPC with respect to the promotion of the products, quality control, and handling of recalls, compels the same conclusion as common sense and ordinary usage:  the 2019 American Crew License Agreement is a "license" and not a "lease," and therefore did not breach Section 7.10.

96.    Nor can Plaintiffs salvage their claim by arguing that the 2019 transaction breached the implied covenant of good faith and fair dealing.  (Compl. ¶ 242.) New York law "does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." *Harris* v. *Provident Life and Accident Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002).  The covenant of good faith and fair dealing "cannot be construed so broadly as effectively to nullify other express terms of a contract, or to create independent contractual rights." *Consol. Edison, Inc.* v. *Ne. Util.*, 426 F.3d 524, (2d Cir. 2005) (quoting *Fesseha* v. *TD Warehouse Inv. Servs., Inc.*, 305 A.D.2d 268, 268 (App. Div. 1st 2003)).  Because the 2019 transaction was expressly permitted by the 2016 Credit Agreement, it cannot sustain an implied covenant claim.

IV.   **Plaintiffs Fail to State Viable Tort or Quasi-Contract Claims Under New York Law**

97.    Plaintiffs attempt to shoehorn their breach of contract claims into a variety of tort and quasi-contract causes of action—conversion, aiding and abetting conversion, unjust enrichment, constructive trust, and tortious interference—based on the same facts and allegations and seeking the same remedy requested under the contract claims.  Each of these theories are defective and should be dismissed for the reasons set forth below.

A.   **Conversion (Eighth Cause of Action) and Aiding and Abetting Conversion (Ninth Cause of Action)**

98.    Under New York law, conversion takes place when someone, intentionally and without authority, exercises control over personal property belonging to someone else, interfering with that person's right of possession.  *See Arcadia Biosciences, Inc.* v. *Vilmorin & Cie*, 356 F. Supp. 3d 379, 403 (S.D.N.Y. 2019) (quoting *Colavito* v. *New York Organ Donor Network, Inc.*, 8 N.Y.3d 43, 49–50 (2006)).  An action for conversion "cannot lie where damages are merely sought for breach of contract."  *Solomatina* v. *Mikelic*, 370 F. Supp. 3d 420, 431 (S.D.N.Y. 2019).

99.    Plaintiffs' conversion claim fails.  *First*, Plaintiffs' action for conversion should be dismissed because Plaintiffs' conversion and breach of contract claims are both premised on the same material allegation—that as a result of the transfer of the BrandCo IP to the BrandCos, Plaintiffs' loans were no longer secured by the BrandCo IP.  (*See, e.g.*, Compl. ¶¶ 387 (alleging that RCPC's breach caused Plaintiffs to "suffer[] the loss of unique and valuable collateral securing their loan to RCPC"), 409 (alleging that RCPC's conversion of the BrandCo IP "had the effect of divesting the Co-Op Lenders of their property interests in the BrandCo IP.").  Any obligation of Revlon to provide a security interest in the BrandCo IP to secure the 2016 loans arose solely out of the loan documents, the same agreements which Plaintiffs allege were breached and therefore, should be dismissed.  *See Strategic Growth Int'l Inc.* v. *RemoteMDx, Inc.*, 06 CIV. 3915, 2008

WL 4179235, at *3 (S.D.N.Y. Sept. 10, 2008) (dismissing conversion claim because "any obligation to register or transfer the shares arise solely out of the Agreement"); *see also Solomatina*, 370 F. Supp. 3d at 431 (to sustain conversion claim, "a plaintiff must allege acts that constitute unlawful or wrongful behavior separate from a violation of contractual rights.") (quoting *Elma RT* v. *Landesmann Int'l Mktg. Corp.*, No. 98 CIV. 3662 LMM, 2000 WL 297197, at *3 (S.D.N.Y. Mar. 22, 2000))*.* That Plaintiffs' conversion claim cannot co-exist with their breach of contract claims is further supported by the well-settled principle under New York law that "a tort claim will not arise 'where plaintiff is essentially seeking enforcement of the bargain.'" *In re Chateaugay Corp.*, 10 F.3d 944, 958 (2d Cir. 1993) (quoting *Sommer* v. *Federal Signal Corp.*, 79 N.Y.2d 540, 552, 583 N.Y.S.2d 957, 961, 593 N.E.2d 1365 (1992)).

100.    *Second*, Plaintiffs fail to show that they had a possessory right or interest in the BrandCo IP. *See Petrone* v. *Davidoff Hutcher & Citron, LLP*, 54 N.Y.S.3d 25, 27 (N.Y. App. Div. 2d Dep't 2017) ("Two key elements of conversion are (1) *plaintiff's possessory right or interest in the property* and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's right.") (emphasis added).   Under the 2016 Collateral Agreement, RCPC granted a security interest in collateral, including the BrandCo IP, to *Citibank*, not the individual lenders, including Plaintiffs.   (*See* Ex. B §3.1.)   Thus, Plaintiffs cannot show that *they* had any possessory interest in the BrandCo IP.   Moreover the BrandCo IP is intangible property which generally cannot be the subject of a conversion action. *See Arcadia Biosciences, Inc.*, 356 F. Supp. 3d at 403 (quoting *Ancile Inv. Co.* v. *Archer Daniels Midland Co.*, 784 F.Supp.2d 296, 312 (S.D.N.Y. 2011)).

101.    Plaintiffs' aiding and abetting conversion claim against the BrandCos should be dismissed for failure to state a valid cause of action for conversion.  *See In re Refco Securities Litig.*, 759 F. Supp. 2d 301, 333 (S.D.N.Y. 2010).

**B.    Unjust Enrichment (Tenth Cause of Action) and Constructive Trust (Thirteenth Cause of Action)**

102.    As a threshold matter, Plaintiffs' unjust enrichment claim is unavailable against RCPC because there is a valid contract between Plaintiffs and RCPC.  *See IDT Corp.* v. *Morgan Stanley Dean Witter & Co.*, 12 N.Y. 3d 132, 142 (2009) ("Where the parties executed a valid and enforceable written contract governing a particular subject matter, recovery on a theory of unjust enrichment for events arising out of that subject matter is ordinarily precluded.").  Plaintiffs concede the existence of a valid contract—the 2016 Credit Agreement—as between the 2016 Lenders and RCPC.  (Compl. ¶¶ 4–5.)  Therefore, Plaintiffs' unjust enrichment claim—an action in quasi-contract that ordinarily requires the absence of a contract—fails as a matter of law.  *See Rabin* v. *Mony Life Ins. Co.*, 387 F. App'x 36, 42 (2d Cir. 2010) ("Under New York law, '[t]he notion of unjust enrichment applies where there is no contract between the parties.'") (quoting *Maryland Cas.* v. *W.R. Grace & Co.*, 218 F.3d 204, 212 (2d Cir. 2000)).

103.    Plaintiffs' unjust enrichment claim should also be dismissed because it is duplicative of their contract claims.  *See Curtis* v. *Berutti*, 176 N.Y.S.3d 423 (N.Y. Sup. Ct., Orange Cnty. 2022) ("[W]here an unjust enrichment claim is premised on the same facts as a breach of contract claim and seeks the same damages, the unjust enrichment claim is duplicative and must be dismissed as a matter of law.").  The factual allegations and requested relief are substantially identical to the breach of contract claims.  (*Compare* Compl. ¶¶ 425, 427, *with* Compl. ¶¶ 368, 388.)

46

104.    Plaintiffs' unjust enrichment claims must also be dismissed for failure to show that RCPC or the BrandCos were enriched at Plaintiffs' expense. *See Hochheiser* v. *Alin*, 100 N.Y.S.3d 609 (N.Y. Sup. Ct., Suffolk Cnty. 2018) ("It is well settled that "[t]o prevail on a claim of unjust enrichment, a party must show that (1) the other party was enriched, (2) at that party's expense . . . ").  While certain benefits may have inured to RCPC and the BrandCos as part of the BrandCo Transaction, this was not at Plaintiffs' expense for the simple reason that Plaintiffs never had any property interest in the benefits conferred, namely the BrandCo IP.  Thus, without something having been taken from Plaintiffs by RCPC or the BrandCos, nothing can be given back to Plaintiffs under a theory of unjust enrichment. *See, e.g.*, *IDT Corp.*, 12 N.Y. 3d at 142 (2009); *State* v. *Barclays Bank of N.Y., N.A.*, 76 N.Y.2d 533, 540-41 (1990) (dismissing unjust enrichment claim because plaintiff "never acquired a property interest in [the funds] and cannot be said to have suffered a loss").

105.    Relatedly, Plaintiffs' constructive trust claim should be dismissed.  Under New York law, a "constructive trust" is a remedy, not an independent substantive cause of action. *In re Chowaiki & Co. Fine Art Ltd.*, 593 B.R. 699, 719 (Bankr. S.D.N.Y. 2018) ("The proper pleading would be a claim for unjust enrichment, with the requested relief of a constructive trust."). Because Plaintiffs have failed to assert a valid unjust enrichment claim, they are not entitled to a constructive trust.  *See In re First Cen. Fin. Corp.*, 377 F.3d 209, 212 (2d Cir. 2004) (noting that the element of unjust enrichment "is the most important [element]" for establishing a constructive trust).  A constructive trust is an equitable remedy designed to "prevent unjust enrichment" (*Weizmann Inst. of Sci.* v. *Neschis*, 229 F. Supp. 2d 234, 257 (S.D.N.Y. 2002)); thus, it may only be "imposed whenever necessary to satisfy the demands of justice." *Sec. Inv. Prot. Corp.* v. *Stratton Oakmont, Inc.*, 234 B.R. 293, 334 (Bankr. S.D.N.Y. 1999).  Accordingly, Plaintiffs'

request for a constructive trust must be denied for the same reasons their other requests for equitable relief should be denied, as discussed above.  *See Pons* v. *People's Republic of China*, 666 F. Supp. 2d 406, 415 (S.D.N.Y. 2009) ("[A] constructive trust should not be imposed unless it is demonstrated that a legal remedy is inadequate.").

### C.   Tortious Interference with the 2016 Credit Agreement (Twelfth Cause of Action)

106.    To state a valid tortious interference claim, Plaintiffs must show that the BrandCos "intentional[ly] procure[d]" RCPC's alleged breach of the 2016 Credit Agreement, and that such procurement was "without justification."  *See Ferrandino & Son, Inc.* v. *Wheaton Bldrs., Inc.*, 920 N.Y.S. 2d 123, 125 (N.Y. App. Div. 2d Dep't 2011).  In Plaintiffs' 99-page Complaint, there is not a single fact that would support an allegation that the BrandCos "intentionally procured" RCPC's alleged breach of the 2016 Credit Agreement, or that such procurement was "without justification."  Plaintiffs' claim that the BrandCos "caused RCPC to breach its obligations under the 2016 Credit Agreement" (Compl. ¶ 436) also lacks any factual support in the Complaint.  Thus, the tortious interference claim must be dismissed for failure to state a valid cause of action.  *See id.* (dismissing the tortious interference claim because "the plaintiff merely asserted, in a conclusory manner and without the support of relevant factual allegations, that [defendant's] actions caused Wheaton to breach the subcontract.").  There is also nothing in the Complaint alleging that RCPC and the BrandCos did anything but pursue their economic interest by acting to protect their financial interests, which serves as a viable defense against any claim for tortious interference.  *See Audax Credit Opportunities Offshore Ltd.* v. *TMK Hawk Parent, Corp.*, 150 N.Y.S.3d 894 (N.Y. Sup. Ct., N.Y. Cnty. 2021) (noting that "a defendant may raise the economic interest defense in response to a claim for tortious interference with contract" and that "courts

routinely dismiss tortious interference claims at the pleading stage when it is evident, on the face of the complaint, that the doctrine applies.").

## V.    Plaintiffs' Remaining Causes of Action Also Fail Or Should Be Considered At Confirmation

107.    The Debtors join in the BrandCo Lenders' arguments as to Count Six for Plaintiffs' failure to state a viable claim that Section 10.1 of the Credit Agreement was breached.

108.    The Debtors also join the BrandCo Lenders' arguments that Counts Fourteen, Sixteen, and Seventeen should be severed or stayed and addressed at confirmation as part of the global settlement embedded in the forthcoming chapter 11 plan.

## <u>CONCLUSION</u>

For the foregoing reasons, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto as **Exhibit A**, dismissing Plaintiffs' Equitable Relief Claims with prejudice.  Plaintiffs do not seek any relief from the Debtors other than equitable relief, and their failure to assert viable Equitable Relief Claims requires the dismissal of Counts One through Thirteen.  In the alternative, the Debtors respectfully request that the Court strike Plaintiffs' Counts One through Thirteen, which, as to the Debtors, exclusively seeks equitable relief because Plaintiffs' Equitable Relief Claims fail as a matter of law.  *See* Fed. R. Civ. P. 12(f).

Granting this Motion will not leave Plaintiffs without a remedy, who will continue to have large claims in these chapter 11 cases for the accelerated amount of their 2016 loans and can pursue additional monetary damages from non-Debtor parties.  Granting the Motion will, however, substantially streamline this adversary proceeding and permit the Debtors to move forward with their reorganization without Plaintiffs' baseless threats to "void" the Debtors' entire capital structure derailing the process.

Dated:   New York, New York
        December 5, 2022

                        Respectfully submitted,

                        /s/ Lewis R. Clayton
                        Paul M. Basta
                        Lewis R. Clayton
                        Alice B. Eaton
                        William A. Clareman
                        Kyle J. Kimpler
                        Robert A. Britton
                        Brian Bolin
                        Jonathan Hurwitz
                        Sean A. Mitchell
                        **PAUL, WEISS, RIFKIND, WHARTON &**
                        **GARRISON LLP**
                        1285 Avenue of the Americas
                        New York, New York  10019-6064
                        Tel:  (212) 373-3000
                        Fax:  (212) 757-3990


                        /s/ Steven F. Molo
                        Steven F. Molo
                        Justin M. Ellis
                        Sara E. Margolis
                        Caleb Hayes-Deats
                        **MOLOLAMKEN LLP**
                        430 Park Avenue
                        New York, NY  10022
                        Tel: (212) 607-8160
                        Fax: (212) 607-8161


                        /s/ Howard J. Kaplan
                        Howard J. Kaplan
                        **KAPLAN RICE LLP**
                        142 West 57th Street, Suite 4A
                        New York, NY  10019
                        Tel: (212) 235-0300


                        *Kaplan Rice LLP is Special Litigation Counsel*
                        *for the Debtors with respect to Plaintiffs*
                        *affiliated with or managed by HPS Investment*
                        *Partners.  MoloLamken LLP is Special*
                        *Litigation Counsel for the Debtors with respect*
                        *to Plaintiffs affiliated with or managed by*

                        50

*Brigade Capital Management and Nuveen Asset Management, LLC.  Paul, Weiss, Rifkind, Wharton & Garrison LLP is counsel for the Debtors with respect to all other Plaintiffs.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| REVLON, INC., *et al.*, | Case No. 22-10760 (DSJ) |
| Debtors. | (Jointly Administered) |
| AIMCO CLO 10 LTD, *et al.*, | |
| Plaintiffs, | Adv. Pro. No. 22-01167 (DSJ) |
| v. | |
| REVLON, INC., *et al.*, | |
| Defendants. | |

## <u>CERTIFICATE OF SERVICE</u>

I, Lewis R. Clayton, hereby affirm, under penalty of perjury, that I caused to be served a true and correct copy of the (1) Debtors' Notice and Motion to Dismiss the Adversary Complaint; and (2) Declaration of Sean A. Mitchell with accompanying exhibits, via the court's electronic case filing and noticing system, upon the following counsel:

Marc Ayala
Boies Schiller Flexner LLP
333 Main Street
Armonk, NY 10504

Andrew Larry Beyda
Boies Schiller Flexner LLP
100 S.E. 2nd Street
Ste 2800
Miami, FL 33131

Eric J. Brenner
Boies Schiller Flexner LLP
55 Hudson Yards
New York, NY 10001

52

Robert Keefe
Boies Schiller Flexner LLP
100 SE 2nd Street
Suite 2800
Miami, FL 33131

Matthew L. Schwartz
Boies Schiller Flexner LLP
55 Hudson Yards
New York, NY 10001

*Counsel for Plaintiffs*

Elliot Moskowitz
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017

*Counsel for the BrandCo Lenders*

Kristopher S. Villarreal
Andrew V. Tenzer
Scott C. Shelley
Will Clark Farmer
Paul Hastings LLP
200 Park Avenue
New York, NY 10166

*Counsel for Jefferies*

Dated: December 5, 2022    /s/ *Lewis R. Clayton*
New York, New York     Lewis R. Clayton
           1285 Avenue of the Americas
           New York, New York  10019-6064
           Tel:  (212) 373-3000
           Fax:  (212) 757-3990
           lclayton@paulweiss.com

**<u>Exhibit A</u>**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>REVLON, INC., *et al.*,<br><br>                              Debtors. | Chapter 11<br><br>Case No. 22-10760 (DSJ)<br><br>(Jointly Administered) |
| AIMCO CLO 10 LTD, *et al.*,<br><br>                              Plaintiffs,<br><br>              v.<br><br>REVLON, INC., *et al.*,<br><br>                              Defendants. | Adv. Pro. No. 22-01167 (DSJ) |

## [PROPOSED] ORDER GRANTING DEBTORS'
## MOTION TO DISMISS THE ADVERSARY COMPLAINT

Upon the motion of the above-captioned debtors and debtors in possession

(collectively, the "Debtors") to *Dismiss the Adversary Complaint* (the "Motion to Dismiss");[1]

and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the

*Amended Standing Order of Reference from the United States District Court for the Southern*

*District of New York*, dated January 31, 2012; and this Court having found that venue of this

proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and

this Court having found that the Debtors' Notice of the Motion to Dismiss was appropriate under

the circumstances and no other notice need be provided; and this Court having determined that

the legal and factual bases set forth in the Motion to Dismiss and the Debtors' accompanying

---

[1]    Capitalized terms not otherwise herein defined shall have the meanings ascribed to such
       terms in the Motion to Dismiss.

1

*Memorandum of Law In Support of Their Motion To Dismiss*, together with all other papers filed by the parties in support of and in opposition to the Motion to Dismiss establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.    The Debtors' Motion to Dismiss the Complaint is GRANTED as set forth herein.

2.    Counts One, Two, Three, Four, Five, Six, Seven, Eight, Nine, Ten, Eleven, Twelve and Thirteen of the Complaint are hereby dismissed with prejudice to the extent they seek relief from the Debtors.

3.    Counts Fourteen, Sixteen and Seventeen of the Complaint are hereby stayed pending the Court's consideration of confirmation of a chapter 11 plan, including any settlement of claims raised in Counts Fourteen, Sixteen and Seventeen incorporated into such plan; *provided, however*, that such stay shall be lifted upon the entry of an order denying confirmation of a chapter 11 plan or at the Court's earlier discretion upon a finding of cause.

4.    The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

.

Dated: _____        _____

New York, New York             THE HONORABLE DAVID S. JONES
                               UNITED STATES BANKRUPTCY JUDGE