**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| REVLON, INC., *et al.*,[1] | Case No. 22-10760 (DSJ) |
| Debtors. | (Jointly Administered) |

| | |
|---|---|
| AIMCO CLO 10 LTD, *et al.* | |
| Plaintiffs, | Adv. Pro. No. 22-01167 (DSJ) |
| v. | |
| REVLON, INC., *et al.* | |
| Defendants. | |

**DECISION AND ORDER GRANTING DEBTOR-DEFENDANTS'**
**MOTION TO DISMISS ALL CLAIMS AGAINST THEM**
**AND ALL EQUITABLE CLAIMS IN THE COMPLAINT**

**APPEARANCES:**

**BOIES SCHILLER FLEXNER LLP**
*Counsel for Plaintiffs*
55 Hudson Yards
New York, New York 10001
By:    Matthew L. Schwartz, Esq.
        Eric J. Brenner, Esq.
        Marc Ayala, Esq.

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
*Counsel for Debtors and Debtors in Possession*
1285 Avenue of the Americas
New York, New York 10019-6064

---

[1] The last four digits of Debtor Revlon, Inc.'s tax identification number are 2955. Due to the large number of debtor entities in these Chapter 11 Cases, for which the Court has granted joint administration, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/Revlon. The location of the Debtors' service address for purposes of these Chapter 11 Cases is: One New York Plaza, New York, NY 10004.

By:     Paul M. Basta, Esq.
        Lewis R. Clayton, Esq.
        Alice B. Eaton, Esq.
        William A. Clareman, Esq.
        Kyle J. Kimpler, Esq.
        Robert A. Britton, Esq.
        Brian Bolin, Esq.
        Jonathan Hurwitz,, Esq.
        Sean A. Mitchell, Esq.

**MOLOLAMKEN LLP**
*Special Litigation Counsel for Debtors*
430 Park Avenue
New York, NY 10022
By:     Steven F. Molo, Esq.
        Justin M. Ellis, Esq.
        Sara E. Margolis, Esq.
        Caleb Hayes-Deats, Esq.

**KAPLAN RICE LLP**
*Special Litigation Counsel for the Debtors*
142 West 57th Street, Suite 4A
New York, NY 10019
By:     Howard J. Kaplan, Esq.

**PAUL HASTINGS LLP**
*Counsel for Jefferies LLC and Jefferies Finance LLC*
200 Park Avenue
New York, NY 10166
By:     Andrew V. Tenzer, Esq.
        Kevin C. Logue, Esq.
        Kevin P. Broughel, Esq.

**DAVIS POLK & WARDWELL LLP**
*Counsel for the BrandCo Lenders*
450 Lexington Avenue
New York, New York 10017
By:     Eli Vonnegut, Esq.
        Elliot Moskowitz, Esq.
        Angela M. Libby, Esq.
        Stephanie Massman, Esq.
        Garrett L. Cardillo, Esq.

**DAVID S. JONES**
**UNITED STATES BANKRUPTCY JUDGE**

## INTRODUCTION[2]

Revlon, Inc. ("Revlon") together with its affiliated entities (collectively, the "Debtors") describes itself as a global leader in the beauty industry with a diverse portfolio of brands associated with thousands of products sold in approximately 150 countries worldwide. (Main Case, ECF No. 30 ¶ 6).[3]  In September 2016, Revlon acquired the beauty brand Elizabeth Arden for $1.03 billion.  To finance the acquisition, Debtor Revlon Consumer Products Corporation ("RCPC") entered into a 2016 "Credit Agreement" which included a secured $1.8 billion term loan facility and provisions for the issuance of supplemental revolver loans to fund RCPC's business operations.  Plaintiffs claim to hold interests in more than 50% of the term loans outstanding under the 2016 Credit Agreement.  Part of the collateral that secured the term loans was Revlon's intellectual property assets, including its trademarks and other rights associated with many of the best known, most well-established beauty brands in the world.

Prior to the onset of the COVID-19 pandemic, Debtors underwent a prolonged period of declining customer demand.  (Main Case, ECF No. 1254 at 18).  This downturn worsened considerably during the COVID-19 pandemic.  (*Id*.).  Debtors experienced a significant decline in net sales in a majority of their business segments and regions.  (Main Case, ECF No. 30 ¶ 12). Beginning in 2019, Debtors explored and implemented a variety of financing and other corporate transactions to address their capital structure.  ((Main Case, ECF No. 1254 at 20).  Two of these transactions were the 2019 "Ares Financing" and the 2020 "BrandCo Facilities" (referred to herein as the "2020 BrandCo Transaction"), both of which are the subject of this lawsuit.  (*Id*. at 21).  In

---

[2] This Decision cites documents filed on the docket of the Debtors' chapter 11 cases as "Main Case, ECF No. _____," and documents filed in this Adversary Proceeding.  as "ECF No. _____".

[3] "In the context of bankruptcy litigation, the public records of which the court  may take judicial notice include documents filed in a related bankruptcy proceeding, an adversary proceeding and the underlying bankruptcy case." *In re Extended Stay, Inc.*, Case No. 09-13764, 2020 WL 10762310, at *5 (Bankr. S.D.N.Y. Aug. 8, 2020).

addition, a nearly $1 billion mistaken payment to lenders by Citibank, N.A., the Administrative Agent for the 2016 Term Loans, caused significant uncertainty and complexity for the Debtors' capital structure. (Main Case, ECF No. 30 ¶ 13). Notwithstanding Debtors' efforts to overcome these challenges, significant liquidity and operational issues forced Debtors to commence these Chapter 11 cases.[4]

On October 31, 2022, Plaintiffs commenced this adversary proceeding challenging the 2020 BrandCo Transaction. The defendants are numerous Debtor and non-debtor entities (collectively, the "Defendants") that Plaintiffs allege orchestrated a scheme "to improperly manipulate Revlon's capital structure and strip hundreds of millions of dollars of collateral that should be available to secure Plaintiffs' claims in these bankruptcy cases." (Complaint ¶ 1). Plaintiffs ask the Court to unwind the 2020 BrandCo Transaction and restore the 2016 Term Loan Facility agent's first-priority liens on all intellectual property that Revlon used as collateral to facilitate the 2020 BrandCo Transaction. All Defendants have moved to dismiss the Complaint, with three separate motions before the Court (the "Motions"), filed, respectively, on behalf of defendants who are Debtors,[5] the Jefferies Defendants,[6] and the BrandCo Lenders.[7]

---

[4] The Chapter 11 Cases are jointly administered under Case No. 22-10760.

[5] *See* Debtors' Notice of Motion to Dismiss the Adversary Complaint (ECF No. 15), and Memorandum of Law in Support thereof (ECF No. 16) (the "Debtors' MTD"); Declaration of Sean A. Mitchell in Support of Debtors' Memorandum of Law in Support of Their Motion to Dismiss the Adversary Complaint (ECF No. 17) (the "Mitchell Declaration"); Debtors' Reply in Support of Their Motion to Dismiss the Adversary Complaint (ECF No. 82) (the "Debtors' Reply"); Supplemental Declaration of Sean A. Mitchell in Support of Debtors' Motion to Dismiss the Adversary Complaint (ECF No. 83) (the "Supplemental Mitchell Declaration"); and Debtors' Amended Reply in Support of Their Motion to Dismiss the Adversary Complaint (ECF No. 93) (the "Debtors' Amended Reply").

[6] *See* Notice of Defendants Jefferies Finance LLC and Jefferies LLC's Motion to Dismiss Plaintiffs' Adversary Complaint (ECF No. 23), and Memorandum of Law in Support thereof (ECF No. 25) (the "Jefferies' MTD"); and Reply Memorandum of Law in Further Support of Defendants Jefferies Finance LLC and Jefferies LLC's Motion to Dismiss (ECF No. 79) (the "Jefferies Reply").

[7] *See* Notice of BrandCo Lenders' Motion to Dismiss Adversary Proceeding Complaint (ECF Nos. 21 and 24), and Memorandum of Law in Support thereof (ECF No. 26) (the "BrandCo Lenders' MTD"); Declaration of Elliot Moskowitz in Support of the BrandCo Lenders' Motion to Dismiss Adversary Complaint (ECF No. 27) (the "Moskowitz Declaration"); and Reply Memorandum of Law in Support of the BrandCo Lenders' Motion to Dismiss Adversary Complaint (ECF No. 94) (the "BrandCo Lenders' Reply").

Debtors ask the Court to dismiss all claims for equitable relief asserted against the Debtors, including any claims seeking specific performance, injunctive relief, or declaratory relief that specified agreements are "void" or should be "rescinded" (the First through Tenth and Twelfth through Seventeenth Causes of Action, collectively, the "Equitable Relief Claims"), or in the alternative, striking all Equitable Relief Claims pursuant to Fed. R. Civ. P. 12(b)(6) and 12(f) and Fed. R. Bankr. P. 7012.  The Jefferies Defendants and the BrandCo Lenders also challenge the availability of equitable relief and argue that the Complaint fails to state claims for relief as against them under applicable state and federal law.  Plaintiffs oppose the Motions.[8]

This adversary proceeding arises against the backdrop of Debtors' effort to obtain prompt confirmation of a plan of reorganization that it hopes will allow it to resume profitable operations, put more sustainable financing in place, and stop incurring the enormous costs associated with remaining in bankruptcy.  This Decision resolves only the Debtor Defendants' Motion.  The BrandCo Lenders' and Jefferies Defendants' Motions will be resolved in a separate decision.

At argument on February 2, notwithstanding that the non-debtor Defendants' motions did not discuss the standing doctrine that is the basis of this ruling as to Debtor Defendants' Motion, counsel for Debtors contended that a grant of Debtors' Motion based on Debtors' standing-based arguments would logically support dismissal of the Complaint in its entirety (Tr. 119:25–120:2; 120:13–14; 228:23–25), and counsel for Plaintiffs at least appeared to agree (Tr. 233:11–234:2). The parties are directed to file letters not to exceed three pages on or before February 15, 2023, concerning whether the standing grounds on which this Decision is based apply to the remaining

---

[8] *See* Plaintiffs' Consolidated Opposition to Defendants' Motions to Dismiss (ECF No. 71) (the "Opposition"); and Declaration of Marc V. Ayala in Opposition to Defendants' Motions to Dismiss the Adversary Complaint (ECF No. 70) (the "Ayala Declaration").

causes of action as against the non-debtor Defendants.  One or more joint letters will be acceptable.

Any party that requires additional time is to file an extension request by February 15.

The Court concludes that Plaintiffs' Equitable Relief Claims against the Debtor Defendants impermissibly "attempt[] to use inventive pleading to sidestep the automatic stay[.]"  *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 477 B.R. 351, 354 (Bankr. S.D.N.Y. 2012). Plaintiffs' Equitable Relief Claims are derivative of claims that belong exclusively to Debtors' bankruptcy estates.  Accordingly, the Debtor Defendants' Motion is GRANTED and Plaintiffs' Complaint as to the Debtor Defendants is dismissed.

## FACTS

### A.  Materials Considered in Deciding the Motions to Dismiss

Unless otherwise noted and notwithstanding that Defendants dispute many of the Complaint's allegations and characterizations, for purposes of these Motions the Court takes all of the factual allegations in the Complaint as true, but is "not bound to accept as true a legal conclusion couched as a factual allegation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The Court may consider "any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference" as well as any documents "integral" to the complaint, *i.e.*, "where the complaint 'relies heavily upon [the document's] terms and effects.'" *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995)).  The Court also may take judicial notice of public filings on its own docket.  *See In re 305 E. 61st St. Grp. LLC*, 644 B.R. 75, 80 n. 6 (Bankr. S.D.N.Y. 2022).

### B. The 2016 Credit Agreement[9]

On June 16, 2016, Revlon agreed to a cash acquisition of all outstanding shares of Elizabeth Arden, a leading global beauty company. (Complaint ¶ 220). On September 7, 2016, Revlon, Inc. and its direct, wholly owned operating subsidiary RCPC acquired Elizabeth Arden for $1.03 billion, and Elizabeth Arden became a wholly owned subsidiary of RCPC. (*Id.*) Revlon entered into two credit facilities to finance the merger and to help service the existing debt of the merged entity. (Complaint ¶ 221). In connection with the closing of the merger, Revlon entered into the 2016 Credit Agreement, dated September 7, 2016, which established a seven-year, $1.8 billion 2016 Term Loan Facility. (*Id.*). The 2016 Term Loan Facility provided the vast majority of the $1.03 billion that Revlon used to acquire Elizabeth Arden. (Complaint ¶ 222). The remaining proceeds of the 2016 Term Loan Facility were used to refinance or retire indebtedness of RCPC and Elizabeth Arden, including debt that financed RCPC's $665 million 2015 acquisition of The Colomer Group, a beauty care company that owned brands including American Crew, Inc. ("American Crew"). (*Id.*) Citibank was appointed Administrative Agent and Collateral Agent for the lenders under the 2016 Credit Agreement. (Complaint ¶ 223).

As part of the 2016 Credit Agreement, Revlon also entered into a Term Loan Guarantee and Collateral Agreement, dated September 7, 2016 (the "2016 Guarantee and Collateral Agreement"), which among other things, granted to the Collateral Agent, for the benefit of the Secured Parties, a security interest in certain property of RCPC and its subsidiaries. (Complaint ¶ 224). The 2016 Term Loan Facility was secured by two groups of liens. (Complaint ¶ 225). The first group of liens were on the accounts, inventory, equipment, chattel paper, documents,

---

[9] For ease of reference, the Court uses many of the capitalized terms in Plaintiffs' Complaint. To the extent Plaintiffs' capitalized terms are pejorative in nature, *see e.g.* paragraph 257 which defines the term "Sham Revolver," the Court's use of these terms is not meant to suggest that the Court adopts Plaintiffs' characterization.

instruments, deposit accounts, real estate and certain investment property, and general intangibles

(other than intellectual property) of RCPC and its subsidiaries. (*Id.*). By contrast, the second

group of liens securing the 2016 Term Loan Facility consisted of liens on all other property—

including intellectual property ("IP") and the capital stock of certain subsidiaries—and these liens

ranked first in priority. (*Id.*). According to Plaintiffs, the first-priority liens on the intellectual

property of RCPC, Elizabeth Arden, and subsidiary guarantors constituted crucial security for the

lenders under the 2016 Term Loan Facility (the "2016 Term Lenders"). (Complaint ¶ 226). The

2016 Term Lenders specifically bargained with Revlon, Inc. and RCPC to acquire first-priority

liens on the intellectual property of RCPC and its domestic subsidiaries, especially Elizabeth

Arden and its domestic subsidiaries whose acquisition the 2016 Term Loan Facility was financing.

(*Id.*).

### C. The 2019 Term Loan Agreement

On August 6, 2019, RCPC entered into a new senior secured term loan facility (the "2019

Term Loan Facility") governed by a 2019 Credit Agreement with Ares Management LLC and/or

certain of its affiliated funds, investment vehicles, or managed or advised accounts, in an initial

aggregate principal amount of $200 million. (Complaint ¶ 228). The 2019 Term Loan Facility

was secured by a first-priority lien on the American Crew IP. (Complaint ¶ 229). The first-priority

lien on the American Crew IP that had secured the 2016 Term Loan Facility was released, and the

American Crew IP was transferred away from RCPC to a new subsidiary that did not guarantee

the 2016 Term Loans. (*Id.*) A new lien on the American Crew IP was granted to Ares. (*Id.*)

The stripping of the 2016 Term Lenders' lien on the American Crew IP was effectuated as

part of what Plaintiffs term a sale-leaseback transaction (termed by Plaintiffs the "American Crew

IP Sale-Leaseback," a characterization that Defendants contest but a term that this Decision

employs without determining that the arrangement constituted a "sale-leaseback"), which allegedly breached the 2016 Credit Agreement. (Complaint ¶ 230). Section 7.10 of the 2016 Credit Agreement provides that RCPC "shall not, and shall not permit any of its Restricted Subsidiaries to:"

> Enter into any arrangement with any Person providing for the leasing by the Borrower or any of its Restricted Subsidiaries of real or personal Property which is to be sold or transferred by the Borrower or any of its Restricted Subsidiaries (a) to such Person or (b) to any other Person to whom funds have been or are to be advanced by such Person on the security of such Property or rental obligations of the Borrower or any of its Restricted Subsidiaries . . . .

(Complaint ¶ 231).

Plaintiffs object that the "American Crew IP Sale-Leaseback" divested the 2016 Term Lenders of key collateral and stripped away their first-priority lien on the American Crew IP without their consent. (Complaint ¶ 233). Defendants contest whether Plaintiffs' consent was required. Plaintiffs contend that the "American Crew IP Sale-Leaseback" was an Event of Default under the 2016 Credit Agreement. (Complaint ¶ 241). Section 8.1 of the 2016 Credit Agreement provides that it is an Event of Default "[i]f any of the following events shall occur and be continuing . . . : The Borrower or any Subsidiary Guarantor shall default in the observance or performance of any agreement contained in . . . Section 7." (*Id*.). According to the Complaint, the "American Crew IP Sale-Leaseback" was an entirely circular sale-leaseback transaction with no legitimate business purpose, and with the illegitimate purpose of stripping the 2016 Term Loan Facility lenders' lien on the American Crew IP so that the American Crew IP could instead be pledged to Ares as part of the 2019 Transaction. (Complaint ¶ 243). Further, according to the Complaint, the American Crew IP Sale-Leaseback was designed to deprive 2016 Term Lenders of the protection of the first-priority liens that they specifically bargained for, and upon which they relied in 2016 in extending credit to RCPC. (Complaint ¶ 244).

9

### D. The 2020 Transaction

#### 1. The 2020 Amendment

On March 9, 2020, Revlon, Inc. entered into a commitment letter with Jefferies Finance LLC to effectuate a transaction that would strip the 2016 Term Lenders of their liens on some of the most important collateral securing their loans, by transferring this collateral to a new set of subsidiaries so it could be repledged to secure additional debt issued under a new separate term credit agreement. (Complaint ¶¶ 246-47).

To effectuate the transaction, Revlon needed the 2016 Lenders' approval of amendments to the 2016 Credit Agreement (the "2020 Amendment"). (Complaint ¶ 248). Without amending the 2016 Credit Agreement (including to authorize the release of the BrandCo IP liens thereunder) it would have been impossible for RCPC to raise new debt facilities because RCPC needed the BrandCo IP to serve as collateral on the new facilities. (*Id.*) The 2020 Amendment provided that: (i) the consenting Lenders would consent to the new debt facilities; (ii) the consenting Lenders would authorize and direct Citibank (which was the 2016 lenders' agent) to release its liens on the BrandCo IP under the 2016 Credit Agreement; and (iii) the consenting Lenders would waive any past or future Default or Event of Default under the 2016 Credit Agreement, including those that arise out of the 2020 Transaction. (Complaint ¶¶ 249-50). The basic terms of the 2020 Transaction required—at a minimum—the consent of "Required Lenders" defined in the 2016 Credit Agreement as "holders of more than 50% of . . . the sum of (i) the aggregate unpaid principal amount of the Term Loans then outstanding, (ii) the Revolving Commitments then in effect, if any . . . ." (Complaint ¶ 251). Because there were no Revolving Commitments when the 2020 Amendment was announced, as of the time of its announcement the 2020 Amendment required—

at a minimum—the consent of holders of more than 50% of the aggregate unpaid principal amount of the 2016 Term Loans then outstanding. (*Id.*).

Revlon, facing the prospect of insolvency, hoped that it would be able to secure lender support for the 2020 Amendment and new debt facilities by providing benefits to a subset of the 2016 Term Lenders—termed by the Complaint the "Conspiring Lenders"[10]—and effectively elevating those lenders over the other 2016 Term Lenders. (Complaint ¶ 253). The Complaint alleges that Revlon saw an opportunity to raise debt by persuading its existing creditors to engage in a hostile and unlawful restructuring of its capital structure. (*Id.*).

Many of Revlon's creditors under the 2016 Term Loan Agreement, however, were unwilling to participate in Revlon's restructuring of its capital structure. (Complaint ¶ 255). The "Conspiring Lenders" that were prepared to support the Amendment ultimately held less than half of the aggregate unpaid principal amount of Term Loans then outstanding. (*Id.*). A group that the Complaint terms the "Co-Op Lenders"—who constituted more than 50% of the 2016 Term Lenders and who did not want the collateral securing their loans to be stripped away—expressly opposed the amendment and committed to vote against it in a formal cooperation agreement. (Complaint ¶ 256). Because the Co-Op Lenders constituted the Required Lenders under the 2016 Credit Agreement, their opposition was sufficient to block an amendment. (*Id.*).

### 2. The Sham Revolver

Upon realizing that RCPC would be unable to amend the 2016 Credit Agreement because of opposition from the Co-Op Lenders who held majority voting power, RCPC and the Conspiring Lenders engineered a transaction to generate what the Complaint terms a "sham" revolving

---

[10] The Complaint defines the "Conspiring Lenders" as Defendants Angelo, Gordon & Co. L.P., Deutsche Bank AG Cayman Islands Branch, Glendon Capital Management, L.P., King Street Capital Management, L.P. and Oak Hill Advisors, L.P. (Complaint ¶ 214).

commitment to be provided by certain "Conspiring Lenders" (the "Sham Revolver") that would never be drawn and that would come into existence solely to manufacture a majority that supported the 2020 Amendment—and then "disappear into thin air." (Complaint ¶ 257). On April 23, 2020, RCPC sent a notice to Citibank, as Administrative Agent, requesting Citibank to establish the Sham Revolver in the amount of $100 million. (Complaint ¶ 260). RCPC falsely claimed the Sham Revolver "will be used to increase liquidity to the Borrower and its Subsidiaries and for general corporate purposes." (*Id.*). RCPC requested that the "Sham Revolver" become effective on April 30, 2020 which was the deadline to vote on the 2020 Amendment. (Complaint ¶ 261). The 2020 Amendment that RCPC was then seeking to effectuate would eliminate the 2016 Revolving Facility in its entirety and terminate RCPC's access to any revolving loans under the 2016 Credit Agreement, such that the Sham Revolver was not even going to exist for any meaningful period of time. (*Id.*).

On April 25, 2020, in view of these events, the Co-Op Lenders "direct[ed] Citibank, N.A. to resign as Agent under the 2016 Credit Agreement." (Complaint ¶ 262). RCPC modified the 2020 Amendment permitting RCPC to draw $65 million under the "Sham Revolver," but then provided that just 10 to 15 business days later, $65 million could be drawn down under the new term loan facility for the exclusive purpose of repaying the Conspiring Lenders' loans outstanding under the Sham Revolver. (Complaint ¶ 264). The Sham Revolver served no legitimate business purpose. (Complaint ¶ 265). It was substantially more expensive than alternative financing, including the new term loan to be created under the 2020 Amendment. (*Id.*). Removing any doubt regarding the true purpose of the Sham Revolver, RCPC issued the exact amount of revolving commitments necessary to turn an estimated 51.5% majority opposing the transaction into an estimated 49.9% minority. (*Id.*). The Complaint asserts that the issuance of the Sham Revolver

12

and the Conspiring Lenders' votes pursuant thereto were invalid for the independent reason that the 2016 Credit Agreement prohibited RCPC from issuing the Sham Revolver while an Event of Default exists.  (Complaint ¶ 266).

In the meantime, on April 29, 2020—prior to the date the Sham Revolver was to become effective—counsel for the Co-Op Lenders sent Citibank, as the Administrative Agent of the 2016 Credit Agreement, a Notice of Event of Default pursuant to Section 9.5 of the 2016 Credit Agreement.  (Complaint ¶ 268).  Plaintiffs contend that, under Section 2.25 of the Credit Agreement, an asserted Event of Default prevented the Sham Revolver from becoming effective, and the Conspiring Lenders could not have had the votes to adopt the 2020 Amendment. (Complaint ¶ 269).  On April 29, 2020, Citibank nevertheless posted a memorandum stating that the deadline for Lenders to vote to consent to the 2020 Amendment was 5:00 p.m. on May 1, 2020. (Complaint ¶ 271).  On April 30, 2020, the Co-Op Lenders again alerted Citibank that, in light of the asserted Event of Default, Citibank could not allow the issuance of the Sham Revolver and that doing so would constitute a further Event of Default.  (Complaint ¶ 272).  On the same date, Citibank executed and delivered a Joinder Agreement and other documentation purporting to establish the Sham Revolver in the amount of $65 million, of which RCPC drew $63.5 million. (*Id*.).

Citibank tabulated the votes consenting to the 2020 Amendment.  (Complaint ¶ 274).  The Conspiring Lenders, who were holders of less than 50% of the aggregate unpaid principal amount of the 2016 Term Loan Facility, consented to the 2020 Amendment.  (*Id*.).  The 2020 Amendment did not have the consent of either the Majority Term Loan Facility Lenders or the Required Lenders (the latter, because the improperly established Sham Revolver could not have been permissibly included in the vote count).  (*Id*.).  Nonetheless, Citibank included the Sham Revolver in its

13

calculations and Defendants claimed without any valid basis that the 2020 Amendment had sufficient votes. (*Id.*).

The 2020 Amendment enriched the Conspiring Lenders who were holders of the Sham Revolver. (Complaint ¶ 285). In particular, the 2020 Amendment gave rise to a "roll up" transaction whereby cash from the new loan facilities that would be issued pursuant to the 2020 Transaction would be used to repurchase the 2016 Term Loans of only the Conspiring Lenders, including those who held Sham Revolver interests. (*Id.*). This "roll up" transaction breached provisions of the 2016 Credit Agreement that prevent RCPC and its affiliates from repurchasing Term Loans in a manner that disproportionally favored certain Term Lenders over others. (Complaint ¶ 286). As a result of the 2020 Amendment, accordingly, the lenders who participated in the Sham Revolver enjoyed the immediate repurchase of their 2016 Term Loans as a result of the amendments whereas the 2016 Term Lenders who did not participate in the 2020 Transaction did not receive any such payment. (Complaint ¶ 289). Further, the 2020 Amendment gave the Conspiring Lenders—including those who held Sham Revolver interests—the right to cause the borrower to make additional repurchases of their 2016 Term Loans but afforded no such rights to the 2016 Term Lenders who did not participate in the 2020 Transaction. (Complaint ¶ 290). And, the reordering of priorities and provision of benefits by the 2020 Amendment affected 2016 Term Lenders only—it had no adverse effect on the holders of the Sham Revolver commitments, all of whom were Conspiring Lenders. (*Id.*).

### 3. The Purported Default Waiver

The 2020 Amendment also proposed to "waive[] any Default or Event of Default that would otherwise result from the BrandCo Loan Parties entering into the BrandCo Loan Documents, and completing the transactions contemplated thereby (including, without limitation,

any Specified Borrower Repurchases), on the Amendment Effective Date, and any other Default or Event of Default that may exist or may have existed prior to the Amendment Effective Date." (Complaint ¶ 292).  Were it effective, the Purported Waiver would waive all existing Events of Default—including those arising out of the 2019 Transaction and the issuance of the Sham Revolver—in what Plaintiffs characterize as an attempted pre-emptive self-pardon of RCPC's unlawful conduct.  (*Id.*)  The Purported Waiver, however, allegedly is not effective, because, like the 2020 Amendment's economic terms, the Purported Waiver adversely affected the 2016 Term Lenders relative to the Sham Revolver holders and therefore required the consent of the Majority Facility Lenders, which was not obtained.  (Complaint ¶ 293).

The Complaint further alleges that, upon effectuating the 2020 Amendment against the will of the majority of 2016 Term Lenders, Defendants relied on the terms of the 2020 Amendment to cause RCPC to complete the remaining components of the 2020 Transaction.  On May 7, 2020, in reliance on Section 1(C)(i)-(ii) of the 2020 Amendment, Citibank (which is not a defendant) "purported to improperly release the liens held for the benefit of the 2016 Term Lenders on the BrandCo IP."  (Complaint ¶ 300).  With those liens now released, RCPC essentially replicated the American Crew IP Sale-Leaseback on a much larger scale and with respect to the BrandCo IP. (Complaint ¶ 301).  RCPC (i) contributed the BrandCo IP into the BrandCo Entities; and (ii) RCPC then leased back the BrandCo IP to provide for its continued use by RCPC and its subsidiaries (the "2020 BrandCo IP Sale-Leaseback").  (*Id.*).  As a result, the 2020 BrandCo IP Sale-Leaseback violated the prohibition against such transactions set forth in Section 7.10 of the 2016 Credit Agreement.  (*Id.*). In other words, exactly like the 2019 Transaction, the 2020 Transaction is predicated on what Plaintiffs characterize as the misappropriation of collateral pledged to the lenders under the 2016 Term Loan Facility.  (*Id.*).

On or around May 7, 2020, RCPC, the BrandCo Lenders[11] (which included the Conspiring Lenders) and "Jefferies" entered into a new credit agreement (the "2020 BrandCo Credit Agreement"). (Complaint ¶ 302). The 2020 BrandCo Credit Agreement gave rise to three new facilities (the 2020 Facilities), pursuant to which the BrandCo Entities granted liens to Jefferies (as Administrative Agent under the 2020 BrandCo Credit Agreement) on the BrandCo IP—the very same assets that Plaintiffs contend had been invalidly stripped as collateral from the 2016 Term Loan Facility. (*Id.*).

Citibank and Jefferies Finance LLC entered into the Pari Passu Intercreditor Agreement as one last component to the 2020 Transaction. (Complaint ¶ 309). The 2020 Pari Passu Intercreditor Agreement purports to severely limit the 2016 Term Lenders' ability to enforce their rights or give effect to their security. (*Id.*).

The 2020 BrandCo Credit Agreement provided for two relevant "Conditions Precedent to Closing": first, "No event of default or contravention under the 2016 Term Facility . . . ," and second, "The effectiveness of the 2016 Term Loan Amendments." (Complaint ¶ 311). According to the Complaint, neither condition precedent was satisfied, rendering the 2020 BrandCo Credit Agreement ineffective because: (i) there were defaults or contraventions under the 2016 Term Loan Facility when the 2020 BrandCo Credit Agreement was executed; and (ii) "the 2016 Term Loan Amendments"—*i.e.*, the 2020 Amendment—was invalid. (Complaint ¶ 312). Specifically, the 2020 Amendment was invalid because it was not adopted with sufficient consents. (Complaint ¶ 314). As a result, the "2016 Term Loan Amendments," as contemplated by the BrandCo Credit Agreement, never were effective and that condition precedent for the effectiveness of the 2020

---

[11] The Complaint defines "BrandCo Lenders" as the Conspiring Lenders, Defendants ASOF Holdings II, L.P., Cyrus Capital Partners, L.P., Nut Tree Capital Management, L.P., and 140 Summer Partners Master Fund, L.P. (Complaint ¶ 215).

BrandCo Credit Agreement never was satisfied. (*Id.*). The 2020 Transaction destroyed the value of the 2016 Term Loans. (Complaint ¶¶ 315–18).

On June 19, 2020, the Co-Op Lenders appointed UMB Bank, National Association ("UMB Bank") as Successor Agent. (Complaint ¶ 322).

### 4. The UMB Complaint

On August 12, 2020, at Plaintiffs' direction, UMB Bank sued Revlon and other defendants in the United States District Court for the Southern District of New York asserting that the 2019 and BrandCo Transactions breached the 2016 Credit Agreement. *UMB Bank, Nat'l Ass'n v. Revlon, Inc., et al.*, No. 1:20-cv-06352 (S.D.N.Y.), ECF No. 1 (the "UMB Complaint"). The UMB Complaint is substantially identical to the Complaint here except that it asserted claims for fraudulent transfer, which Plaintiffs' Complaint here omits. Through UMB, Plaintiffs alleged that the 2019 and BrandCo Transactions breached the 2016 Credit Agreement, and included claims for breach of the same provisions of the 2016 Credit Agreement that Plaintiffs allege here. UMB sought equitable relief including rescission of the 2020 Amendment and the 2020 Pari Passu Intercreditor Agreement; a declaration that the 2016 loans were validly accelerated; and "[v]oiding" the transfer of IP to the BrandCos, the "transfer" of liens in the BrandCo collateral; and "all obligations arising under any of the facilities provided in the 2020 BrandCo Credit Agreement." (Mitchell Declaration, Ex. W at 116). UMB also sought an award of "damages in an amount to be proven at trial to compensate the [Objecting] Lenders for the loss of the liens on collateral securing payment of their loans under the 2016 Credit Agreement." (*Id.*).

On November 9, 2020, before it had served defendants or any substantive motions had been filed, Plaintiffs directed UMB to dismiss the UMB Complaint without prejudice. (Debtors'

MTD ¶ 29).  A Notice of Voluntary Dismissal was filed the same day.  (*UMB Bank,* No. 1:20-cv-06352, ECF No. 18).

### E.   The Complaint

On October 31, 2022, Plaintiffs filed the Complaint, which demands relief including, among other things, the invalidation of the "Sham Revolver," the 2020 Amendment, and the transactions undertaken pursuant thereto.  (Complaint ¶ 332).  Overall, the Complaint asserts seventeen Causes of Action against all or several of the Defendants, under state common law, federal law, and the Bankruptcy Code, as follows:

### 1.   Declaratory Judgment Claims (28 U.S.C. §§ 2201-2202)

| COA | Defendants | Summary of Contentions and Relief Requested |
|---|---|---|
| **I**<br><br>¶¶ 341–48 | RCPC<br>BrandCo Lenders<br>Jefferies<br>BrandCo Entities | RCPC and the Conspiring Lenders failed to obtain the consent of the Required Lenders to adopt the 2020 Amendment under § 10.1 of the 2016 Credit Agreement.  Accordingly, the 2020 Amendment and the transactions undertaken pursuant to it were void *ab initio*.  **Relief requested:**  Plaintiffs are entitled to a declaratory judgment so stating. |
| **VII**<br><br>¶¶ 399–406 | RCPC<br>BrandCo Lenders | RCPC and the Conspiring Lenders breached §§ 7.10, 2.25, 10.1(a)(C) and the § 10.1 Proviso of the 2016 Credit Agreement. **Relief requested:**  Plaintiffs are entitled to a declaration that RCPC's breaches constituted an Event of Default under § 8.1 and that the Notices of Default delivered to Citibank and UMB Bank were proper under § 9.5. |
| **XIV**<br><br>¶¶ 447–57 | Debtors<br>BrandCo Lenders<br>Jefferies | The 2020 BrandCo Credit Agreement provides for the payment of an "Applicable Premium" or "make-whole" (the "BrandCo Make-Whole") to the lenders under various circumstances, including an Event of Default triggered by the filing of a bankruptcy petition.  The BrandCo Make-Whole claim is:  (i) a disallowed claim for unmatured interest under 11 U.S.C. § 502(b)(2); and/or (ii) an unenforceable penalty.  ***Relief requested:***  Plaintiffs are entitled to a declaratory judgment that the BrandCo Make-Whole is disallowed in its entirety. |
| **XV**<br><br>¶¶ 458–63 | Debtors<br>BrandCo Lenders<br>Jefferies | Certain provisions of the 2020 Pari Passu Intercreditor Agreement purport to restrict Plaintiffs' ability to enforce their rights or give effect to their security.  **Relief requested:**  Plaintiffs are entitled to a declaratory judgment that such provisions are unenforceable as violative of public policy. |

| COA | Defendants | Summary of Contentions and Relief Requested |
|---|---|---|
| **XVI**<br><br>¶¶ 464–69 | Debtors<br>BrandCo Lenders<br>Jefferies | If the 2020 BrandCo Credit Agreement and related security documents are valid, then the value of the collateral securing the obligations is less than the aggregate amount owed to the BrandCo Lenders. ***Relief requested:*** Any related claim against the Debtors should be treated as one aggregate claim under the 2020 Facilities because the BrandCo Lenders were granted one lien against RCPC. Alternatively, Plaintiffs are entitled to a declaratory judgment that obligations under the 2020 Facilities give rise to a single undersecured claim which is not entitled to postpetition interest. |
| **XVII**<br><br>¶¶ 470–79 | Debtors<br>BrandCo Lenders | The adequate protection payments to be made to the BrandCo Lenders under the 2020 BrandCo Credit Agreement violate §§ 2.1 and 2.5 of the 2020 Pari Passu Intercreditor Agreement. ***Relief requested:*** If the BrandCo Credit Agreement is enforceable, Plaintiffs are entitled to a declaratory judgment that any adequate protection payments made to the BrandCo Lenders violate the 2020 Pari Passu Intercreditor Agreement and must be credited against the Intercompany DIP Obligations in accordance with the terms of the Final DIP Order. |

### 2. Breach of Contract Claims

| COA | Defendants | Summary of Contention(s) |
|---|---|---|
| **II**<br><br>¶¶ 349–57 | RCPC | RCPC breached § 7.10 of the 2016 Credit Agreement when it assigned and transferred all of its rights, title, and interests in the American Crew IP to BrandCo and then entered into a license and royalty agreement with BrandCo to provide for RCPC's continued use of the American Crew IP during the term of the 2019 Term Loan Facility. ***Relief requested:*** Plaintiffs are entitled to specific performance of the 2016 Credit Agreement and the 2016 Guarantee and Collateral Agreement and rescission of the American Crew IP Sale-Leaseback. |

| COA | Defendants | Summary of Contention(s) |
|---|---|---|
| **III**<br><br>¶¶ 358–69 | RCPC | RCPC breached § 2.25 of the 2016 Credit Agreement because an Event of Default existed when RCPC issued and drew upon the Sham Revolver. ***Relief requested:*** Plaintiffs are entitled to specific performance of the 2016 Credit Agreement and the 2016 Guarantee and Collateral Agreement and rescission of the 2020 Amendment and the transactions undertaken pursuant thereto. |
| **IV**<br><br>¶¶ 370–79 | RCPC<br>Conspiring<br>Lenders | RCPC and the Conspiring Lenders exercised their discretion, if such existed, in bad faith by issuing and exploiting the Sham Revolver, which destroyed Plaintiffs' rights to receive the fruits of their bargain in violation of the implied covenant of good faith and fair dealing. ***Relief requested:*** Plaintiffs are entitled to specific performance of the 2016 Credit Agreement and the 2016 Guarantee and Collateral Agreement and rescission of the 2020 Amendment and the transactions undertaken pursuant thereto, or compensatory damages. |
| **V**<br><br>¶¶ 380–88 | RCPC | RCPC breached § 7.10 of the 2016 Credit Agreement when it assigned and transferred all of its rights, title, and interests in the BrandCo IP to the BrandCo Subsidiaries and then entered into a license and royalty agreement with the BrandCo Subsidiaries to provide for RCPC's continued use of the BrandCo IP during the term of the 2020 BrandCo Credit Agreement. ***Relief requested:*** Plaintiffs are entitled to specific performance of the 2016 Credit Agreement and the 2016 Guarantee and Collateral Agreement, rescission of the BrandCo IP Sale-Leaseback, and rescission of the Intercompany DIP Facility. |
| **VI**<br><br>¶¶ 389–98 | RCPC<br>Conspiring<br>Lenders | RCPC and the Conspiring Lenders breached § 10.1 of the 2016 Credit Agreement by implementing the 2020 Amendment without obtaining the consent of the majority of the 2016 Term Lenders. ***Relief requested:*** Plaintiffs are entitled to specific performance of the 2016 Credit Agreement and the 2016 Guarantee and Collateral Agreement, rescission of the 2020 Amendment and the transactions undertaken pursuant thereto, or compensatory damages. |

### 3. Equitable Claims

| COA | Defendants | Summary of Contention(s) |
|---|---|---|
| **VIII**<br><br>(Conversion)<br><br>¶¶ 407–13 | RCPC<br>BrandCo Lenders | In May 2020, RCPC entered into a series of integrated transactions, including the 2020 BrandCo IP Sale-Leaseback, the 2020 Amendment, and the 2020 Pari Passu Intercreditor Agreement which had the effect of divesting the Co-Op Lenders of their property interests in the BrandCo IP – RCPC's conversion of the Co-Op Lenders' valuable collateral. ***Relief requested:*** Plaintiffs are entitled to an order directing that the BrandCo IP be returned to RCPC, that BrandCo Lenders' liens be released and Plaintiffs' liens be restored, or compensatory damages. |
| **IX**<br><br>(Aiding and Abetting Conversion)<br><br>¶¶ 414–22 | Jefferies<br>BrandCo Entities<br>BrandCo Lenders | Jefferies, the BrandCo Entities, and the Conspiring Lenders aided and abetted RCPC's conversion of the Co-Op Lenders' collateral by participating in the 2020 BrandCo IP Sale-Leaseback and the 2020 Amendment. ***Relief requested:*** Plaintiffs are entitled to an order directing that the BrandCo IP be returned to RCPC, that BrandCo Lenders' liens be released and Plaintiffs' liens be restored, or compensatory damages. |
| **X**<br><br>(Unjust Enrichment)<br><br>¶¶ 423–27 | RCPC<br>Jefferies<br>BrandCo Entities<br>BrandCo Lenders | In April and May 2020, Jefferies, the BrandCo Entities, and the Conspiring Lenders executed a series of integrated transactions, including the 2020 BrandCo IP Sale-Leaseback, the issuance of the Sham Revolver, the 2020 Amendment, and the 2020 Pari Passu Intercreditor Agreement in which they unjustly took Plaintiffs' first-priority lien on the BrandCo Collateral. ***Relief requested:*** Plaintiffs are entitled to an order directing that the BrandCo IP be returned to RCPC, that BrandCo Lenders' liens be released and Plaintiffs' liens be restored, or compensatory damages. |
| **XI**<br><br>(Equitable Subordination)<br><br>¶¶ 428–33 | BrandCo Lenders | The BrandCo Lenders' and Conspiring Lenders' misconduct in connection with the Sham Revolver, the 2020 Amendment, the 2020 BrandCo IP Sale-Leaseback and the 2020 Pari Passu Intercreditor Agreement devastated Plaintiffs' economic position and rendered the 2016 Term Loan Facility subordinate to the 2020 Facilities with respect to the BrandCo IP. The BrandCo Lenders stand to receive a windfall recovery in Debtors' bankruptcy cases. ***Relief requested:*** All claims, payments, or benefits sought by the BrandCo Lenders should be subordinated for distribution purposes pursuant to §§ 510(c) and 105(a) of the Bankruptcy Code to the allowed claims of Plaintiffs. |

| COA | Defendants | Summary of Contention(s) |
|---|---|---|
| **XII**<br><br>(Tortious Interference with Contract)<br><br>¶¶ 434–40 | Jefferies<br>BrandCo Entities<br>Ares<br>BrandCo Lenders | Jefferies, the BrandCo Entities, Ares and the BrandCo Lenders caused RCPC to breach the 2016 Credit Agreement and therefore tortiously interfered with that contract to Plaintiffs' detriment. ***Relief requested:*** Plaintiffs are entitled to an order directing that the BrandCo IP be returned to RCPC and that BrandCo Lenders' liens be released, or compensatory damages. |
| **XIII**<br><br>(Constructive Trust)<br><br>¶¶ 441–46 | BrandCo Entities<br>BrandCo Lenders<br>Jefferies<br>RCPC | RCPC promised to give the 2016 Term Lenders a first-priority lien on the BrandCo IP. The 2016 Term Lenders took action in reliance on RCPC's promise. The BrandCo Entities and the BrandCo Lenders would be unjustly enriched if the BrandCo Entities were allowed to retain the BrandCo IP and the BrandCo Lenders retained their first-priority liens imposed thereon. The BrandCo Entities presently hold the BrandCo IP, and Jefferies holds any first-priority liens thereon, in constructive trust for the 2016 Term Lenders. ***Relief requested:*** The BrandCo Entities should be required to deliver the BrandCo IP to RCPC, and the BrandCo Lenders and Jefferies should be required to deliver their first-priority liens on the BrandCo IP to Plaintiffs. |

## F. Motions to Dismiss

The Motions are filed, respectively, on behalf of Debtors, the Jefferies Defendants, and the BrandCo Lenders, and seek relief under Rules 12(b)(1) (raised only by Jefferies) and 12(b)(6). As noted, this Decision resolves the Debtor Defendants' motion and does not resolve the separate motions of the BrandCo Lenders and the Jefferies Defendants, which will be decided separately. This Decision nevertheless briefly describes all three Motions.

Collectively, the Movants argue that Plaintiffs lack standing to pursue their equitable relief claims because such claims are derivative of claims that belong exclusively to Debtors' estates and therefore must be dismissed. Debtors argue that "Plaintiffs are bystanders to their Equitable Relief Claims: rather than seek direct relief for themselves, they demand, on behalf of the non-BrandCo Debtors, return of the BrandCo IP to the non-BrandCo Debtors and an order voiding the non-BrandCo Debtors' obligations under the BrandCo Transaction documents." (Debtors' MTD ¶ 33).

The Movants argue that, by definition and as discussed below, claims to recover assets and augment the bankruptcy estate are derivative. And that, the Movants argue, is just what Plaintiffs' equitable relief claims seek – "avoidance of obligations and liens and rescission of transfers – as a fraudulent transfer claim, which can be brought *only* by a debtor."

While not disputing that a bankruptcy trustee has exclusive standing to bring claims on behalf of the estate such that "derivative" claims by others are barred, Plaintiffs claim that Defendants "have it all wrong." (Opposition at 98). Specifically, they observe, "[a]lthough a bankruptcy trustee has exclusive standing to bring 'claims founded, *inter alia*, on the rights of the debtor and on certain rights of the debtor's creditors'" (*id.* (quoting *St. Paul Fire & Mar. Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 700 (2d Cir. 1989)), "a trustee has no standing to 'enforce entitlements of a creditor'" (*id.* (quoting *In re Bernard L. Madoff Inv. Sec. LLC*, 740 F.3d 81, 88 (2d Cir. 2014)). "'Only [a] creditor can enforce' a 'direct—not derivative—claim against [a] third party.'" (*Id.* at 98–99 (quoting *In re Madoff*, 740 F.3d at 88)). Plaintiffs argue that they are asserting direct, not derivative, claims based on their individual entitlements, such that only Plaintiffs, not the estate, have standing. (*Id.* at 99).

For reasons explained below, the Court concludes that Plaintiffs' claims for equitable relief are derivative of claims that belong to Debtors' estates, and that Plaintiffs therefore lack standing to bring the claims for equitable relief that they assert in this adversary proceeding. The Court therefore grants the Debtor Defendants' Motion.

## DISCUSSION

### A. LEGAL STANDARDS

#### 1. Rule 12(b)(6)

"A Rule 12(b)(6) motion tests the sufficiency of the allegations in support of a complaint in light of the pleading requirements in Rule 8 of the Federal Rules of Civil Procedure." *In re*

*Extended Stay, Inc.*, Case No. 09-13764, 2020 WL 10762310, at *5 (Bankr. S.D.N.Y. Aug. 8, 2020). To survive a Rule 12(b)(6) motion, a plaintiff must show that the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (hereinafter, "*Iqbal*"). The court accepts the complaint's factual allegations as true and must draw all reasonable inferences in the plaintiff's favor. *Iqbal*, 556 U.S. at 678; *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 679. Thus, "[a] pleading that offers labels and conclusions or a formulaic recitation of a cause of action will not do." *Id*. at 678 (quoting *Twombly*, 550 U.S. at 555).

"[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id*. at 679. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id*. (quoting Fed. R. Civ. Proc. 8(a)(2)). "To be plausible, the complaint need not show a probability of plaintiff's success, but it must evidence more than a mere possibility of a right to relief." *Nakahata v. New York-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 197 (2d Cir. 2013) (first citing *Iqbal*, 556 U.S. at 678 and then citing *Twombly*, 550 U.S. at 556).

On a motion to dismiss pursuant to Rule 12(b)(6), "courts must consider the complaint in its entirety as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and

matters of which a court may take judicial notice." *Tellabs, Inc.*, 551 U.S. at 322. A complaint is "deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam)).

Defendants filed numerous documents in support of their respective motions. *See supra* notes 5 and 7. Some of those documents are mentioned, cited, or relied on by the Plaintiffs in their Complaint. Others are docketed in the Revlon Chapter 11 cases. Plaintiffs did not attach any documents to their Complaint but did submit several documents in support of their opposition to the Motions. *See supra* note 8.

### B. Plaintiffs' Claims Against Debtors Are Dismissed for Lack of Standing

Plaintiffs' Equitable Relief Claims against Debtor Defendants, without exception, turn on allegations that through the 2019 Ares Transaction and the 2020 BrandCo Transaction, Defendants improperly manipulated Revlon's capital structure and stripped hundreds of millions of dollars of collateral that secured Plaintiffs' interests under the 2016 Credit Agreement. Plaintiffs' Equitable Relief Claims seek to rescind, or to the greatest extent possible, reverse these Transactions so as to restore Plaintiffs' first-priority lien status on that collateral or subordinate the BrandCo Lenders' rights to Plaintiffs'.[12] In fact, Plaintiffs' counsel acknowledged during oral argument that "[t]he

---

[12] *See* Complaint's first cause of action ("COA"), which seeks a declaratory judgment against all defendants that the 2019 transaction was null and void for any purpose under the 2016 agreement and that the 2020 agreement is "void *ab initio*"; 2d COA (against debtor RCPC, seeking specific performance and rescission of 2019 transaction as alleged breaches of 2016 agreement); 3d COA (against debtor RCPC, seeking specific performance of 2016 agreement and rescission of the 2020 agreement and related transactions due to alleged breach of 2016 agreement); 4th COA (against debtor RCPC and alleged conspiring lenders, seeking specific performance and rescission of 2020 agreement based on alleged breach of implied covenant of good faith and fair dealing); 5th COA (against Debtor RCPC, seeking specific performance and rescission of BrandCo IP asserted sale-leaseback as well as rescission of intercompany DIP facility); 6th COA (against RCPC and lenders, seeking specific performance and rescission of the 2020 agreement); 7th COA (against RCPC and BrandCo Lenders, seeking declaration that RCPC breached 2016 agreement and thereby created an Event of Default that in turn renders subsequent financing invalid); 8th COA (against debtor RCPC and BrandCo

only possible remedy that we can get from the Debtors is an equitable remedy which is to have our liens restored," [Tr. 47:25–48:2], and "the proper remedy is to give us our security back." [Tr. 57:12–13].

"When, as here, a company files for bankruptcy, the automatic-stay provision of the Bankruptcy Code, 11 U.S.C. § 362, operates to prevent certain creditors from 'pursu[ing] their own remedies against the debtor's property.'" *In re Tronox Inc.*, 855 F.3d 84, 99 (2d Cir. 2017) (alteration in original) (quoting *St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.* ("*St. Paul*"), 884 F.2d 688, 701 (2d Cir. 1989)). Section 541 of the Bankruptcy Code defines what constitutes property of the estate, which "is comprised of . . . property" including "all legal or equitable interests of the debtor in property as of the commencement of the case[,]" and "[a]ny interest in property that the trustee recovers under section 329(b), 363(n), 543, 550, 553, or 723 of this title." 11 U.S.C. §§ 541(a)(1) and (3).[13] In turn, § 550(a) provides that, with exceptions not relevant here, "to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property. . . ." 11 U.S.C. § 550(a). Most relevant here, § 547 provides for the trustee's avoidance of preferences, and § 548 provides for the trustee's avoidance of fraudulent transfers.

---

Lenders, seeking order directing return of BrandCo IP to RCPC, release of BrandCo Lenders' liens, and "restor[ation]" of Plaintiffs' liens on BrandCo IP). The 9th COA seeks injunctive relief and in rem damages against the Jefferies and BrandCo defendants, seeking return of BrandCo IP to RCPC, a release of BrandCo Lender Liens, and purported restoration of Plaintiffs' liens). The 10th COA is against Debtor and non-debtor defendants and similar demands a return of BrandCo IP to RCPC and other relief aimed at defeating RCPC's liens and "restoring" Plaintiffs'. The 11th COA seeks equitable subordination of the BrandCo Lenders' liens to those of Plaintiffs. The 12th COA requests an order directing the return of BrandCo IP to debtor RCPC and other substantive lien relief. The 13th COA demands the imposition of a constructive trust that among other things would result in the return of BrandCo IP to debtor RCPC. The 14th COA seeks a declaratory judgment disallowing relief for the BrandCo Lenders. Finally, the 15th–17th COAs all involve Debtors and other parties, and all seek declaratory judgments attacking aspects of the 2020 agreement.

[13] "In Chapter 11 cases where no trustee is appointed, § 1107(a) provides that the debtor-in-possession, *i.e.*, the debtor's management, enjoys the powers that would otherwise vest in the bankruptcy trustee. Along with those powers, of course, comes the trustee's fiduciary duty to maximize the value of the bankruptcy estate." *Off. Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003).

The automatic stay and the statutory vesting of the trustee with authority to pursue recoveries for the estate from, among other things, preferences and fraudulent transfers, "protect all creditors by making the trustee the proper person to assert claims against the debtor." *Tronox*, 855 F.3d at 99 (quoting *St. Paul*, 884 F.2d at 701). Further, "[t]his reasoning extends to common claims against the debtor's alter ego or others who have misused the debtor's property in some fashion." *Id.* (quoting *St. Paul*, 884 F.2d at 701). Thus, "[w]hile bankruptcy courts generally have limited authority to release a non-debtor's independent claims, so-called 'derivative claims'—i.e., claims 'based on rights 'derivative' of, or 'derived' from, the debtor's'—typically constitute 'property of the estate.'" *Id.* (quoting *In re Madoff*, 740 F.3d at 88).

The Court takes judicial notice that, in the main bankruptcy case, the Official Committee of Unsecured Creditors (the "UCC") took steps to preserve its possible standing to assert claims on behalf of the estate arising from the BrandCo Transaction and any other arrangement that gave rise to the BrandCo Lenders' assertedly valid security interests as against estate property. Early in the bankruptcy, the Debtors proposed and the Court agreed that the BrandCo Lenders could serve as debtor-in-possession lenders to the estate, and that their pre-petition debt could be "roll[ed] up" into their debtor-in-possession debt facility. (Main Case, ECF No. 330 at 27–34). As a condition of this approval, and recognizing that affected parties were entitled to a procedural opportunity to attack the validity of the BrandCo Lenders' security interests which justified the roll-up approval and which have enormous impact on the entitlements of all parties in interest in the bankruptcy case, the Court allowed any party wishing to challenge the liens held by the BrandCo Lenders to file a motion seeking standing to pursue such claims on or before October 31, 2022. (*Id.* at 89–97).

As Debtors emphasize and as the Plaintiffs here acknowledge, the Plaintiffs did not file such a motion, instead contending that their injuries are direct and opting to pursue separate litigation before this Court. The UCC, by contrast, secured extensions of time to move for standing to sue the BrandCo Lenders or others on behalf of the estate, and, after reportedly intensive investigation and negotiation, eventually entered into a proposed settlement agreement that, if approved by the Court after notice and an opportunity for objections, will resolve all estate claims against, among others, the BrandCo Lenders. (*See* Main Case, ECF No. 1254 at 50–57, Ex. A at 93–99).

The actual or potential claims resolved by agreement of the Debtors and the UCC (subject to Court approval) include all claims that were or could have been brought against the BrandCo Lenders by or for the benefit of the estate, including but not limited to actions for fraudulent transfer. (*See* Main Case, ECF No. 1254, Ex. A at 93-99). The adequacy of that consideration and all other aspects of the settlement remain subject to this Court's review as part of a required eventual approval hearing, either jointly with Debtors' plan of reorganization, or otherwise.

These realities make clear that, like in *Tronox* and *In re Madoff*, Plaintiffs impermissibly are "pursu[ing] their own remedies against the debtor's property." *Tronox Inc.*, 855 F.3d at 99 (alteration in original) (quoting *St. Paul*, 855 F.3d at 701). Plaintiffs' Complaint makes substantially similar or identical factual allegations as did the complaint in the hastily withdrawn pre-bankruptcy UMB lawsuit. The UMB action explicitly asserted fraudulent transfer claims that would have benefitted Plaintiffs, but the Plaintiffs' Complaint in this action omits any such overt claims, which Plaintiffs acknowledge are part of the property of the estate. (Opposition at 111 ( "[a]n estate *can* settle avoidance claims it owns")).

Attempting to steer clear of asserting claims that indisputably belong to the estate, Plaintiffs instead articulate other theories for relief arising from the same facts and same asserted injuries, which they urge is permissible here even though much of their Complaint is aimed at equitable relief to substantively rescind or reset the consequences of the 2020 BrandCo Transaction. As Plaintiffs emphasize, "when creditors . . . have a claim for injury that is particularized as to them, they are exclusively entitled to pursue that claim, and the bankruptcy trustee is precluded from doing so." *Tronox*, 855 F.3d at 99 (quoting *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1093 (2d Cir. 1995)).

Despite their insistence that they seek to remedy an injury that is particularized to them, examination of the Complaint reveals that Plaintiffs are mounting an attack on the key underpinnings of Debtors' current capital structure and possible estate entitlements, an effort that in substance replicates the fraudulent transfer and potential similar estate claims that the UCC and the estate have investigated and provisionally settled, all hinging especially on the 2020 BrandCo Transaction. Plaintiffs' claims for equitable relief thus entirely overlap with claims and proposed forms of relief that either were, or could have been, sought by the UCC or any other authorized estate representative regarding fraudulent transfers, preferences, or other voidable transactions by which the BrandCo Lenders acquired their interests in estate property. Again, every single one of the Complaint's equitable claims against the Debtor and other Defendants seeks to invalidate, void, set aside, or override aspects of the 2020 BrandCo Transaction, as could indisputably have been done through the UCC's investigation and negotiations if legally and factually supportable. This specifically includes Plaintiffs' demand for a Court-compelled unwinding of pre-bankruptcy transactions and the reordering, creation, or elimination of security interests tied to those transactions and their collateral—all characteristic estate entitlements to unwind a fraudulent

transfer. Further, the BrandCo Lenders' liens securing their loans to Debtors cannot be subordinated or invalidated without fundamentally changing Debtors' rights and obligations under their most important financing arrangements, and, for reasons described above flowing from the automatic stay and its bar on non-bankruptcy-forum pursuit of claims against property of the estate, Debtors and other authorized estate representatives have exclusive authority to seek relief from those arrangements.

Plaintiffs try but fail to circumvent this bar. Plaintiffs emphasize that they do not rely on legal theories such as avoidance of preferences or fraudulent transfers that the Bankruptcy Code expressly reserves for the trustee or bankruptcy estate. Plaintiffs instead rely on other theories for equitable relief from Debtors, and on theories such as alter ego, contract, and tort to seek monetary relief from two sets of non-debtors, the BrandCo Lenders and the Jefferies Defendants. Plaintiffs further emphasize the Second Circuit's statement in *St. Paul* that "the determination of whether a claim may be brought by a creditor of a bankrupt corporation outside of the bankruptcy proceedings depends on an analysis of state law," and that "[w]hether the rights belong to the debtor or the individual creditors is a question of state law." *St. Paul*, 884 F.2d at 700. And, citing *NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*, 118 A.3d 175 (Del. 2015), Plaintiffs argue that principles that apply in Delaware state-law non-bankruptcy cases establish that Plaintiffs' claims are uniquely their property, not the estate's, because Plaintiffs seek relief for injuries that they allege they uniquely suffered when their liens were "stripped" by the 2019 and 2020 transactions.

Plaintiffs' argument does not overcome the bankruptcy-specific considerations articulated in key cases including *Tronox* and *In re Madoff*. While Plaintiffs attempt to sidestep these considerations by insisting that Delaware state law controls based on isolated language they pluck from *St. Paul*, that case also explains, as set forth above, that the bar on creditors individually

asserting "derivative" claims in bankruptcy cases flows from the need to prevent individual

creditors from pursuing individual collection actions that would usurp or interfere with potential

recoveries or remedies that form part of the assets of the estate. Plaintiffs omit, for example, that

in the same paragraph they quote regarding the centrality of state law to the derivative claim

analysis, *St. Paul* also states that, "under the Bankruptcy Code, the bankruptcy trustee may bring

claims founded, *inter alia*, on the rights of the debtor and on certain rights of the debtor's creditors,

*see, e.g.*, 11 U.S.C. §§ 541, 544, 547 (1982 & Supp. V 1987)." *St. Paul*, 884 F.2d at 700. In *St.*

*Paul*, moreover, the allegations at issue did not overlap with potential fraudulent conveyance

claims conferred on the estate by the Bankruptcy Code itself, but rather were potential causes of

action by a debtor's guarantor against a non-debtor for, among other things, a non-debtor parent

company's alter ego liability and tort that allegedly caused a debtor entity to engage in measures

that led to insolvency, thus causing the plaintiff guarantor to incur liability on the subsidiary's

unpaid debts. The *St. Paul* court did not identify and deem irrelevant any overlap with estate

causes of action, whether for fraudulent transfer or otherwise. Thus, the statement in *St. Paul* that

"the answer to the question whether [the guarantor] PepsiCo's claims may be asserted by the

bankruptcy trustee depend[ed] on an analysis of state alter ego and tort law[,]" *id*. at 700, occurred

in service of a decision that did not view the Bankruptcy Code as a potentially applicable basis for

either the plaintiff's or the estate's relevant litigation entitlements.

   That holding did not, and does not, eliminate the reality that claims can also be derivative

if they would usurp estate rights and interests that are conferred by operation of the Bankruptcy

Code itself—such as the trustee's or, when appropriate, an official committee of unsecured

creditors' statutorily conferred entitlement to pursue any and all avoidance and fraudulent transfer

actions for the benefit of the estate. *See, e.g.*, 11 U.S.C. §§ 541, 544 and 547, recognized by *St.*

*Paul* itself to be among the trustee's powers.  As explained at length above, that is the situation

here.  As Chief Judge Glenn has observed, "a creditor's claim against a third party is not particular

simply because the trustee cannot bring the *exact claim* as the creditor" the "proper analysis . . .

involves a comparison between the harms that are subject of the creditors' claim and the harms

that are actionable via the trustee's claims."  *In re Port Morris Tile & Marble LP*, 645 B.R. 500,

515 (Bankr. S.D.N.Y. 2022).  It is for this reason that subsequent bankruptcy-specific decisions

emphasized by Debtors and barely grappled with by Plaintiffs apply with full force here.

Nor does Plaintiffs' strategic pleading choice not to overtly assert a fraudulent transfer

claim transform their in-substance-derivative claim into a non-derivative one.  Rather, Plaintiffs

are pursuing a strategy that Second Circuit case law repeatedly cautions against and instructs courts

not to endorse:  Plaintiffs here are simply "pleading around" causes of action that they would need

to concede are derivative or exclusively reserved for the trustee and the estate, while seeking

substantively identical relief.  As *Tronox* instructs, "labels are not conclusive since plaintiffs often

try, but are not permitted, to plead around a bankruptcy."  *Tronox*, 855 F.3d at 100 (citing *In re

Madoff*, 740 F.3d at 91–92).  Thus, creditors "lack standing to bring causes of action [that] are . . .

similar in object and purpose to claims that the trustee could bring in bankruptcy regardless of

whether such claims are technically part of the estate of the bankrupt."  *In re Hatu*, 19-05428-5,

2022 WL 1436051, at *10 (Bankr. E.D.N.C. May 5, 2022) (alteration in original) (internal

quotation marks omitted) (quoting *Poth v. Russey*, 99 Fed. App'x 446, 457 (4th Cir. 2004)); *Nat'l

Am. Ins. Co. v. Ruppert Landscaping Co.*, 187 F.3d 439, 441 (4th Cir. 1999) (claims derivative

where "similar in object and purpose to claims that the trustee could bring in bankruptcy court");

*Ritchie Cap. Mgmt., L.L.C. v. Gen. Elec. Cap. Corp.*, 121 F. Supp. 3d 321, 336–37 (S.D.N.Y.

2015), *aff'd*, 821 F.3d 349 (2d Cir. 2016) (claims of aiding and abetting fraud and civil conspiracy

were derivative where they "overwhelmingly overlap[ped]" with trustee's fraudulent transfer claims). Like in *In re Madoff*, Plaintiffs' claims here "echo" those available to (and pursued and resolved through settlement by) the Trustee, and were based on the same underlying facts. 740 F.3d at 91. One specific application of this concept is that it makes no difference that the required elements of Plaintiffs' claims may not be identical to all those required of fraudulent transfer claims. *See Ritchie Cap. Mgmt.*, 121 F. Supp. 3d at 336–37.

Also of no moment is Plaintiffs' insistence that their alleged injuries are uniquely felt by them because their liens were, in their view, improperly stripped by operation of the 2019 and 2020 transactions, which removed valuable intellectual property rights such as brand trademarks from the reach of Plaintiffs' liens, allegedly in violation of covenants that were part of the 2016 agreements by which Plaintiffs financed a major Revlon transaction in exchange for top-priority liens. This allegation does not make their claims non-derivative, even if it makes their injury large and painful. *Tronox*, particularly in discussing the Third Circuit's decision in *In re Emoral, Inc.*, 740 F.3d 875 (3d Cir. 2014), makes clear that a contention like Plaintiffs' cannot carry the day. Rather,

> [t]hat the plaintiffs in *Emoral* had an underlying harm specific to them did not put the claims automatically outside the estate. Indeed, every creditor in bankruptcy has an individual claim (set forth in a proof of claim) against the debtor, whether it be in tort . . . , contract, or otherwise. But often there are claims against third parties that wrongfully deplete the debtor's assets. Individual creditors may wish to bring claims against those third parties to seek compensation for harms done to them by the debtor and secondary harms done to them by the third parties in wrongfully diverting assets of the debtor that would be used to pay the claims of the individual creditor. The fact that an individual creditor may seek to do so does not make those secondary claims particular to the creditor, for it overlooks the obvious: Every creditor has a similar claim for the diversion of assets of the debtor's estate.

*Tronox*, 855 F.3d at 103.

33

This discussion fully applies to Plaintiffs' claims here. Plaintiffs claim that the BrandCo Transaction in 2020 wrongly took valuable intellectual property out of the reach of their liens to their detriment, allegedly as a result of wrongful conduct by Debtors and self-enriching conduct by the non-debtor Defendants. But the reality is inescapable that this transaction was of general interest to the estate and that the entitlement to seek to unwind the transaction belongs to the estate: Debtors' property interests and capital structure are inseparable from the challenged transactions. And, now, the BrandCo Lenders are the DIP lenders to this estate, they hold a senior secured and superpriority position thanks to their agreement to provide post-petition financing which in turn was premised on the entitlements they held by virtue of the 2020 transaction, and, as noted, the Court approved these arrangements over the objections of the UCC and others who opposed various terms of the DIP financing provided by the BrandCo Lenders, subject to the UCC's or any other party's entitlement to seek standing to pursue relief from those transactions and arrangements on the estate's behalf. Since then, however, as contemplated by the DIP Order, the UCC has investigated whether to seek standing and assert claims against the BrandCo Lenders, and has negotiated a proposed settlement that is a cornerstone of Debtors' proposed plan of reorganization. Plaintiffs themselves could have, but did not, seek a grant of statutory standing to pursue whatever estate remedies they thought appropriate and legally supportable.

The Court is not unsympathetic with Plaintiffs' observation that they stand to recover vastly less than they might if they had retained their first-priority liens against the BrandCo IP. But all impaired creditors are in an unfortunate spot, and Plaintiffs have not been deprived of meaningful opportunities to vindicate their rights. They could have, but never did, seek to enjoin the 2019 Ares Transaction when it occurred. (They point to Citibank's role as agent at that time, but they do not point to anything beyond a demand they communicated to Citibank to show that they

attempted to protect their interests.)  Further, when asked at oral argument, even after Debtors'
counsel expressly represented that Plaintiffs did not seek to enjoin or bar the 2020 BrandCo
Transaction before it closed, (Tr. 206:3–17), Plaintiffs' counsel did not dispute that Plaintiffs did
not seek to enjoin the 2020 BrandCo Transaction before it closed.  Then, although the UMB
litigation was commenced months after the 2020 BrandCo Transaction closed, that lawsuit was
promptly dropped, albeit after a mistaken Citibank repayment of the 2016 debt – even though
many of the repaid 2016 lenders promptly returned the mistaken payment to Citibank while all
others knew they eventually might need to, so litigation may have remained possible.

Next, during the bankruptcy, as this Decision repeatedly observes, Plaintiffs did not apply
by the applicable deadline of October 31, 2022 for standing to pursue estate recoveries on account
of the 2020 BrandCo Transaction or any other concerning pre-petition matter.  By contrast, the
UCC investigated the same transactions to assess whether the BrandCo Lenders' entitlements were
valid, and the UCC sought and obtained extensions of time to file a standing motion while it
continued the investigation that ultimately resulted in the UCC's and estate's proposed settlement
with the BrandCo Lenders.  And finally, if the Plaintiffs remain dissatisfied with the result of the
UCC's efforts to secure relief from the BrandCo Lenders or the UCC's failure to secure recoveries
from the Jefferies Defendants in connection with the 2020 BrandCo Transaction, they remain able
to object to the proposed settlement and plan, and to seek allowance of a claim in a higher amount
or more advantageous classification.

All of this recitation of procedural opportunities not taken serves to counter some of the
Plaintiffs' protestations that they are helpless victims of pre-petition misconduct coupled with
procedural injustice during the course of the bankruptcy.  They are understandably aggrieved
creditors who may receive a significantly discounted distribution.  But their plight, while worse in

35

degree than that of many other Revlon creditors, is not materially different in kind.  They all are creditors of the estate with a shared interest in maximization of the estate's value and the resulting distributions.  They also have an individualized interest in maximizing the amount and seniority of their claim, but that can be addressed within the bankruptcy case itself.

What Plaintiffs are not entitled to do is to usurp the trustee's exclusive role, augmented by the UCC where appropriate, to seek to recover and protect the estate's property, to avoid impermissible pre-bankruptcy transactions, and to administer the estate including by appropriately settling disputes that affect the estate's rights.  These are core estate functions.  The injuries Plaintiffs assert all flow from the 2019 and especially the 2020 transactions, which have come to lie at the heart of this bankruptcy case, and Plaintiffs' equitable claims therefore are derivative of injuries sustained by, and asset-recovery and obligation-minimizing rights held by, the estate.  Indeed, to hold otherwise would "produce near anarchy" by replacing the Bankruptcy Code's orderly system of defining estate rights and obligations and ordering distributions with a "first-come-first-served" litigation free-for-all.  *In re MortgageAmerica Corp.*, 714 F.2d 1266, 1275–76 (5th Cir. 1983).  The law neither requires nor countenances that result.

Finally, on a point not central to the Court's reasoning but responsive to Plaintiffs' state-law contentions, Plaintiffs overstate the strength of their claims under Delaware state law jurisprudence.  While *NAF* includes language that is favorable to Plaintiffs, more recent Delaware decisions suggest that the gap between Delaware law in the non-bankruptcy context and bankruptcy derivative-claim analysis is not so stark, and, so, Plaintiffs would not necessarily prevail even if bankruptcy-specific jurisprudence did not control.  *See, e.g.*, *Brookfield Asset Mgmt., Inc. v. Rosson*, 261 A.3d 1251, 1263 (Del. 2021) (to bring a direct claim, a plaintiff must show that it "suffered an injury that is not dependent on an injury to the corporation" and that it

"can prevail without showing an injury to the corporation") (quoting *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1036 (Del. 2004)).  As discussed above, all of Plaintiffs' claims and theories turn on allegations of allegedly impermissible transactions by Revlon entities that alienated and encumbered Revlon property, all seek the "undoing" of those transactions or other measures to replicate as closely as possible the pre-transaction state of affairs, and all equitable remedies proposed by Plaintiffs entail making estate property subject to liens that benefit Plaintiffs while subordinating or invalidating liens of others.  The ultimate remedies sought by Plaintiffs, if granted, thus necessarily would involve some combination of restoring property to the estate and securing financial recoveries from counterparties to transactions with the estate, most or all of which could also be sought by the estate itself as either "the property transferred" or "the value of such property."  11 U.S.C. § 550(a).  It is hard to see how such claims are not "derivative" as a matter of Delaware law under *Brookfield* alone.

Plaintiffs therefore lack standing to assert their claims for equitable relief.  The Court, accordingly, grants Debtors Defendants' Motion to dismiss the Complaint as against them, and all of the Complaint's claims for equitable relief, for lack of standing.

### C. The Court Does Not Reach the Alternative Bases Asserted By Debtors and Others for Dismissal of Claims for Equitable Relief

Both Debtors and the BrandCo Defendants identify numerous grounds in addition to standing doctrine to dismiss the Complaint's claims for equitable relief.  These include, among others, that those claims are unavailable as a matter of law due to the availability of monetary relief; that Plaintiffs are not entitled to set aside a contract to which they were not a party; that Plaintiffs failed to seek to enjoin or set aside the transactions to which they object without undue delay; and that the equitable relief sought would by "impracticable" at this late date – *i.e.*, that the

"egg" that was "scrambled" through the 2019 and 2020 transactions and the many events that have ensued since in reliance on those transactions cannot now be "unscrambled."

The Court finds most, if not all, of these arguments to be strong. It is difficult to conceive of a viable or permissible way to rescind or unwind the 2019 and 2020 Transactions, on which it is obvious to the Court multitudes of market participants have long depended as they engaged in subsequent transactions, arrangements, and financial calculations. *Cf. In re Motors Liquidation Co.*, 777 F.3d 100, 105 (2d Cir. 2015) (rejecting availability of relief that entailed "undoing" a release of liens, even where the release was concededly mistaken).

The Court nevertheless declines at this time to base its dismissal of Plaintiffs' claims for equitable relief on these grounds. Case law frequently instructs that these sorts of objections at least ordinarily are not a proper basis for a dismissal under Rule 12(b)(6), and instead are best considered in the light of facts that the parties can adduce as a case goes forward. *See, e.g.*, *Friar v. Wyndham Vacation Resorts, Inc.*, No. 20-CV-2627, 2021 WL 1062615, at *4 (S.D.N.Y. Mar. 19, 2021) (request for dismissal of equitable claims due to plaintiff's undue delay); *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 898 (2d Cir. 1976) (request to dismiss equitable claims that are impracticable); *Rekor Sys., Inc. v. Loughlin*, No. 19-CV-7767, 2020 WL 6898271, at *4–6 (S.D.N.Y. Nov. 23, 2020) (request to dismiss untimely and impracticable equitable claims on additional theory that monetary claims are an available alternative). This Decision does not and need not go so far as to reject application of these doctrines in the circumstances here, and, if the future course of the litigation warrants, any or all Defendants may raise them again. The Court need say or do no more at present, however, in view of this Decision's dismissal of all claims for equitable relief on standing grounds.

## CONCLUSION

For the reasons stated above, Debtor Defendants' Motion to dismiss all claims against them and all of the Complaint's claims for equitable relief is GRANTED.  The parties are directed to file letters not to exceed three pages on or before February 15, 2023, concerning whether the standing grounds on which this Decision is based apply to the remaining causes of action as against the non-debtor Defendants.  One or more joint letters will be acceptable.  Any party that requires additional time is to file an extension request by February 15.  Plaintiffs also are to submit a proposed order on notice to effectuation this Decision.


Dated:  New York, New York
        February 14, 2023

                                    _____*s/ David S. Jones*_____
                                    HONORABLE DAVID S. JONES
                                    UNITED STATES BANKRUPTCY JUDGE